**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| CITY OF SUNRISE GENERAL EMPLOYEES' RETIREMENT PLAN, on behalf of itself and all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>FLEETCOR TECHNOLOGIES, INC., RONALD F. CLARKE, and ERIC R. DEY,<br><br>          Defendants. | Civ. A. No. 1:17-cv-_____<br><br><u>COMPLAINT - CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

Plaintiff City of Sunrise General Employees' Retirement Plan ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by FleetCor Technologies, Inc. ("FleetCor" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning FleetCor; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This federal securities class action is brought on behalf of all those that purchased FleetCor securities during the time period of February 5, 2016 to May 2, 2017, inclusive (the "Class Period").   The claims asserted herein are alleged against FleetCor and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Headquartered in Norcross, Georgia, FleetCor is a fuel-card company that offers its products and services to small businesses as well as government and

corporate clients.  A fuel card is essentially a credit card used most commonly for the purchase of gasoline and diesel fuel at gas stations.  FleetCor provides these fuel cards purportedly to allow fleet operators to save money when card users purchase gas.  During the Class Period, FleetCor also partnered with many well-known fleet operators, oil companies, and petroleum marketers, such as Chevron/Texaco—the Company's largest partner in the U.S.—to develop and implement branded fuel card programs.  According to investment firm Citron Research, while card issuers on average earn 10% of their net revenue from charging fees to customers, FleetCor generates 56% of its net revenue from such fee income.

3.     Throughout the Class Period, FleetCor misled investors with regard to the sources of and reasons for its earnings and growth, attributing the Company's success to factors such as investments in the Company's sales infrastructure, the conversion of new customers, and the performance of acquired companies, among other things.  FleetCor also falsely stated that it clearly discloses its fees to customers and that its business is focused on helping employers control spending and save money.

4.     These statements were materially false and misleading.  In truth, the Company's ostensible success was based on its fraudulent overcharging of

customers, dissemination of misleading marketing materials, and reliance on predatory sales practices.  In addition, FleetCor's fees were not clearly disclosed in its contracts and, contrary to its representations to investors and customers, FleetCor's illicit business practices did not help fleet operators control spending or save money.

5.    Investors began to learn the truth regarding FleetCor's improper practices through a series of corrective disclosures.  On December 19, 2016, Chevron—FleetCor's largest U.S. partner—announced that it terminated its relationship with the Company and signed a long-term contract with FleetCor's primary competitor.  On this news, the price of FleetCor stock declined from $148.04 per share on December 16, 2016 to $142.96 per share on December 19, 2016, or approximately 3%.

6.    On March 1, 2017, investigative news and legal analysis company Capitol Forum published an article describing how FleetCor's business model relies on overcharging customers and padding fee income through late fees even when customers pay on time.  Capitol Forum's analysis, as discussed more fully below, relied on interviews with numerous former FleetCor employees as well as current and former FleetCor customers.  The publication of Capitol Forum's March

1 article caused the price of Company's stock to decline from $170.00 per share on February 28, 2017 to $164.75 per share on March 1, 2017, or approximately 3%.

7.     On April 4, 2017, Citron issued a report that similarly accused FleetCor of being a "predatory company by design, whose core strategy is to methodically rip off its customers, using business practices and fees that are designed to deceive."  Like Capitol Forum's article, Citron's publication relied on interviews with FleetCor customers, competitors and former employees.  On this news, the price of the Company's stock declined from $150.15 per share on April 3, 2017 to $141.60 per share on April 4, 2017, or approximately 6%.

8.     On April 27, 2017, Citron issued a follow-up report that explained how FleetCor developed a scheme to categorize its customers based on the level of improper fees the Company could charge without the customers complaining, among other things.  This disclosure caused the price of the Company's stock to decline from $151.38 per share on April 26, 2017 to $145.65 per share on April 27, 2017, or 4%.

9.     On May 1, 2017, Chevron sued FleetCor in Texas State court for breach of contract.  The filing of Chevron's complaint, which was not widely reported, caused the price of the Company's stock to decline from $148.18 per share on May 1, 2017 to $138.00 per share on May 2, 2017, or approximately 7%.

Then, on May 3, 2017, Citron reported on the filing of Chevron's lawsuit. According to Citron, Chevron's suit indicates that its termination of the FleetCor contract was due the Company's mistreatment of customers.  On this news, the price of the Company's stock dropped from $138.00 per share on May 2, 2017 to $131.26 per share on May 3, 2017, or roughly 5%.

## JURISDICTION AND VENUE

10.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  FleetCor maintains its corporate headquarters in Norcross, Georgia, which is situated in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff City of Sunrise General Employees' Retirement Plan ("Plaintiff"), based in Florida, is a public pension fund that provides retirement benefits to public workers (other than police officers and firefighters) within the city of Sunrise, Florida.   As of September 30, 2016, Plaintiff managed approximately $176 million in assets on behalf of approximately 1,100 participants.  Plaintiff purchased shares of FleetCor stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13.     Defendant FleetCor is a global provider of workforce payments products.  The Company's primary products include fuel card payments product solutions, corporate payments products, toll products, lodging cards and gift cards. Incorporated in Delaware, the Company maintains its corporate headquarters at 5445 Triangle Parkway, Suite 400, Norcross, Georgia 30092-2575.  FleetCor stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "FLT."  As of April 24, 2017, FleetCor had over 92 million shares of stock outstanding, owned by hundreds or thousands of investors.

14.     Defendant Ronald F. Clarke ("Clarke") is, and was at all relevant times, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of FleetCor.

15.     Defendant Eric R. Dey ("Dey") is, and was at all relevant times, Chief Financial Officer ("CFO") of FleetCor.

16.     Defendants Clarke and Dey are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with FleetCor, possessed the power and authority to control the contents of FleetCor's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   Each of the Individual Defendants was provided with copies of the Company's reports, press releases, and other information alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

17.     FleetCor presents itself as a fuel-card company that services small businesses, as well as government and corporate clients.  A fuel card is essentially a credit card used most commonly for the purchase of gasoline and diesel fuel at gas stations.

18.     FleetCor provides these fuel cards to different businesses to purportedly allow them to increase savings at gas stations, limit expenses, control spending, and minimize unauthorized transactions and billing through the receipt of real-time transaction information.   In addition to small businesses and government clients, the Company's partners also include many large corporate clients including Chevron/Texaco—the Company's largest partner in the U.S—MasterCard, Shell, BP, Speedway, and ARCO.

19.     According to Citron, while a range of card issuers on average earn 10% of their net revenue from fees, FleetCor generates 56% of its net revenue from fees.  Indeed, FleetCor's primary competitor, WEX, Inc., generates just 12% of its net revenue from fees.  Synchrony Financial, which serves a lower credit quality customer than FleetCor and facilitates purchases of discretionary items—thus warranting increased fees—earns roughly 18% of its net revenue from fees.  And Visa earns just 3% of its net revenue from fees.

20.     According to a report issued by Credit Suisse, roughly 55% of the fees FleetCor charges are "transaction fees," which include out of network charges, minimum use charges, and credit-based fees tied to credit score.  The Company also provides programs that are initially free, but then begin to incur fees after a promotional period expires.  The Company derives the remaining 45% of its fees from "late/financing fees," which include penalties that equate to a percentage of the outstanding balance assessed every billing cycle (around 10%) and an interest component comparable to credit card rates in the mid-20% range.

## FLEETCOR DEFRAUDS INVESTORS

21.     The Class Period starts on February 5, 2016, the first trading day after FleetCor reported earnings results for the Company's fourth quarter and fiscal year of 2015.  FleetCor announced those results after the market closed on February 4, 2016.

22.     Specifically, on February 4, 2016, FleetCor announced that it generated $431 million in revenue for the fourth quarter of 2015—an increase of 14% over the prior year.  For the fiscal year of 2015, the Company reported $1.7 billion in total revenue, a 42% increase over the prior year.  On FleetCor's earnings conference call for the fourth quarter and fiscal year of 2015 held on February 4, CEO Clarke stated that the Company's results were driven by strong organic

growth, including 43% growth in FleetCor's MasterCard business, strength in several other FleetCor business areas, and the conversion of many new customers.

23.     CFO Dey similarly stated on the February 4 earnings conference call that the Company's results in the fourth quarter were driven by "increases in both transactions and revenue per transaction measured on a constant fuel price basis," organic growth, as well as the "exceptional performance of our MasterCard product, which had estimated revenue growth of approximately 43% over the fourth quarter of 2014 . . . driven by increases in both transactions and revenue per transaction."

24.     When explaining the reasons for the growth in FleetCor's MasterCard business, CEO Clarke stated that while "we did put some fees in [] the clients are enjoying a much lower absolute bill from us.  I think we continue to say . . . it's not opportunity limited.  It's really investment and execution limited."

25.     The statements and omissions set forth in ¶¶22-24 were materially false and misleading.  In truth, FleetCor's reported results were predicated in substantial part on the improper overcharging and misleading of its customers. FleetCor developed an algorithm that classified customers into a color-based scheme depending on the amount of unwarranted fees that FleetCor could charge each customer.  FleetCor's customers were not enjoying a lower absolute bill from

FleetCor as those bills were inflated with extra fees, and the Company's opportunity for growth was limited in that it was contingent on FleetCor's continued mistreatment of customers.

26.     On February 29, 2016, FleetCor filed its Annual Report for 2015 on Form 10-K with the SEC.  Defendant Clarke signed the Annual Report in his capacity as CEO and Chairman of FleetCor's Board of Directors.  Defendant Dey also signed the Annual Report in his capacity as the Company's CFO.

27.     In the 2015 Annual Report, Defendants attributed FleetCor's "leading industry position" to the Company's "size and scale, geographic reach, advanced technology and our expansive suite of products."  Defendants also represented in the 2015 Annual Report that FleetCor retains customers by means of the Company's professional and dedicated call centers that "adher[e] to industry standard service levels" as well as "regular customer surveys to ensure customers are satisfied with our products and services."

28.     The statements and omissions set forth in ¶27 were materially false and misleading.  In truth, the Company's ostensible success was based on its fraudulent billing practices, dissemination of misleading marketing materials, and reliance on predatory sales tactics.  The Company did not adhere to industry

standards with regard to customer service, and the Company's practices severely undermined customer satisfaction.

29.    On May 4, 2016, FleetCor held its earnings conference call for the Company's fourth quarter of 2016.  For the quarter, FleetCor generated revenue of $414 million, in-line with what the Company reported over the prior year.  On the earnings conference call, CEO Clarke told investors that the Company had not yet "maxed out" in terms of what it is able to charge its customers.  Specifically, Defendant Clarke stated that "there is always more.  It is just a decision of, like we say how—where to push and how to push?  I'd say we are pretty comfortable where we are, but I would say there is always more opportunity" to increase fees.

30.    The statements and omissions set forth in ¶29 were materially false and misleading.  In truth, the Company's opportunities to increase fees were limited in that they were premised on FleetCor's ability to continue assessing unwarranted or hidden charges, and misleading customers with regard to the level of fees they would be charged.

31.    On August 4, 2016, the Company held its earnings conference call for its second quarter of 2016.  For the quarter, the Company generated revenue of $418 million, an increase of 3% compared to the $405 million that FleetCor generated over the prior year.  On the conference call, CEO Clarke stated that the

Company's results were driven by an improving macroeconomic environment, strong new bookings—growing 18% over the prior year—as well as new business development efforts and organic growth.

32.    According to CFO Dey, FleetCor's performance for the second quarter of 2016 was driven by strong organic growth in the Company's North American segment and 27% revenue growth in FleetCor's MasterCard business. CEO Clarke attributed the growth in FleetCor's MasterCard business, and the Company's business generally, to "sales investment."  With regard to the success of FleetCor's MasterCard product, CEO Clarke stated, "there's a product for everybody, little accounts with five cars like it because it is convenient.  Giant accounts because it works everywhere, and it is controlled. . . . [Y]ou can sell it in every geography, to every segment, and so I guess we like the prospects of double-digit, for as long as we can see, assuming we can keep investing enough in sales, as the base keeps getting bigger."

33.    The statements and omissions set forth in ¶¶31-32 were materially false and misleading.  In truth, FleetCor's results and growth were driven by the assessment of improper fees to numerous customers and misleading customers with regard to the level of fees they would be charged, as opposed to sales investment.  Upon learning of FleetCor's illicit billing and marketing practices,

many of its customers complained and terminated their relationships with the Company.  This includes Chevron, one of FleetCor's most important partners, as discussed below.

34.    On November 1, 2016, FleetCor held its earnings conference call for the third quarter of 2016.  For the quarter, the Company announced that it generated revenue of $484 million, an increase of 7% compared to the $451 million that FleetCor earned over the prior year.  On the conference call, CEO Clarke stated that the Company's results were driven by three factors—"[o]rganic revenue growth, [an] acquisition, and tax favorability."  According to Defendant Clarke, the Company experienced "some really good sales performance . . . a number of our businesses grew sales in excess of 50% in the quarter."  CEO Clarke also told investors that the Company's MasterCard division performed exceptionally well, growing 28% over the prior year.

35.    CFO Dey similarly stated that for the Company's North American segment, "most of our lines of business performed well resulting in approximately 9% organic growth. . . . Many of the positive drivers in North America during the quarter were similar to the last several quarters including our MasterCard product which had revenue growth of approximately 28% over the third quarter of 2015."

36.     The statements and omissions set forth in ¶¶34-35 were materially false and misleading.   In truth, the Company's performance was driven by FleetCor's imposition of excessive fees on customers that were either unaware of the charges or paid the charges rather than dispute them with the Company.   The dissemination of misleading marketing materials that understated the level of fees that customers would be charged also drove FleetCor's performance.

37.     In addition, the Company stated on its website throughout the Class Period that its business is focused on "help[ing] employers control spending and save money," and that FleetCor clients "[p]ay no fees–no set-up fees, transaction fees, card fees or annual fees."

38.     The statements and omissions set forth in ¶37 were materially false and misleading.  In truth, FleetCor's business model was not focused on helping its clients control spending or save money, but rather, was directed to assess the maximum amount of unauthorized fees without customers noticing.   The Company's customers paid substantial fees to FleetCor and the "no-fee" statements in the Company's marketing materials were not based in fact.

## DISCLOSURES OF COMPANY'S MISCONDUCT CAUSE SIGNIFICANT INVESTOR LOSSES

39. On December 19, 2016, Chevron—FleetCor's largest U.S. customer—announced that it terminated its relationship with the Company and signed a long-term contract with WEX. On this news, the price of FleetCor stock declined from $148.04 per share on December 16, 2016 to $142.96 per share on December 19, 2016, or approximately 3%.

40. On February 8, 2017, FleetCor held its earnings conference call for the fourth quarter of 2016. On the call, the Company reported revenue of $515 million, an increase of 20% over the prior year. According to CEO Clarke, FleetCor benefitted in the fourth quarter of 2016 from healthy sales growth across the Company's entire portfolio, as well as increased new sales bookings as compared to the prior quarter. CEO Clarke also represented that the Company "advanced a number of new things that should accelerate our performance going forward," including adding more management and technological depth, testing a number of new product ideas, and simplifying FleetCor's technological footprint.

41. Similarly, CFO Dey told investors that the Company's strong performance in North America was driven by factors "similar to the last several quarters, including our MasterCard product, which had revenue growth of

approximately 16% over the fourth-quarter of 2015," and that FleetCor's organic growth rate will continue to increase.

42.     With regard to the Chevron contract, CEO Clarke simply stated that the Company was "disappointed with Chevron that they've decided to move on after 10 years with us.  But we will help them transition to their new supplier." CEO Clarke also stated that "we continue to believe there's still lots of opportunity in front of us.  And we believe we can double FleetCor again."

43.     The statements and omissions set forth in ¶¶40-42 were materially false and misleading.  In truth, the Company's success was based in significant part on its fraudulent overcharging of customers, dissemination of misleading marketing materials, and reliance on abusive sales practices.   FleetCor also concealed that Chevron terminated its relationship with the Company because of similar misconduct.

44.     On March 1, 2017, Capitol Forum—an investigative news and legal analysis company—published an article titled "FleetCor: Sales and Billing Practices Raise Questions Regarding the Legitimacy of FleetCor's Fee-Based Income."  Based on interviews with "seven former FleetCor employees as well as nine current and former FleetCor customers" and the review of "complaints filed with state and federal regulators, online complaints, and filings from various

litigation proceedings," Capitol Forum described how FleetCor routinely imposes a "myriad of unwarranted fees on customers and that such fees are generally only removed in instances where customers are both persistent and vocal in raising objections."

45.    Indeed, according to Capitol Forum's March 1 report, FleetCor's business model "relies in large part on customers being unaware that they are being overcharged. . . . and achieve[s] this objective by: (1) understating or misrepresenting the fees associated with its products at the point of sale; (2) waiving fees during the first three months of card use when customers are most likely to scrutinize their bills; and (3) burying the fees at the end of lengthy transaction reports utilizing a host of vague descriptors."  In fact, the Company's sales representatives were trained to describe FleetCor's cards as a "free service" and to use the "absence of fees [] as a selling point to differentiate FleetCor from its competitors."

46.    Further, according to Capitol Forum's March 1 article, FleetCor further supplements its fee revenue with late fees through the use of a bill payment system that makes it "extremely difficult, if not impossible, for customers to make timely payments."  And even if "customers pay on time, they are still assessed late fees."

47.    According to one former employee interviewed by Capitol Forum, "[o]ne customer paid by sending a check overnight by FedEx to make sure it got there way before the due date . . . [A]ccounting always cashed the check the day after it was due."

48.    In response to Capitol Forum's article, FleetCor attempted to assure investors on March 1 that "[a]ll fees are disclosed clearly in our contracts" and that "General Contract Terms and Conditions are provided with the customer welcome package before the customer is able to fuel."   Notwithstanding the Company's assurances, the price of Company's stock declined from $170.00 per share on February 28, 2017 to $164.75 per share on March 1, 2017, or approximately 3%.

49.    On April 4, 2017, an investment firm, Citron Research, published a report that similarly accused FleetCor of being a "predatory company by design, whose core strategy is to methodically rip off its customers, using business practices and fees that are designed to deceive."   Like Capitol Forum's article, Citron's publication relied on extensive research from "numerous customer, competitor and former employee interviews . . . gathering of customer invoices . . . FOIA requests, and financial modeling," among other things.

50.    Significantly, Citron's April 4 report specifically attributed Chevron's shift from FleetCor to WEX to the Company's "aggressive and egregious"

business practices, and that "Chevron could not afford to associate its corporate name with such a pernicious institutional 'rip off' of their long-time customers." Citron's report also summarized a number of recent customer complaints, including one that stated that "[t]his company is not a fuel charge card, but rather a FEES charge card.  They will eat you ALIVE in fees.  My experience has been that it is impossible to pay the bill to them (on time) without getting a $75.00 late fee. After doing some research, I have found many, many, many, many people with the exact same complaint(s). . . . This is border-line criminal."  In response to the Citron report, the price of the Company's stock declined from $150.15 per share on April 3, 2017 to $141.60 per share on April 4, 2017, or approximately 6%.

51.     On April 27, 2017, Citron issued a follow-up report on FleetCor that described, among other things, how FleetCor "developed a deep learning algorithm to intentionally cheat its customers with 'junk' fees."  Specifically, Citron explained how FleetCor fits its customers "into a profile/classification based on how many fees can be extracted without complaints.  FleetCor classifies 'Red,' 'Yellow' and 'Green' customers based on its internal algorithmic analysis of how vulnerable the customers are to this type of gouging without detecting it or complaining."

52.     Citron also described in its April 27 report how the Company is in full "cover-up mode" after Capitol Forum's and Citron's publications, having removed the "no-fee" language from FleetCor's website that markets to government agencies.  According to Citron, the marketing change "could be the sign of either: Impending Government Probe of their Fees[;] Attorney General Investigations[; or] FTC Inquiry/Investigation into deceptive marketing."  As Citron stated, "[t]he question to ask yourself is: If FleetCor is willing to deceive its ***own government agency customers***, imagine what they are willing to do to mom and pop customers. . . Federal and state attorneys general will be laser-focused on the computer system operating at FleetCor, which proactively discriminates against their own customers."  (emphasis in original).

53.     Expanding on Citron's research in an interview with *Benzinga*, an online financial media outlet, Citron's founder, Andrew Left, stated on April 27 that "[i]n my opinion, through the interviews, through that analysis that this is something completely contrived by management.  This isn't by chance, this isn't just a few rogue employees jimmyjacking the system.  This is a company that said we found ways to do this to circumvent the system with fine print and in their mind still be legal and compliant.  They keep pushing the envelope to the point where it's not compliant anymore, and that's what I believe."  In the wake of Citron's and

Capitol Forum's reporting, FleetCor hired a law firm to review the Company's fee practices.  The disclosure of Citron's follow-up report caused the price of the Company's stock to decline from $151.38 per share on April 26, 2017 to $145.65 per share on April 27, 2017, or 4%.

54.    On May 1, 2017, Chevron sued FleetCor in Texas State court for breach of contract.  According to Chevron's complaint, FleetCor is wrongfully denying Chevron access to Chevron's fuel card portfolio, including "basic revenue and expense data," which is necessary to transition the business to WEX.  The filing of Chevron's complaint, which was not widely reported, caused the price of the Company's stock to decline from $148.18 per share on May 1, 2017 to $138.00 per share on May 2, 2017, or approximately 7%.

55.    Then, on May 3, 2017, Citron and *Benzinga* reported on the filing of Chevron's lawsuit.  According to Citron, Chevron's suit indicates that Chevron terminated its contract with FleetCor due the Company's mistreatment of customers.  On this news, the price of the Company's stock dropped from $138.00 per share on May 2, 2017 to $131.26 per share on May 3, 2017, or roughly 5%.

## LOSS CAUSATION

56.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a

scheme to deceive the market.  This artificially inflated the price of FleetCor stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on December 19, 2016, March 1, 2017, April 4, 2017, April 27, 2017, May 2, 2017, and May 3, 2017, the price of FleetCor stock fell, as the prior artificial inflation came out of the price over time.  As a result of their purchases of FleetCor stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired FleetCor securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of FleetCor and their families and affiliates.

58.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 24, 2017, FleetCor had over 92 million shares of stock outstanding, owned by hundreds or thousands of investors.

59.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of FleetCor stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

60.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

61.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

62.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

63.    FleetCor's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

64.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of FleetCor who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts

made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

65.    At all relevant times, the market for FleetCor stock was an efficient market for the following reasons, among others:

(a)    FleetCor stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, FleetCor filed periodic public reports with the SEC and the New York Stock Exchange;

(c)    FleetCor regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    FleetCor was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for FleetCor stock promptly digested current information regarding FleetCor from all publicly available sources and reflected such information in the price of FleetCor stock.   Under these circumstances, all purchasers of FleetCor stock during the Class Period suffered similar injury through their purchase of FleetCor stock at artificially inflated prices and the presumption of reliance applies.

67.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding FleetCor's sales, marketing and billing practices—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of FleetCor's fuel card business and fee income derived therefrom, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

68.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FleetCor stock at artificially inflated prices.

70.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for FleetCor stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

72.     During the Class Period, Defendants made the statements specified above, which Defendants knew, or recklessly disregarded the likelihood that the statements were false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal FleetCor's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FleetCor stock. Plaintiff and the Class would not have purchased the Company's stock at the prices they paid, or at all, had they been aware that the market prices for FleetCor stock had been artificially inflated by Defendants' fraudulent course of conduct.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

76.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

77.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of FleetCor within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about FleetCor, the Individual Defendants had the power and ability to control the actions of FleetCor and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the
    Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class
    members against all Defendants, jointly and severally, for all damages
    sustained as a result of Defendants' wrongdoing, in an amount to be proven
    at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses
    incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may
    deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 14, 2017

/s/ H. Lamar Mixson

H. Lamar Mixson
Georgia Bar No. 514012
Amanda Seals Bersinger
Georgia Bar No. 502720
**BONDURANT MIXSON &
   ELMORE, LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Tel: (404) 881-4100
Fax: (404) 881-4111
mixson@bmelaw.com
bersinger@bmelaw.com

*Liaison Counsel for Plaintiff City of
Sunrise General Employees'
Retirement Plan*


Avi Josefson (*pro hac vice* forthcoming)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554 1400
Fax: (212) 554 1444
avi@blbglaw.com

*Counsel for Plaintiff City of Sunrise
General Employees' Retirement Plan*