## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CITY OF SUNRISE GENERAL EMPLOYEES' RETIREMENT PLAN, on behalf of itself and all others similarly situated,<br><br>                         Plaintiff,<br><br>             v.<br><br>FLEETCOR TECHNOLOGIES, INC., RONALD F. CLARKE, and ERIC R. DEY,<br><br>                         Defendants. | Civ. A. No. 1:17-cv-02207-LMM<br><br><u>COMPLAINT - CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**BONDURANT MIXSON & ELMORE, LLP**
H. Lamar Mixson
Georgia Bar No. 514012
Amanda Seals Bersinger
Georgia Bar No. 502720
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Telephone:  (404) 881-4100
Facsimile:  (404) 881-4111
Email:  mixson@bmelaw.com
Email:  bersinger@bmelaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Katherine M. Sinderson (admitted *pro hac vice*)
Julia K. Tebor (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
Email:  KatieM@blbglaw.com
Email:  Julia.Tebor@blbglaw.com

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ....................................................................2

II.    JURISDICTION AND VENUE ..................................................................8

III.   PARTIES ....................................................................................................8

IV.    SUMMARY OF THE ACTION..................................................................11

    A.    Overview of FleetCor And Its Relevant Businesses...........................11

    B.    FleetCor And The Executive Defendants Made Repeated False
       And Misleading Statements About The Reasons For The
       Company's Revenue Growth and Bookings Growth..........................14

    C.    Unbeknownst to Investors, FleetCor's "Sales and Marketing"
       Investments Actually Consisted of Predatory Sales Practices............16

        1.   FleetCor Imposed Onerous Fees On Its Customers In Order To
           Drive Revenue..........................................................................17

           a.    FleetCor Deliberately Prevented Its Customers From
               Paying Their Bills On Time In Order To Drive
               Revenue Through Usurious Late Fees ...........................17

           b.    FleetCor Charges A Fee To "High Risk" Customers.....24

           c.    FleetCor Imposed A Number Of Other Exorbitant
               Miscellaneous Fees Without Notice ...............................26

        2.   FleetCor's Vaunted Sales and Marketing Infrastructure Was
           Deliberately Set Up to Mislead Customers and Extract
           Enormous Fees..........................................................................31

        3.   As A Result Of Its Fraudulent Billing and Marketing Practices,
           Customers Criticized FleetCor Far More Than Its Peers..........37

        4.   The Predatory Marketing And Fraudulent Billing Practices

i

Were Orchestrated By FleetCor Executives, Including The Executive Defendants .................................................................40

**D.** FleetCor's Bookings Growth, Or New Business Growth, Was A Result Of Flipping Accounts .................................................45

**E.** Defendant Clarke Falsely Claimed That FleetCor Was Assisting Chevron's Transition To WEX ..........................................51

**F.** The Executive Defendants Took Advantage of FleetCor's Soaring Stock Price To Reap Millions in Insider Stock Sales............55

**G.** The Market Slowly Begins To Learn About FleetCor's Lending Practices ........................................................................59

    **1.** Chevron Terminates Its Relationship With FleetCor Due To Its Improper Fee Practices ...........................................59

    **2.** The March 1, 2017 Capitol Forum Report Revealing Some Of FleetCor's Predatory Practices.................................61

    **3.** The April 4, 2017 Citron Report that Disclosed Further Unsustainable Practices ..........................................63

    **4.** The April 27, 2017 Capitol Forum and Citron Reports Revealing The Results Of Additional Third Party Investigation Into FleetCor ...............................................................65

    **5.** The May 1, 2017 Filing Of The Chevron Action .....................69

**H.** Post Class Period Events ...................................................73

**V.** DEFENDANTS' FALSE STATEMENTS .................................................75

**A.** Defendants Misrepresented And Omitted Material Facts Concerning The Company's "Sales and Marketing" .........................76

**B.** Defendants Made Numerous False Statements Regarding FleetCor's Bookings Growth ..............................................79

ii

**C.** Defendants Made Numerous False Statements Regarding FleetCor's Revenue Growth .................................................................. 83

**D.** Defendants Falsely Stated That They Were Helping Chevron Transition To WEX .................................................................. 86

**VI.** ADDITIONAL ALLEGATIONS OF FLEETCOR'S AND THE EXECUTIVE DEFENDANTS' SCIENTER ................................................. 87

**VII.** LOSS CAUSATION ............................................................................... 100

**VIII.** CLASS ACTION ALLEGATIONS ........................................................... 103

**IX.** INAPPLICABILITY OF STATUTORY SAFE HARBOR ....................... 105

**X.** PRESUMPTION OF RELIANCE .......................................................... 106

<u>COUNT I</u> FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS ..................... 108

<u>COUNT II</u> FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE EXECUTIVE DEFENDANTS .............................. 110

PRAYER FOR RELIEF .................................................................................... 111

JURY DEMAND ................................................................................................ 111

Lead Plaintiff City of Sunrise General Employees' Retirement Plan ("Sunrise General" or "Lead Plaintiff"), by and through its counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Lead Plaintiff brings this class action on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of FleetCor Technologies, Inc. ("FleetCor" or the "Company") during the period from February 4, 2016 to May 3, 2017, inclusive (the "Class Period") and were damaged thereby (the "Class"). The Defendants in this Action are FleetCor; FleetCor's Chief Executive Officer ("CEO") Ronald Clarke ("Clarke"); and FleetCor Chief Financial Officer ("CFO") Eric Dey ("Dey").

Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (i) press releases and media reports issued and disseminated by the Company; (ii) analyst reports and investigative reports concerning FleetCor, including those from Citron Research ("Citron") and Capitol Forum; (iii) interviews with former FleetCor employees; (iv) filings in Chevron's breach of contract lawsuit against FleetCor, styled *Chevron U.S.A. Inc. v. FleetCor Technologies Operating Co., LLC* (D. Harris County), Civ.

A. No. 2017-29153 (the "Chevron Action"); (v) complaints concerning FleetCor and WEX, Inc. ("WEX") filed with the Better Business Bureau, Federal Trade Commission, and Consumer Financial Production Bureau; and (vi) other public information regarding the Company. Lead Plaintiff believes that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

## I.    **PRELIMINARY STATEMENT**

1.    This securities class action arises from Defendants' misrepresentations and omissions concerning FleetCor's widespread predatory business practices, thereby concealing fundamental weaknesses in the Company's financial outlook. FleetCor makes the vast majority of its revenue through its sales and management of multiple different "fuel card" programs. A "fuel card" is a payment card most commonly used for gasoline, diesel, and other fuels at gas stations. FleetCor marketed these fuel cards to businesses nationwide that relied on fleets of vehicles for their operations. Since its initial public offering in 2010, FleetCor has experienced explosive growth, increasing its revenue over 300%. According to Defendants CEO Clarke and CFO Dey, FleetCor's strong growth was done "the old-fashioned way" – through investments in "sales and marketing" and FleetCor's superior sales techniques.

2

2.     However, although Defendant Dey claimed that there was no "secret sauce" to FleetCor's success at sales, in fact there was a secret:  FleetCor directed all of its telesales representatives to market FleetCor's various fuel cards as "no fee" or "free money."   Accordingly, customers were shocked and furious when they began to receive bills with late fees and other miscellaneous fees improperly tacked onto their invoices.  As discussed in detail herein and based upon the numerous and consistent accounts of FleetCor's former employees, FleetCor (i) made it impossible for its customers to pay on time and regularly charged exorbitant late fees; (ii) improperly and secretly charged customers as "Tier 2" or "high risk" when the customers actually had strong credit; (iii) after an "acclimation" period while the customers grew comfortable with FleetCor, they began to lard customers' bills with miscellaneous administrative fees and opt-out program charges, on little or no notice.  These fees often amounted to thousands and thousands of dollars per month per card and drove a significant amount of FleetCor's revenue.  As the Company disclosed near the end of the Class Period, these fees alone amounted to $200 million in revenue in 2016, or over 10% of the Company's total revenue.  FleetCor's conduct was particularly egregious because FleetCor targeted "down market" companies – i.e., small, unsophisticated businesses – as the primary source for its revenue growth,

3

because, as Defendant Dey once put it, "those customers have very little pricing leverage."

3.    In addition to FleetCor's exploitative sales and billing practices, FleetCor also encouraged its sales people to pad their numbers in order to artificially inflate the number of new "bookings" FleetCor could report to its shareholders. Defendants touted FleetCor's superior growth in new bookings (*i.e.*, new customers) to illustrate the Company's success in sales and the bright future for the Company. Defendant Clarke expressly identified FleetCor's "new bookings" figures as "the single best indicator of health" for investors to examine.  However, Defendants' statements concerning "bookings growth" were materially false and misleading.  In reality, as numerous former FleetCor employees informed Lead Counsel, there was a rampant practice at FleetCor of "flipping" accounts from one FleetCor card (such as a BP or Chevron card) to another card (such as a Universal MasterCard). FleetCor's salespeople – with the explicit encouragement of their managers and incentivized by FleetCor's compensation structure – would "flip" the same customer to multiple cards.  Many times these accounts were flipped without the customer knowing that the same company (FleetCor) was marketing and managing both cards. In this way, FleetCor could both report positive growth numbers and retain revenue

4

from customers who were tricked into opening a new card on the mistaken belief that they were escaping FleetCor's excessive fees and poor customer service.

4.     As the Company's stock price rose on the strength of these misrepresentations, Defendants took advantage of FleetCor's artificially inflated stock prices to enrich themselves through stock sales of $104.5 million.  In fact, Defendant Clarke on his own sold $100.4 million in FleetCor shares, whereas in the period of similar length prior to the Class Period, he had sold zero shares.  Similarly, Defendant Dey sold over $4 million in FleetCor stock during the Class Period.

5.     FleetCor's rapacious practices appear to have eventually led Chevron, FleetCor's largest oil company partner, to terminate their relationship in December 2016, causing FleetCor's stock price to drop and resulting in significant losses to investors.   As Chevron later asserted, FleetCor's excessive fees threatened irreparable destruction to Chevron's reputation and goodwill with these customers.  Then, over the course of the Spring of 2017, several third parties published investigatory reports revealing for the first time how FleetCor derived so much of its revenue.  On March 1, 2017, business journal Capitol Forum published a report concluding that FleetCor "routinely imposes a myriad of unwarranted fees on customers" and that "FleetCor further supplements its fee revenue with late fees through the use of a bill payment system that makes it extremely difficult, if not

impossible, for customers to make timely payments." This and subsequent investigative reports caused the price of the Company's publicly-traded securities to drop sharply, resulting in billions of dollars of losses to members of the Class.

6.      Desperate to maintain the revenue from Chevron, its largest partner, Defendants engaged in still further unethical and improper conduct: they secretly stonewalled Chevron's attempts to transition its business to FleetCor's main competitor, WEX.  In public, Defendant Clarke told investors that, although he was "disappointed" in Chevron's decision to leave FleetCor, FleetCor would "help them transition to their new supplier."  In reality, as the market later learned in a lawsuit Chevron filed against FleetCor on May 1, 2017, at the exact same time that Defendant Clarke made this statement, FleetCor's senior executives were "sabotaging" Chevron's and WEX's deal by refusing WEX and Chevron access to key information about Chevron's portfolio.  According to Chevron's lawsuit, "FleetCor's calculated refusal to comply with its contractual obligations is intended to derail Chevron's deal with WEX so that FleetCor will be allowed to maintain some or sole control" over the Chevron accounts.  Chevron further made it clear that FleetCor was seeking to "maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels.  These actions are harming Chevron's customer goodwill and will continue to inflict

6

damages to goodwill until the [Chevron accounts are] transferred to WEX." When Chevron filed its verified complaint revealing FleetCor's obstructionism and investors learned of still further deceptive conduct by FleetCor, the Company's stock price again dropped dramatically, causing investors further significant losses.

7.      Notably, after Capitol Forum and Citron went public with the results of their investigations, FleetCor's Board of Directors brought in outside counsel to initiate an internal investigation.  In short order, FleetCor's President, North America Direct – who oversaw FleetCor's fuel card operations in the U.S. and reported directly to Defendant Clarke – and FleetCor's Vice President for U.S. Sales Operations both mysteriously and suddenly "resigned."  Further, for the first time, FleetCor's sales employees have now been provided with a description of FleetCor's fees and have been instructed to tell potential customers about fees.  Thus, the Board's efforts to "clean house" required sweeping personnel and policy changes at the Company.

8.      In total, from the first partial disclosure of the fraud until the end of the Class Period, FleetCor's stock price declined from $148.08 to $131.26, a drop of 11.35%.  This drop caused a loss of approximately <u>$1.5 billion</u> in market capitalization.  Investors are now entitled to recover against the individuals and entities responsible for their losses.

## II.   **JURISDICTION AND VENUE**

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  FleetCor maintains its corporate headquarters in Norcross, Georgia, which is situated in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   **PARTIES**

11.     Lead Plaintiff Sunrise General is a public pension fund that provides retirement benefits to public workers (other than police officers and firefighters) within the city of Sunrise, Florida.  As of October 12, 2017, Plaintiff managed

8

approximately $200 million in assets on behalf of approximately 1,100 participants. Lead Plaintiff purchased shares of FleetCor stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12.     Defendant FleetCor is a global provider of workforce payments products.  The Company's primary products include fuel card payments product solutions, corporate payments products, toll products, lodging cards, and gift cards. The Company maintains its corporate headquarters at 5445 Triangle Parkway, Suite 400, Norcross, Georgia 30092-2575.  FleetCor stock trades on the New York Stock Exchange, an efficient market, under ticker symbol "FLT."  As of April 24, 2017, FleetCor had over 92 million shares of stock outstanding, owned by thousands of investors.

13.     Defendant Ronald F. Clarke ("Clarke") is, and was at all relevant times, CEO and Chairman of the Board of Directors of FleetCor.  Clarke received over $29 million in total compensation from FleetCor in 2016.  During the Class Period, while in possession of material, adverse, non-public information, Clarke sold 633,617 shares of FleetCor for total proceeds of $100.4 million dollars.  If the Company's stock price had not been inflated due to Defendants' false and misleading statements to the public, Clarke's total proceeds would not have been nearly as high.  If Clarke

9

had sold his stock on the last day of the Class Period, after a series of disclosures removed the artificial inflation from the Company's stock price, he would have received approximately $17 million dollars less in profits.  Notably, during the fifteen months before the Class Period, Clarke had not sold a single share of FleetCor stock.

14.     Defendant Eric R. Dey ("Dey") is, and was at all relevant times, Chief Financial Officer ("CFO") of FleetCor.  Dey received approximately $1.5 million in total compensation from FleetCor in 2016.  During the Class Period, while in possession of material, adverse, non-public information, Dey sold 25,279 shares of FleetCor for total proceeds of over $4 million.

15.     Defendants Clarke and Dey are collectively referred to hereinafter as the "Executive Defendants."  The Executive Defendants, because of their positions with FleetCor, possessed the power and authority to control the contents of FleetCor's reports to the SEC (and in fact, the Executive Defendants signed the SEC filings), press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  On information and belief, each of the Executive Defendants was provided with copies of the Company's reports, press releases, and other information alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

10

cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

IV.   **SUMMARY OF THE ACTION**

   A.   **Overview of FleetCor And Its Relevant Businesses**

16.   FleetCor primarily derived its revenue through the maintenance of "fuel card" programs to business owners with vehicle fleets.  A fuel card is a payment method used most commonly for the purchase of gasoline and diesel fuel at gas stations.  FleetCor provides these fuel cards to businesses purportedly to allow them to increase savings at gas stations, limit expenses, control spending, and minimize unauthorized transactions and billing through the receipt of real-time transaction information.  These businesses provide fuel cards to their employees, so that employees can pay for expenses while traveling for work.

17.   FleetCor represents its transactions in its SEC filings in the following manner:

11



Under FleetCor's business model, it purports to derive revenue from the difference between the price charged to a customer for a transaction and the price paid to the merchant or network pursuant to wholesale pricing contracts FleetCor had with merchants.   In return, FleetCor claimed to customers that their drivers were discounted approximately $0.10 to $0.15 per gallon of gas by using FleetCor products.

18.    During the Class Period, FleetCor also coordinated with major oil company "partners," such as Chevron/Texaco—formerly the Company's largest partner in the United States—to develop and implement branded fuel card programs. Chevron and other oil companies provide branded commercial cards to consumers, some of which are administered by outside third parties like FleetCor.  In 2007, FleetCor and Chevron agreed that FleetCor would manage Chevron's commercial card program for  ten years.

12

19.    In addition to revenue derived from their merchant relationships, FleetCor stated that in 2016 it derived 76% of its revenue from program fees and other fees and charges from its oil company partners and customers.  FleetCor's U.S.-based fuel card programs contribute the majority of FleetCor's revenue. According to FleetCor, 70% of its revenue is derived from management of various companies in the United States and 70% of FleetCor revenue is derived from management of its fuel cards both nationally and internationally.

20.    FleetCor provides its services through a number of different card programs.  Among other programs, the Company administers the "Fuelman" card, the Universal Fleet MasterCard, the Speedway SuperFleet product, Pacific Pride, BP cards, Universal BuilderPro, and Comdata.

21.    FleetCor contracted with businesses with large fleets (over 150 vehicles), medium fleets (11-150 vehicles), small fleets (1-10 vehicles), and government fleets (which include police vehicle fleets and school bus fleets). However, FleetCor focused its business development efforts on small to medium fleets, instead of large fleets. Defendants Clarke and Dey repeatedly emphasized to analysts and investors during conference calls that it was focused on selling its products "down market."  FleetCor targeted "down market" companies – *i.e.*, small,

unsophisticated businesses – as the primary source for its revenue growth because, as Defendant Dey once put it, "those customers have very little pricing leverage."

22.     FleetCor stated in its SEC filings that it targeted small fleet businesses through telesales.  For larger accounts, FleetCor had sales agents in the field making face-to-face pitches.  FleetCor primarily housed its telesales group in its corporate headquarters in Norcross, Georgia.

**B.     FleetCor And The Executive Defendants Made Repeated False And Misleading Statements About The Reasons For The Company's Revenue Growth and Bookings Growth**

23.     Prior to the Class Period, and starting in and around late 2015, FleetCor purportedly began to suffer macroeconomic "headwinds," including lower fuel prices and foreign currency interest rates, that prevented FleetCor from growing its revenue.  To reassure investors of the Company's underlying value even in the face of stagnating revenue, Defendants Clarke and Dey emphasized FleetCor's purported "organic" growth – or growth absent the fuel price and Forex ("FX") headwinds – of over 10% year over year.  According to Clarke and Dey, without these headwinds, FleetCor was actually experiencing significant revenue growth and bookings growth.

24.     Defendants Clarke and Dey attributed this supposedly strong growth to the Company's purported "old-fashioned" focus on "strong sales and marketing."

14

For example, an analyst from Deutsche Bank asked Dey during the September 13, 2016 Deutsche Bank Technology Conference: "I think one of the questions I always get is, how come FleetCor is so good at sales and marketing? What is your secret there?"  Dey denied that there was any "secret sauce" to FleetCor's marketing. Instead, he stated that FleetCor used every avenue available to reach customers, including telemarketing, mail, internet, direct sales forces, and cross-selling with other products.  Notably, Dey specifically noted the Company's "big investment in telemarketing…we know what that message that we have to deliver is in order to get a new account."

25.    As a result, even in light of overall "headwinds," analysts were excited by FleetCor's growth story.   Analysts asked about Defendants' growth story frequently and invited Defendants to various conferences and meetings to discuss the Company.  For example, JPMorgan reported on February 22, 2016 that its analysts had met with Clarke and Dey and that "[t]he team sounded quite confident in executing what it can control, and has designed a business to deliver 10% FX/fuel-neutral growth revenue again in 2016 and beyond.  The key to the 10% formula is incremental sales and marketing dollars where it can get a 2x return on revenue and those investment dollars have been put to work.  We're confident FLT can at least deliver on its stated guidance[.]"

**C.     Unbeknownst to Investors, FleetCor's "Sales and Marketing" Investments Actually Consisted of Predatory Sales Practices**

26.     Contrary to Clarke's and Dey's public statements, FleetCor <u>did</u> have a "secret sauce" that explained its success.  FleetCor's impressive growth was not, in fact, the result of investments in sales and solid credit products.  As the market later learned, FleetCor's revenue growth derived from misleading potential customers about FleetCor's services and then stuffing their invoices with exorbitant fees – so much so that, as confirmed by Former Employee ("FE") 1, a Customer Service Representative at FleetCor from August 2014 to April 2016 and FE 2, a Regional Sales Manager at FleetCor from September 2012 to August 2017, Company employees internally called FleetCor "FeeCor."[1]  Indeed, the March 1, 2017 Capitol Forum investigative report reported that the Company "routinely imposes a myriad of unwarranted fees on customers and that such fees are generally only removed in instances where customers are both persistent and vocal in raising objections.  In addition, FleetCor further supplements its fee revenue with late fees through the use of a bill payment system that makes it extremely difficult, if not impossible, for customers to make timely payments."

---

[1] A chart for the title and tenure of each Former Employee is attached hereto as Appendix A.

      **1.**     **FleetCor Imposed Onerous Fees On Its Customers In Order To Drive Revenue**

          **a.**    **FleetCor Deliberately Prevented Its Customers From Paying Their Bills On Time In Order To Drive Revenue Through Usurious Late Fees**

27.　　FleetCor's "sales and marketing" tactic was to represent to customers that there were "no fees" on FleetCor's cards – and then force customers to pay thousands of dollars in late fees by making it nearly impossible for customers to pay their bills on time.  As the Company disclosed for the first time towards the end of the Class Period, these late fees accounted for a sizeable proportion of FleetCor's revenue (approximately 6% of its revenues from fees, or $100 million) and could be an extremely high percentage of customer bills.  As set forth below, the statements of former employees corroborating that FleetCor made it impossible to pay on time are so numerous and so consistent that the only inference to be drawn is that this was a deliberate practice.

28.　　There were multiple methods potentially available to FleetCor's customers to pay their bills.  FleetCor manipulated each one to prevent customers from paying their bills on time.  <u>First</u>, many former employees relayed that FleetCor's online payment system, iConnect, was deliberately constructed to impose late fees on customers – indeed, there was <u>no</u> way for customers to avoid late fees if they paid online.  The online system did not allow for early payments, and payments

17

made on the due date were "posted" days later.  FE 3, FE 4, and FE 5[2] confirmed

that the online system was constructed such that customers could only pay online on

the date the bill was due.  Then, it took two days to process online payments.  The

online system's delay in posting payments was confirmed by FE 2, FE 3, FE 5, FE

6, FE 7, and FE 8.[3]  Capitol Forum also corroborated this systemic delay in its May

11, 2017 report.  In that report, Capitol Forum quoted a current employee as stating

that payments are not posted immediately and that "oftentimes they hold the

payment or if they apply the payment it will not credit the account right away." Thus,

if the due date was on a Wednesday, and the client posted a payment on that

Wednesday, the payment would still be late.  Additionally, according to FE 5, the

online system would often malfunction. When customers called to pay over the

phone, they would be billed yet another fee for telephone payments.  A March 1,

---

[2] FE 3 was a Regional Territory Manager at FleetCor from January 2016 to March 2017; FE 4 was a Customer Service Representative at FleetCor from April 2014 to July 2015; and FE 5 was an Inside Sales Account Manager at FleetCor from August 2015 to December 2016.

[3] FE 6 was an Inside Sales Representative at FleetCor from October 2015 through March 2016; FE 7 was a Senior Account Manager with FleetCor from December 2012 to July 2017; and FE 8 was a BP Account Manager from November 2014 to June 2017.

2017 Capitol Forum[4] report also concluded, based on reviews of customer complaints and discussions with FleetCor customers, that there are suspiciously frequent problems with the payment website that make it difficult for customers to pay online.

29.  <u>Second</u>, FleetCor made it nearly impossible for customers to pay their bills by mail.  FleetCor bills provided two addresses to clients to pay by mail.  One address was purportedly monitored by a third party, and according to Capitol Forum, the location for overnight payments was FleetCor itself.  Numerous former employees reported that it was next to impossible for customers to mail their payments for timely receipt.  According to several former FleetCor employees, including FE 8 and FE 9, a Customer Service Representative with FleetCor from the fall/winter of 2014 until mid-2016, FleetCor would not pick up and/or process checks until a certain period of the month and by that time, the customer's payment

---

[4] Capitol Forum is a business journalism company launched in 2012 by a former senior vice president of MF Global, which focuses on consumer protection as well as antitrust and merger and acquisition activity.  Capitol Forum's website states that "[f]or consumer protection and financial service issues, we conduct interviews up and down the supply chain and follow key actions of the agencies and Congress to determine whether or not behavior is likely to run afoul of the law or provoke consumer protection and policymakers to act."

would already be late.  FE 8 stated that this was FleetCor's "trick of the trade." According to FE 7, FleetCor basically said "Good luck if you mail it in."

30.    Indeed, FleetCor's delays in posting mail payments were so routine and widespread that multiple customers deliberately tested whether FleetCor would allow them to pay on time. FE 4 recalled that one of his customers lived down the street from the P.O. Box where customers would send their checks.  The customer would walk his check down and physically deliver it to the P.O. Box, and would still receive a late fee.  Additionally, FE 7 recalled that the P.O. Box was located in Louisiana and that the P.O. Box was not checked every day.  According to FE 8, one customer conducted a test where she sent a check overnight to FleetCor, but the check did not get deposited until two weeks later.  Similarly, FE 10, Senior Outside Sales Representative with FleetCor from November 2014 to October 2016, cited as an example of customers' frequent inability to pay on time a situation where that if a bill was due on the 15th and the customer mailed it on the 1st, it would not be cashed until the 17th.  In fact, according to FE 3, customers would regularly call in and accuse the company of running a scam by charging late fees when they had mailed their checks on time.  These complaints would be logged in a centralized computer database called Salesforce.

31.    Investigations by third parties have corroborated Lead Counsel's findings. A Capitol Forum report dated March 1, 2017 quoted a small business owner, Wes Hamilton, owner of Plumb Pro, Inc., recounting that:

> They didn't post my check payment I sent from Alabama in early January to North Carolina until January 24. . . They have plenty of time to post it and all this time they kept calling and calling telling me I'm late. I explained that they are holding two checks and charging late fees and his only advice was to provide my banking info so I pay online and if there was overage I'd get a credit refunded but I wasn't comfortable with that.

32.    Third, numerous former FleetCor sales people reported that their customers typically were unable to enroll in Electronic Funds Transfer ("EFT") billing, which would withdraw funds from the customer's bank account automatically. According to a former employee, FE 8, FleetCor denied customer applications 80% of the time for Electronic Funds Transfer ("EFT") billing. FE 8 and FE 2 each confirmed that the vast majority of their customers were inexplicably not eligible for EFT. In denying customers EFT billing, FleetCor refused customers who wanted to pay on time directly from their accounts and who continued accruing massive late fees.

33.    Fourth, customers were able to make payments directly and immediately to FleetCor over the phone – but were charged a fee for doing so.

34.     Late fees could be an incredibly high percentage of the customers' fees. For example, FE 3 recalled that a customer who had a credit line of $25,000 received a $2,300 late fee when her payment was only a couple of days late.  FE 10 recounted one client who was charged $7,000-$9,000 in late fees and interest on a $45,000 bill – or 20% of the original bill.  FE 10 added that in this case the customer had mailed a check early, but FleetCor posted the payment two days late.    Similarly, a September 19, 2016 complaint to the Federal Trade Commission (obtained by Capitol Forum) states that a customer received $121,000 in late fees between the period of February 2013 and March 2016.

35.     While FleetCor's customers often did not notice that late charges were being added to their bills, those that did often vigorously complained.  For example, one Chevron customer (who later became a Citgo customer), the Southern Appalachian Labor School (SALS) in West Virginia, which is a small non-profit that runs a food pantry and repairs homes for low income families, sued FleetCor in 2014 in West Virginia State Court after numerous requests that FleetCor take off unauthorized late fees of $1,000 on bills that typically ran from $4,000 to $7,000. According to correspondence with FleetCor's attorney (provided by SALS to Lead Counsel), "in consideration of the work" done by SALS, FleetCor fully credited one year's worth of late fees to SALS.  According to SALS' executive director, John

David, this still left SALS with $12,000-13,000 in late fees that they simply had to absorb on their extremely limited budget.  However, according to Mr. David, since SALS' Citgo fuel card was transferred to FleetCor's chief competitor, WEX, SALS has not had any of the same issues with late fees.

36.     The Better Business Bureau website also contains numerous customer complaints about FleetCor regarding exorbitant late fees similar to the following:

- "I opened the account in June of 2016 and literally 11 months out of the 13 months we had the account trying to get my account corrected from Program fees of $30, administration fees of $300, high risk fees of $120, and late fees, of over $1000. However I was never late and paid the account in full every single month. I also called 11 out of the 13 months we had the account because I was not receiving the statements. They had my correct email and correct address. I would get it 2 days before it was due and had to call and make the payment over the phone. Which was a $25 phone fee."

- "If you try to pay on [their] website it won't let you process the payment until the following day. Then they charge 15% late fee. Around $500 on a little over $3,000."

- "We were charged [a] $1,982.83 late fee and $285.62 'default int charge' on an invoice when the check was sent 6 days before the due date. . . .The check was mailed on Monday Dec. 8th.  It was due on Sunday (Dec 14th) and not cashed until Tuesday Dec 16th.  This is the second time they have done this but it was credited the last time when I complained.  When I called I was told they charge up to $5,000 in late fee[s]."

- "Ever heard of a $1,000 late fee? Mind you, our payments were not late. . . . After 6 months of MULTIPLE submissions of EFT forms, phone calls, faxes, etc. [we were advised by FleetCor that] '[w]e don't do autopay.'"

23

- "I opened the [FleetCor] account in June of 2016 and literally 11 months out of the 13 months we had the account, [we needed to get the account corrected because there were] program fees of $30, administration fees of $300, high risk fees of $120 and late fees [] of over $1000."

### b.    FleetCor Charges A Fee To "High Risk" Customers

37.    In addition to unmerited and exorbitant late fees, FleetCor also charged a "high risk" fee to certain of its customers.  FleetCor called this fee "Level 2 Pricing" and reserved it for customers who FleetCor determined (partly through random testing) had a credit score below a certain threshold.  According to FleetCor documents attached to an April 11, 2017 Capitol Forum Report, FleetCor may impose this pricing from the outset when customers have commercial credit scores below 520 and individual credit score below 660. According to the same report, FleetCor may also impose Level 2 pricing as a result of two late payments.  After making such a determination, FleetCor imposed these fees on customers without notice or an opportunity to dispute FleetCor's decision before the fees were imposed.  In fact, FE 10 confirmed that if a customer were looking at their bill, the only way for the customer to know if this Level 2 pricing had been imposed was to compare fuel receipts against transaction prices listed on their invoices and recognize a discrepancy.  Additionally, Capitol Forum corroborated in its April 11, 2017 report that because the Level 2 pricing does not appear as its own separate fee on customer

bills, customers are likely to remain unaware of the change in pricing. In other words, there were no itemized fees for Tier 2 pricing, not even buried at the end of an invoice like the other fees charged by FleetCor. As reported by Capitol Forum, the Level 2 charge was increased from 10 cents per gallon to 20 cents per gallon at some point after July 2016 without any notice to customers. In response to Capitol Forum's inquiries, FleetCor disclosed that risk based pricing fees "represent roughly 1.5% of FLT's revenue."

38.     FleetCor makes the determination of whether a customer is high risk – and being charged enormous fees – without any notice to the customer. Often FleetCor is incorrect and the customers actually have perfect credit. FE 7 confirmed that sometimes customers would be assessed a high risk fee even when they had a very high credit score. Similarly, as part of its April 11, 2017 investigative report, Capitol Forum interviewed Nancy Lawrence, the bookkeeper for Oval Tennis, a provider of tennis court construction and maintenance. She noticed that on November 1, 2016, her company was charged an additional 5% on each transaction even though the business had an excellent credit history. This, however, was the second time that FleetCor put Oval Tennis on Level 2 Pricing. Lawrence explained that "[b]usiness owners don't have time to cross check all those gas receipts against the invoices each month."

25

### c. FleetCor Imposed A Number Of Other Exorbitant Miscellaneous Fees Without Notice

39.     After customers were with FleetCor for a number of weeks – and presumably after they had stopped checking their invoices carefully – FleetCor made it a practice to add assorted other fees to customers' invoices without notice.  Indeed, FleetCor former sales people reported that customers called to complain about numerous other random fees that were tacked onto clients' bills.   As these salespeople confirmed, and as discussed below, they did not know anything about those fees or how to avoid them, because they were not trained to give explanation about potential charges and were not provided with the terms and conditions for the cards.

40.     According to FE 2, FE 3, and FE 10, FleetCor would wait a certain amount of time to add fees onto new customers' bills.  FE 3 stated that FleetCor waited a few weeks or a few months to add on fees so that it would initially appear to the customer that they were getting the deal that they had been promised.  And FE 10 stated that FleetCor waited 90 days to tack on fees so that customers would grow comfortable with their customer invoices. According to FE 3, this was because customers were more likely to review their bill when they first started their relationship with FleetCor and would be less likely to review their bill as the relationship continued.  After a certain amount of time, FleetCor would begin to add

in fees in the hopes that the customer would remain unaware and just pay the bill. Moreover, to the extent the terms and conditions provided some (limited) disclosure about assorted fees, the terms and conditions documents reviewed by Lead Counsel that accompanied a client invoice typically stated that FleetCor "reserved the right" to impose a certain fee or that FleetCor "may" charge each miscellaneous fee. This gave FleetCor the ultimate discretion to time the imposition of assorted fees for when they thought the customer was not paying attention or for customers who had very little "leverage." As discussed below, FleetCor carefully tracked and modulated the amount of fee pressure they could place on their clients to maximize the fees they could extract.

41.     As confirmed by a March 1, 2017 Capitol Forum report, through interviews with FleetCor customers Capitol Forum found that after the first three months – and after seeing that their bills contain no fees – customers are very likely to stop reviewing their bills, which is when FleetCor begins charging customers excessive and hidden fees. Indeed, Capitol Forum provided access to customer bills, which Lead Counsel has reviewed, showing customer fees creeping up over time, with no apparent rhyme or reason.

42.     When FleetCor did add in the fees, they were buried in invoices with only a summary charge on the first page, but miscellaneous charges were detailed

27

on the final page of the bill.  Thus, customers would need to dig through their bills

to understand what fees had been tacked onto their bills. These fees included:

- account administration fees;
- member fees;
- minimum usage fees;
- transaction fees;
- high risk transaction fees;
- minimum program administration fees
- credit risk assessment fees;
- high risk credit fees;
- convenience network surcharges;
- advantage program fees;
- payment processing fees;
- electronic transfer fees;
- telephone payment fees; and
- inactive card fees.

43.    FleetCor also began to impose a "Minimum Program Administration

Fee" on its customers several months after the customers joined a card program.

FleetCor's Minimum Program Administration Fee is one of FleetCor's more

egregious and significant fees.  FleetCor reserved the right to impose a Minimum

Program Administration Fee on its customers when fuel prices dropped below $3.25.

According to the U.S. Energy Information Administration, gas prices have generally

remained below $3.25 since 2014 (an average of $2.429 in the U.S. for 2015 and

$2.143 in the U.S. for 2016).  Thus, contrary to FleetCor's marketing, customers

were potentially <u>always</u> paying more for their fuel than the sticker price.  Due solely

28

to the Minimum Program Administration Fee (much less all of the other fees FleetCor could charge), customers could end up paying as much as 10 cents per gallon above the retail gas price.   Indeed, a March 20, 2017 Capitol Forum investigative report discussed FleetCor's Minimum Program Administration fee and noted one example where a FleetCor customer incurred a $1,004 Minimum Program Administration Fee in connection with retail fuel charges of $3,241 – or 24% of the total bill.  The Capitol Forum investigative report also quoted one former employee as stating that "what we were always told to disclose is that [customers] will never pay more than the pump price. . .but with gas prices as low as they are, one of the things that they did was start these administrative fees and people were paying higher than pump price."

44.    Additionally, according to FE 5, FleetCor would charge a fee to customers if they failed to meet their minimum purchase of gallons per month. Similar to the Minimum Program Administration fee, sales representatives did not tell customers about this fee.

45.    Additionally, FE 11, a Regional Sales Manager with FleetCor from July 2015 to September 2016, stated that there was a "dashboard" that would allow customers to see what their drivers were buying in terms of fuel or other purchases for which FleetCor charged a "FleetDash" fee. According to FE 1 and FE 11, sales

29

representatives would not explain to customers that there was a fee that was associated with this "FleetDash" feature. While customers could opt out of the FleetDash fee, they were not told that they could do so.

46.    As discussed below, the fact that FleetCor charged exorbitant fees was also corroborated by the Verified Original Petition And Application For Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in the Chevron Action (defined above as the "Chevron Petition"), filed on May 1, 2017, which alleged that FleetCor was seeking to "maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels. These actions are harming Chevron's customer goodwill and will continue to inflict damages to goodwill until the [Chevron accounts are] transferred to WEX." In other words, Chevron had identified that FleetCor's enormous fees and poor customer service were harming its customer relationships. Additionally, in a July 17, 2017 report, Capital Forum reported that BP, which is another major partner of FleetCor, was pressing FleetCor to address customer complaints relating to deceptive marketing, delayed posting of payments resulting in late fees, hidden fees and charges, delayed application of credits, missing rebates, withheld deposits, website portal problems, and lack of action despite numerous customer calls.

> 2. **FleetCor's Vaunted Sales and Marketing Infrastructure Was Deliberately Set Up to Mislead Customers and Extract Enormous Fees**

47.     During the Class Period, Defendants touted the growth in FleetCor's products as due to investments in "sales performance," and Defendant Dey specifically attributed FleetCor's financial success to FleetCor's "big investment in telemarketing . . . we know what that message that we have to deliver is in order to get a new account." In reality, FleetCor's success depended largely on the fact that its current and potential customers were not aware that FleetCor would charge any fees for its services. In other words, FleetCor did indeed "know what that message" was that would earn it new accounts – and, across the board, that message was to mislead new prospects.

48.     According to numerous former employees at the Company, including FE 1, FE 3, FE 5, FE 7, FE 10, FE 11, and FE 12,[5] FleetCor trained its sales people to tell potential customers that there were no fees associated with FleetCor accounts. Indeed, FE 3 stated that sales representatives were trained to stress that it is not a credit card, it is a fuel card, and customers only pay for the fuel that they use. According to FE 8, employees were trained that they should not talk about fees in

---

[5] FE 12 was an Account Manager with FleetCor from July 2016 to April 2017.

their pitch and instead say that the FleetCor services were "free money."  And, according to FE 7, managers told new employees to tell customers that there were no fees attached to the FleetCor products.  Similarly, FE 10 stated that, as FE 10 was told, the "talk track," or the sales pitch, was that FleetCor makes its money on what it saves on margins.  It then shares those savings with the customer in the form of rebates per gallon.   Similarly, in its March 1, 2017 report Capitol Forum reported that sales representatives were told by their supervisors that there were no fees associated with FleetCor's cards.

49.    In fact, during their training, representatives were not given any information about fees, or they were taught that FleetCor did not have any fees except for late fees.  FE 2, FE 4, FE 6, FE 7, FE 10, and FE 12 confirmed that FleetCor employees were not trained on or told about fees. Further, according to FE 5, sales representatives learned about all of the additional fees only from customers calling to complain.  Similarly, according to FE 2, FE 3, FE 6, and FE 11, sales personnel were not provided with a copy of the terms and conditions and did not know how to answer customer questions about fees.  FE 11 recalled asking Valencia Beagles, Director of Outbound Sales, and Steve Casper, Vice President, U.S. Sales Operations, for the terms and conditions for the cards, but they would not provide them.  FE 11 recalled that the response from Steve Casper was that "You're in sales,

it's your job to sell through that [lack of information].  You need to find a way to get them to sign the contract anyway."  Indeed, Capitol Forum reached out to FleetCor and attempted to obtain a copy of the Terms and Conditions from the Company.  The Company told Capitol Forum that it was "unable" to provide a copy.  Capitol Forum did, however, obtain a Welcome Kit sent to Fuelman cardholders, which was sent to new cardholders in an email with several attachments.  The attachments discuss how to access and use certain features, but did not mention fees.  Apparently, the terms and conditions, if sent, were sent later, after the customer had already received the "no fees" sales pitch and a Welcome Kit without mention of fees.  Moreover, as discussed below, to the extent terms and conditions were sent, they were printed in barely legible 4-point font in grey ink – at Defendant Clarke's express direction.

50.    The March 1, 2017 Capitol Forum report corroborated that customer representatives were not given any information about FleetCor's fees.  In that report, Capitol Forum reported that "the sales representatives unwittingly provide little transparency regarding fees at the point of sale.  The sales representatives we spoke with indicated that they were told by their supervisors that there were no fees associated with FleetCor's cards—a message that they then conveyed to prospective customers."  The same Capitol Forum report quoted a former FleetCor sales person

as stating that "[w]e claim [to the customer that] we didn't charge card fees, that was our advantage over [WEX]."

51.     FleetCor's written marketing material corroborated this false sales pitch.  For example, Lead Counsel has been able to confirm through internet archiving that Fuelman products were, throughout the entire Class Period, advertised as "Pay no fees- no set-up fees, transaction fees, card fees or annual fees."  FleetCor used the same "no fees" language in connection with advertising for, at a minimum, the following products:

- The Fuelman Public Sector Fleet Card;

- The Fuelman Discount Advantage FleetCard; and

- The Fuelman Diesel Advantage FleetCard.

52.     This advertising was on FleetCor's website as late as April 4, 2017. Notably, FleetCor took this advertising for each of these cards down after the Citron Research and Capitol Forum reports were published and the advertising was not on the Company's website as of July 9, 2017.

53.     FleetCor's sales personnel were not incentivized to be honest with prospective customers – just the opposite.  FleetCor employees' compensation is structured to sign up new customers and entice them to use their new card for a very short time, after which the customer was handed off to the tiny customer service

department for any assistance.  Thus, employees are not in any way incentivized to build client relationships or maintain the relationship long term.  According to multiple former employees, including FE 13, an Account Executive with FleetCor from October 2014 to March 2017, FleetCor sales representatives would get paid for the amount of fuel that a customer consumed during the first 10 weeks with their new card. Similarly, according to FE 8, employees were told to just hold onto an account for enough time to get their commission and then let the customer go.  FE 8 stated that FE 8 would lose 6-8 accounts monthly while FE 8 brought in about 10-12 accounts monthly.  FE 9 stated that FE 9 would cancel 5-10 accounts per day. According to FE 7, employees would get a weekly report, called the START Report, that would show the activity for each representative, including the accounts lost or gained.

54.    Even when FleetCor knew that they were incorrectly charging customers, they would not credit the fees back unless customers vigorously complained.  For example, FE 4 recalled attending a FleetCor meeting in the February 2015 where it was discussed that 5,000 accounts were being charged incorrectly.  FleetCor employees were instructed only to give clients a credit if they called in to complain.  FleetCor would not correct this massive error of its own volition.  Similarly, FE 12 recalled that at a certain point in and around January 2017,

FleetCor accidentally double billed customers.  While FleetCor understood that it had wrongly charged customers, it refused to reimburse customers, but would only credit the amount back on the next month's bill, and then only if the customers complained.  According to FE 10, if a customer called to complain about an unwarranted or undisclosed fee, FleetCor would eventually credit back the fee, but you had to "pull teeth" to get the money back.  Capitol Forum also confirmed in an April 27, 2017 report that customers are only credited when they complain.  The report quoted a former sales employee as stating "[w]hy are we refunding fees just because they caught it?" When customers did not pay the fees, they were charged the fee the next month plus additional late fees.  Additionally, FleetCor rigorously disincentivized employees from crediting customers for improper fees.  Former employees recalled being told that if they credited back too many customers, they would lose some of their compensation.  FE 9 recalled that FE 9 had gotten in trouble with her manager for crediting fees and FE 9 did not get her bonus as a result.  Similarly, according to FE 4, FleetCor customer service representatives could not credit more than one charge per 90 day period.  FE 4 and FE 10 corroborated that a credited fee would show up as a deduction on a later bill, but customers did not actually receive the money back.

3.   **As A Result Of Its Fraudulent Billing and Marketing Practices, Customers Criticized FleetCor Far More Than Its Peers**

55.   Lead Counsel reviewed customer complaints against FleetCor and its chief competitor, WEX, to determine whether FleetCor was unique in its sharp sales tactics and usurious fees in the fuel card industry.  These complaints establish that FleetCor was, instead, well outside the norm in its sales and billing practices, because customers complained in dramatically greater volumes about FleetCor's billing than about WEX's.

56.   For example, responses to a FOIA request sent to the Consumer Financial Protection Bureau for records of WEX and FleetCor from January 1, 2010 to present showed that FleetCor had <u>12.5 times</u> as many billing-related complaints as WEX, with 38 complaints in connection with "late fee[s]," 29 complaints in connection with "billing disputes," 5 complaints in connection with "billing statement[s]," and 3 complaints in connection with "fees" (a total of 75 billing-related complaints).  WEX only had 6 complaints regarding "late fee[s]."

57.   Similarly, a March 27, 2017 Capitol Forum Report provided the following statistical comparison of WEX Federal Trade Commission ("FTC") complaints versus FleetCor FTC Complaints for the years 2014-2016**:**

| Year | FleetCor | WEX |
|------|----------|-----|
| 2014 | 80 | 1 |
| 2015 | 70 | 1 |
| 2016 | 73 | 13 |

58.     In addition, Lead Counsel has reviewed customer complaints on the Better Business Bureau website to discover what customers reported concerning FleetCor versus WEX. While the website states that FleetCor had <u>144 Billing/Collection Issues</u> related complaints in the last three years, <u>WEX had just 2 Billing/Collection Issues</u> complaints in the same three-year time period, an almost 200% difference.  The FleetCor complaints corroborate that FleetCor perpetrated a billings fraud to bilk its customers by adding previously undisclosed fees to their bills and making it nearly impossible for customers to pay on time.  Some examples of complaints from customers on the Better Business Bureau website (some of which are quoted above) are set forth below and corroborate the accounts of FleetCor's former employees:

- "If you try to pay on [their] website it won't let you process the payment until the following day. Then they charge 15% late fee. Around $500 on a little over $3,000."

- "We don't save any money buying our fuel through Fleetcor because with the admin charges and the delay in posting payments and the resulting late charges we end up spending more for fuel than if we had used a regular credit card. Paying them is a nightmare as if you send in a physical check it will likely take a minimum of 10 days for them to process it and by then you've got new late charges."

38

- "I opened the account in June of 2016 and literally 11 months out of the 13 months we had the account trying to get my account corrected from Program fees of $30, administration fees of $300, high risk fees of $120, and late fees, of over $1000. However I was never late and paid the account in full every single month. . . . I would get [the FleetCor bill] 2 days before it was due and had to call and make the payment over the phone. Which was a $25 phone fee. The fees [sic] are on the hidden on the last page of the statement."

- "Watch your invoices. They are always adding fees and charges for items not requested or signed up for. . . I have received interest charges for late payments despite paying on time. They claim it is not when it is 'received' but when it is posted."

- "Signed up with Universal Premium Fleet Card after having [WEX] and leaving because of fees. I was promised there would be ZERO fees and come to find out, they charge triple what [WEX] does. Extremely difficult for a business to switch fleet accounts but after their blatant lie regarding fees, that is exactly what we will be doing."

59.    Even though customers complained about FleetCor and were often extremely dissatisfied with FleetCor's products, customers were often trapped in their relationship with FleetCor because they had just handed out FleetCor products to their employees, who were already on the road.  To cancel FleetCor would be a significant administrative fiasco, not to mention that it might prevent their employees from paying for gas, lodging, and tolls, until the customer found a new service provider.  In fact, if customers did not pay their bills on time, FleetCor could turn off all of their payment products automatically, leaving employees stranded on the road with no means of paying for food, lodging, and other essentials.

### 4. The Predatory Marketing And Fraudulent Billing Practices Were Orchestrated By FleetCor Executives, Including The Executive Defendants

60.     Interviews with former employees and investigative reports from third parties show that the widespread billing fraud and predatory marketing scheme was created and coordinated by senior management, including Defendant Dey, and spearheaded by Defendant Clarke.

61.     As discussed in an April 27, 2017 Capitol Forum report, "[f]ormer employees say that Mr. Clarke – not line level customer service and sales employees – is the driving force behind the various business practices [such as adding undisclosed fees and preventing customers from paying bills on time]." According to a former management-level employee, "Ron [Clarke] is the mastermind – He's pulling all the levers."     The former employee further told Capitol Forum that Defendant Clarke "specifically directed that the font on the terms and conditions be reduced from 6 to 4 point and switched from black to gray font," and recalled Defendant Clarke saying "Don't make it easy on folks to read." According to Capitol Forum, another former sales employee told them that he heard Mr. Clarke state, "[i]f you are not losing 10% of your customers, you are not charging enough." Another former employee recalled that the FleetCor headquarters had a white board stating "[i]t's all about the money." FE 13 recalled being told by FE 13's supervisor, Bill

Jackson, Director of Accounting at Comdata, that "[w]hatever the CEO [Ron Clarke] wanted to charge that day, he would charge."

62.     FleetCor executives were well aware that many of its customers were upset about the massive, previously undisclosed fees.  In fact, according to FE 7, FleetCor initiated semi-regular focus groups with some of its top sales people in and around late 2015 or early 2016 where these exact issues were fully discussed.  According to FE 7, FleetCor executives, including Paul Citarella, Senior Vice President of Sales and Marketing, and Crystal Williams, FleetCor's Vice President of Human Resources, attended the focus groups.  FE 7 confirmed that Todd House, President, North American Direct Issuing, U.S. Telematics and Efectivale, who reported directly to Defendant Clarke, was also in attendance for at least one such focus group meeting.  During the focus groups, employees were asked about customer complaints.  According to FE 7 there were approximately 15-20 employees in the focus groups.  FE 7 recalled that employees would emphasize to FleetCor executives that customers were consistently complaining about fees and that it was a real issue for the Company.  FE 7 further recalled that employees raised concerns with executives, including House and Williams, about many of the practices discussed herein, including: (i) the impossibility of customers paying online; (ii) the

41

two-day delay in processing payments; and (iii) the random fees that FleetCor imposed on customers in addition to late fees.

63.     A May 17, 2017 Capitol Forum report provided further information and documents confirming that the Company carefully monitored and controlled its billings practices to extract the greatest amount of fees from their customers. According to that article, the Company used a Journal Entry Spreadsheet, which is a "document that various lower level FleetCor employees use to request approval from upper level managers to provide FleetCor customers with a percentage credit back for various fees those customers incur." The report provided a copy of the spreadsheet, which Lead Counsel has reviewed. The spreadsheet provides "REASON CODE[S]" for the employee to select when providing a credit to a customer. The spreadsheet states that these "reason codes" are "just what it says, this is the reason you are issuing the credit/debit." For example, Reason Codes for credits included "Billing Error" or "Disaster Relief" credits. One of the Reason Codes was labeled "TESTING." According to the Spreadsheet, "Testing" credits were "[t]o be used by management only for specific test transactions, payments, fees, etc." As clarified by a former employee, this code denotes tests run by the Company "to see what will be acceptable to clients for fees, if they get pushback for fees, they will stop, but that's only a management call." In other words, FleetCor management

would "test" how far it could push its customers with fees and credit amounts when those customers pushed back. The spreadsheet also contains language stating "% OF FEE CREDITS," which states "This is the percentage of the fee you are crediting and if that credit is in conjunction with a rebate. This shows how well we are negotiating." In other words, FleetCor carefully tracked its personnel's negotiation of credits to pacify dissatisfied customers – and encouraged staff not to reimburse the fees that were imposed. Notably, one of the only six categories of permissible "billing error" credits was "customer provided proof that payment was received prior to the due date" – indicating that this was a frequent enough "error" that FleetCor recognized it merited its own category.

64.     Other evidence supports the inference that FleetCor was deliberating testing vulnerabilities in its customer base to establish how far FleetCor could push their fees. Capitol Forum reported on April 27, 2017 that fees that are taken off of a customer bill are often tacked right back on within several billing cycles. The report quoted a former sales employee as stating that FleetCor "push[s] the envelope until they get their hand caught in the cookie jar and then say whoops we'll fix that. If they take it off, that fee will mysteriously pop back up within the next two billing cycles and then you will have to go through it all over again to get it taken off."

65.    Citron[6] also corroborated that FleetCor used an algorithm to adjust customer fees in an April 27, 2017 report entitled "Citron Exposes the Dirty Illegal Secrets of FleetCor.  Also, Proof the Company is Already in Cover-Up Mode." This new report explained how FleetCor developed a "deep learning algorithm" to "intentionally cheat its customers."  According to the report, Citron interviewed 25 former employees and determined that FleetCor customers are "fitted into a profile/classification based on how many fees can be extracted without complaints." Citron reported that customers are classified as "Red," "Yellow" or "Green," based on "internal algorithmic analysis of how vulnerable the customers are to this type of gouging without detecting it or complaining."

66.    FleetCor also carefully tracked its customer retention rate, including accounts lost, and the reason for the customer attrition.  As noted above, the Company tracked the original sales person and the number of accounts won or lost any given week through its "START" reports.  Further, according to FE 3 and FE 9, FleetCor also tracked all of its customer complaints through a computer system

---

[6] Citron is an online stock commentary website, which has been publishing columns for over 14 years.  It has investigated and reported on fraud in a myriad of companies, including sparking the investigation of Valeant.  Citron's website states that its goal is to "provide truthful information in an entertaining format to the investing public."

called Salesforce.  Indeed, FE 4 recalled getting 65 to 80 customer service calls on average per day, the majority of which were related to late fees and interest charges. Similarly FE 9 stated that 60% of the 60 to 70 calls FE 9 received per day were about fees. As Salesforce would also show, due to the exorbitant fees on customer bills, customer retention was a massive issue.  Indeed, the Salesforce system was accessible to all FleetCor employees, including FleetCor executives and management. Accordingly, FleetCor had a centralized database that maintained all information about client complaints – making this information directly accessible to Defendants Clarke and Dey.

### D.      FleetCor's Bookings Growth, Or New Business Growth, Was A Result Of Flipping Accounts

67.    As discussed above, Defendants, including Executive Defendants Clarke and Dey, made repeated statements throughout the Class Period that FleetCor's new business or "bookings" was growing rapidly – at a rate as high as 27%.  For example, during a May 4, 2016 conference call, Defendant Clarke told investors that FleetCor's new bookings growth was "literally across-the-board" in all areas of FleetCor and that the "US numbers were up big."  In reality, a material part of this "new business" was entirely illusory.  A substantial portion of new bookings was attributable to FleetCor's routine practice of shifting customer accounts from one fuel card to another, and then counting this movement as "new

business" – a widespread FleetCor practice that employees internally called "flipping" accounts. FleetCor's "new business" thus was not generated by any investments in sales or reaching out to a new client base, but merely by "flipping" customers from one FleetCor card to another. FleetCor's flipping practices accounted for a material number of the "new" accounts that Clarke and Dey reported to investors. According to FleetCor's former employees, the flipping practices that they experienced and observed at FleetCor ranged from 40-50% of new sales (FE 7) to 70% of new sales (FE 5).

68. FleetCor was able to take advantage of the fact that it managed multiple branded cards in flipping these accounts. Because FleetCor purchased so many companies (such as Comdata) or managed the fuel cards for oil companies (such as Chevron and BP), customers often did not realize that it was a company called "FleetCor" that was managing their fuel card program. Thus, if an aggrieved customer complained about the branded card program that FleetCor had sold to them, FleetCor could then just have a sales representative call and sell the customer a different card program. Indeed, FE 8 confirmed that often customers did not know that both the old and new cards were managed by FleetCor. FE 1, FE 8, and FE 11 described one way sales people would "flip" cards from one branded card to another, with the customer unaware that FleetCor managed each card. There were two

46

Chevron teams and one team each for BP, Husky and some other smaller companies. There was one central database where all customer information was stored. FE 11 observed that often a customer would get a Chevron card and then when they would find out about all the added fees, they would stop using the card. FE 7 stated that for MasterCard products, FleetCor used the MCUI system, which would show customers' other accounts, how much they were spending and their credit limit. From this information FleetCor employees could learn whether a customer was a good candidate to be "flipped." The sales person would then take that customer and move them to another card, which was spun as a new promotional card to the client.

69.    FleetCor senior management internally encouraged account flipping through, among other things, its compensation structure for sales personnel. As discussed above, FleetCor's compensation structure was set up such that FleetCor sales people were compensated for gallons purchased during the customers' first ten weeks using a new card. After the first ten weeks, FleetCor sales personnel were no longer compensated for that customer's card usage. However, by moving the customer to a new account right before the ten-week clock expired, FleetCor employees could simply "reset the clock" on their compensation from that customer, while initiating supposedly "new" business for FleetCor. FleetCor's former employees confirm that the Company's compensation structure led to "flipping"

47

accounts across-the-board.  For example, FE 2, FE 7, and FE 8 confirmed that FleetCor employees would flip accounts from one card to another to extend their compensation for a productive account.  According to FE 8, there was no limitation on doing so.  FE 7 stated that FleetCor salespeople were reselling accounts that were already with FleetCor, but they would set the accounts up as a new account.  As FE 7 put it, "if you don't flip there [at FleetCor], you don't make money."

70.    FleetCor's incentive compensation for its middle management similarly encouraged flipping.  Because FleetCor compensated its mid-level executives at least in part based on new accounts (which Clarke and Dey could then report to investors), they were similarly encouraged to originate accounts at all costs. According to FE 7, the managers encouraged this practice, because they needed to make their numbers as well and the flipped accounts counted as new accounts and they could be credited for gallons used in the first ten weeks.  FE 11 stated that FleetCor was "cannibalizing their own market" and that FE 11 confronted Paul Citarella, FleetCor's Senior Vice President of Sales & Marketing, about the flipping in a meeting.  Someone else in the meeting told FE 11, "[g]et used to it" and that it was "the FleetCor way."  Similarly, FE 7 recalled that another employee told Valencia Beagles, the Director of Outbound Sales, about the extensive "flipping" at FleetCor.  Beagles replied that the employee needed to mind their own business.

48

71.     The fact that a customer had already had a FleetCor fuel card – or two, or three – was readily available in the Company's central database.  According to FE 11, the full account history – including the number of different cards that FleetCor had originated for the same customer – was readily available in the customer's history in the central sales database.  Specifically, according to FE 8 and FE 7, a FleetCor computer system named ATS tracked all of a customers' previous credit cards.  According to FE 2, from the ATS system, FleetCor executives could tell all of the different cards that FleetCor customers had in the past and when they had obtained them.

72.     As confirmed by FE 7, the Chevron sales teams originated the flipping. FE 7 stated that FE 7 had been sitting with the Chevron group and that one of the Chevron representatives taught FE 7 how to flip an account.  The managers of the Chevron teams also gave their entire team access to a system called ATS, from which FleetCor sales personnel could access customer data and determine who was a good candidate for flipping.  According to FE 7, the managers on other teams usually gave access to this system only to top sales people.  According to FE 11, the ATS system would notate any new sales where the customer already had an existing account, or a "flipped" account.  If sales were $50,000 or larger, the sale would have to be approved by Steve Casper, who had access to the ATS system.  Indeed, according

to FE 2, Casper and any other senior executives would have been able to tell if any account had been "flipped."

73.    FleetCor's widespread accounting flipping threatened to, and did, endanger its critical relationships with its oil company partners.  Because FleetCor was generally agnostic concerning which card any customer used – as long as the customer continued to rack up enormous fees – its salespeople constantly poached clients from its branded oil cards (such as Chevron or BP) to switch the customer to another FleetCor card, such as Fuelman.

74.    Thus, not only did FleetCor's fees and lack of customer service threaten to endanger the relationships of their oil company partners, those partners might lose the customer entirely to FleetCor's other cards.  As discussed below, when Chevron terminated its relationship with FleetCor, FleetCor significantly ramped up the flipping of Chevron accounts to FleetCor's other cards in order to retain that business.

75.    At a certain point, FleetCor realized that this practice could get them in trouble with investors and partners. According to FE 2, FleetCor brought in external auditors to review employee practices regarding flipping.  However, at no point did FleetCor make any public disclosures about the practice.

50

E.   **Defendant Clarke Falsely Claimed That FleetCor Was Assisting Chevron's Transition To WEX**

76.   By the end of 2016, FleetCor's exploitative practices forced the destruction of their relationship with Chevron, its largest oil partner.  On December 19, 2016, Chevron announced that it was ceasing its relationship with FleetCor and transferring its huge portfolio of accounts to WEX, FleetCor's chief competitor.  During a February 8, 2017 earnings call, Defendant Clarke claimed that while he was "disappointed with Chevron . . . we will help them transition to their new supplier."  This statement was false.

77.   In reality, to disguise both its historic and ongoing account flipping and the extent to which it had exploited Chevron's customers with exorbitant fees, FleetCor immediately began to obstruct the transition of Chevron's portfolio to WEX.  As detailed in Chevron's Verified Original Petition And Application For Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (defined above as the "Chevron Petition"), FleetCor "wrongfully denied" Chevron and WEX "access to the books and records of the Chevron branded charge-card portfolio."  Under the terms of Chevron's original deal with FleetCor, if Chevron later choose a different partner, this successor partner would be entitled to purchase the Chevron portfolio from FleetCor at a price to be determined by third-party investment banks.  The contract obligated FleetCor to provide full financial

information about the portfolio to both Chevron and WEX so that they could value the portfolio along with their investment banks.   According to Chevron, this information was necessary for Chevron and WEX to determine:

> [W]hether the program assets are as stated and valued (otherwise FleetCor could provide unreliable or incomplete information to the investment banks) and WEX needs to understand the assets fully in order to prepare for and implement an effective transition of accounts – and to determine whether it has in fact received all accounts in the Program Portfolio.

78.    However, despite this broad commitment under the contract, FleetCor refused to provide Chevron or WEX detailed revenue or expense data regarding the portfolio, including information about "interchange, transaction fees, accountholder fees, and spread margin revenue."   Further, FleetCor refused to provide any information about the Chevron and Texaco "Diesel Advantage" accounts. According to Chevron, FleetCor was attempting to "sabotage" Chevron's and WEX's deal by refusing WEX and Chevron access to key information about Chevron's portfolio.

79.    As detailed in the Chevron Petition, Chevron provided notice to FleetCor on January 24, 2017 that it wished to commence due diligence.   FleetCor then had fifteen days in which to provide all of the requested information.   By Wednesday, February 8 – the fifteenth day and the same day that Defendant Clarke claimed that FleetCor would "help [Chevron] transition to their new supplier" –

52

FleetCor had refused to provide Chevron and WEX with the basic financial information they had requested.   Shortly thereafter, according to the Chevron Petition, between February 13 and March 22, FleetCor:

- "refused to permit WEX as the Company Designee to conduct reasonable due diligence to confirm the fair market value of the portfolio WEX would be purchasing";

- "refused to provide Chevron and WEX access to all of the books, records, and data regarding the Program Portfolio";

- "demanded that the investment banks provide a preview of output from their analysis – also neither customary nor supported by the Program Agreement"; and

- "refused to provide data regarding the majority of Chevron and Texaco Diesel Advantage cards, under the groundless pretext that these Chevron-branded cards are somehow excluded from the Program Portfolio."

80.    According to the Chevron Petition, when Chevron informed FleetCor that their conduct violated the terms of its contract, FleetCor finally agreed to provide the requested data.   Then, when WEX's and Chevron's due diligence was delayed by FleetCor's obstructionism, FleetCor refused to extend the due diligence period, endangering the deal between Chevron and WEX.

81.    Chevron also made it clear that FleetCor was seeking to "maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels.   These actions are harming Chevron's customer goodwill and will continue to inflict damages to goodwill until the Program is

transferred to WEX."   In other words, Chevron had identified that FleetCor's enormous fees and poor customer service were harming its customer relationships. Specifically, FleetCor had imposed yet another miscellaneous fee on Chevron customers – a "customer card shipping-and-handling fee" – that was damaging Chevron's customer relationships and "decreas[ing] the value of the portfolio." FleetCor's actions in imposing these fees were so detrimental that, according to Chevron, they threatened to impose immediate and irreparable harm to Chevron's business.

82.     FleetCor's obstructionism served multiple purposes.  First, as Chevron concluded, "FleetCor's calculated refusal to comply with its contractual obligations is intended to derail Chevron's deal with WEX so that FleetCor will be allowed to maintain some or sole control over the Program Portfolio."   Second, pushing off WEX's acquisition of the Chevron portfolio would allow FleetCor more time in which to siphon off Chevron accounts and maximize fees from the remaining Chevron portfolio.  Finally, it allowed FleetCor to conceal the extent to which it had been extracting unconscionable fees from Chevron customers and harming Chevron's reputation and goodwill with its customers.

83.     Certain of FleetCor's employees confirmed that FleetCor's account flipping of Chevron accounts accelerated when FleetCor knew Chevron was going

to depart.  For example, FE 8 stated that as soon as Chevron announced that it was leaving FleetCor to move to WEX, employees started to "flip" accounts that were on Chevron cards to other non-Chevron cards so that the Chevron accounts (and the revenue from said accounts) would remain at FleetCor.

84.     Chevron's petition served its purpose.  Within four weeks, on May 26, 2017, Chevron filed a notice of non-suit when the parties had apparently resolved the matter to Chevron's satisfaction.

### F.     The Executive Defendants Took Advantage of FleetCor's Soaring Stock Price To Reap Millions in Insider Stock Sales

85.     Defendants Clarke and Dey had a significant motive to drive up FleetCor's stock price through any means necessary.  Notwithstanding the fact that Defendant Clarke is one of the highest paid CEOs in the country – reaping almost $20 million in salary and benefits annually – he also sold over $100 million dollars in personally held stock during the Class Period.  Though dwarfed by Clarke's gargantuan sales, Dey also sold an enormous amount of shares, reaping over $4 million in proceeds during the Class Period.  The sales made by each of the Executive Defendants are illustrated in the following chart:

| INSIDER SALES BY EXECUTIVE DEFENDANTS | | | | |
|---|---|---|---|---|
| Defendant | Date | Shares Sold | Share Price | Total Value |
| Clarke, Ronald | 05/10/2016 | 290,000 | $150.42 | $43,621,800.00 |

| INSIDER SALES BY EXECUTIVE DEFENDANTS | | | | |
|---|---|---|---|---|
| Defendant | Date | Shares Sold | Share Price | Total Value |
| | 09/06/2016 | 100,000 | $166.73 | $16,672,700.00 |
| | 09/07/2016 | 63,617 | $168.15 | $10,697,262.17 |
| | 09/08/2016 | 80,000 | $167.55 | $13,403,840.00 |
| | 03/08/2017 | 12,116 | $162.55 | $1,969,431.57 |
| | 03/09/2017 | 87,884 | $160.68 | $14,121,403.25 |
| **TOTAL** | | **633,617** | | **$100,486,436.99** |
| | | | | |
| | | | | |
| Dey, Eric | 05/26/2016 | 2,310 | $149.83 | $346,114.92 |
| | 09/06/2016 | 21,969 | $166.62 | $3,660,540.69 |
| | 03/08/2017 | 1,000 | $162.50 | $162,500.00 |
| **TOTAL** | | **25,279** | | **$4,169,155.61** |
| | | | | |

86.     Moreover, many of these insider trades took place a short time before Chevron announced its departure after what was according to the Chevron Petition "a lengthy request for proposal process," at which point FleetCor and the Executive Defendants would have been aware of Chevron's potential departure.

87.     Remarkably, neither of these executives used a "Rule 10b5-1 plan" to execute these trades.  In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. Previously, courts had split on whether simple possession of material, nonpublic information at the time of the trade was a

sufficient basis for imposing liability, and some courts had held that liability attached to a trade only if the insider "used" inside information in making the trade. *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51, 716, at 51,727 (Aug. 24, 2000). To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Trading Plans"). *See id.* at 51,727-28. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.  Neither Clarke nor Dey's trades were made pursuant to a 10b5-1 trading plan or a plan for insiders to sell a predetermined number of shares at a predetermined time.

88. **Clarke.** During the Class Period, Defendant Clarke's sales of 633,617 shares of FleetCor for total proceeds of $100.4 million dollars.  If the stock price had not been inflated due to Defendants' false and misleading statements to the public, Clarke's total proceeds would not have been nearly as high, and he would have made approximately $17 million dollars less (approximately $83 million) if the stock had been trading at the same price as the last day of the Class Period.

89.     Defendant Clarke's sales of FleetCor securities were suspicious in size and amount as he sold <u>no</u> shares of FleetCor securities at all during the prior period of similar length – from November 9, 2014 to February 4, 2016.

90.     Defendant Clarke's sales of FleetCor securities were suspicious in amount compared to his total holdings of FleetCor common stock and exercisable FleetCor stock options as these shares represent approximately <u>67%</u> of the shares that he held during the Class Period.   Notably, investor groups, such as CtW Investment Group, a group that works with pension funds to enhance long-term shareholder returns through active ownership, have publicly denounced FleetCor for its investor pay.   In an open letter in June of 2017 to FleetCor, CtW Investment Group stated that "FleetCor's pay plan has more red flags than a Chinese battleship . . . If you give executives shares, you'd think they would hang on to them.  <u>But [Clarke has] been cashing out.  He's basically using the company as his personal ATM.</u>" (emphasis added).

91.     **Dey.**  As noted above, during the Class Period, Defendant Dey's sales of 25,279 shares of FleetCor for total proceeds of $4,169,155.61 were not made pursuant to a 10b5-1 trading plan.  Notably, Dey's trades in the years before the Class Period were made pursuant to a 10b5-1 trading plan (including a trade in July

2015), indicating that Dey abandoned his 10b5-1 plan or did not renew it specifically for his trades during the Class Period.

92.    Defendant Dey's sales of FleetCor securities were suspicious in amount compared to his total holdings of FleetCor common stock and exercisable FleetCor stock options because the shares sold represented approximately <u>78%</u> of the shares that he held during the Class Period.

93.    During the Class Period, the Executive Defendants made no purchases of FleetCor shares on the open market – all shares were part of a compensation package – which supports a strong inference that the Executive Defendants did not view FleetCor stock on the open market to be undervalued.

### G.    The Market Slowly Begins To Learn About FleetCor's Lending Practices

#### 1.    Chevron Terminates Its Relationship With FleetCor Due To Its Improper Fee Practices

94.    On December 19, 2016, Chevron – FleetCor's largest U.S. partner – announced that it terminated its relationship with the Company and signed a long-term contract with FleetCor's primary competitor, WEX.  As discussed in greater detail below and as later confirmed, Chevron's move to WEX was, at least in part, due to FleetCor's fraudulent billing practices and its addition of egregiously high undisclosed fees onto Chevron customers' bills.

95.    On this news, the price of FleetCor stock declined from $148.04 per share on December 16, 2016 to $142.96 per share on December 19, 2016, a statistically significant amount on abnormally high trading volume of 3,220,700 shares (versus an average of 886,435 during the Class Period).

96.    Indeed, the news regarding Chevron was critical to investors, who commented on the importance of the termination of the Chevron relationship with FleetCor. For example, analysts at Morgan Stanley noted on December 22, 2016, that FleetCor was "trading at recent lows following . . . loss of the Chevron/Texaco US & Canada outsourcing contract, previously its largest partner in the US, and the associated pressure this will put on 2018 organic growth."

97.    Subsequently, as discussed in more detail above, Chevron filed the Chevron Action, alleging that FleetCor was attempting to sabotage Chevron's ability to move its accounts to WEX.  The lawsuit confirmed that FleetCor's excessive use of undisclosed fees was at least part of the reason for Chevron's move to WEX.

98.    That Chevron moved to WEX because of FleetCor's fraudulent billing scheme and the reputed harm to Chevron was further validated by news from a July 17, 2017 Capitol Forum Report.  In that article, Capital Forum reports that BP, which is another major partner of FleetCor, was pressing FleetCor to address customer complaints relating to deceptive marketing, delayed posting of payments resulting

60

in late fees, hidden fees and charges, delayed application of credits, missing rebates, withheld deposits, website portal problems, and lack of action despite numerous customer calls.

### 2. The March 1, 2017 Capitol Forum Report Revealing Some Of FleetCor's Predatory Practices

99. On March 1, 2017, Capitol Forum published an explosive investigative report describing for the first time for the public how FleetCor's business model relies on overcharging customers and padding fee income through late fees even when customers pay on time.

100. The Capitol Forum report relied on interviews with former FleetCor employees and current and former FleetCor customers, and discussed (as stated above) how FleetCor was engaged in a scheme to increase revenue by: (i) making it impossible for customer to pay their bills on time in order to generate late fees; and (ii) heaping large fees on customers and ensuring that the customers remained unaware of these fees by understating or misrepresenting the fees at point of sale, waiving fees for the first three months of card use, and burying the fees.

101. The Capitol Forum report concluded that:

[g]iven the tactics that FleetCor employs, it is particularly vulnerable to any future developments that would draw attention to the company's billing practices such as a regulatory investigation or negative headlines. Either development would likely result in current customers

subjecting bills to closer scrutiny, the company being required to issue refunds or other potential penalties, and the loss of future and existing business to competitors.

102.   In response to the publication of Capitol Forum's March 1 article, the price of Company's stock declined from $170.00 per share on February 28, 2017 to $164.75 per share on March 1, 2017, a statistically significant amount on abnormally high daily trading volume of 2,401,500 shares (versus an average of 886,435 shares during the Class Period).

103.   However, Defendants were able to mitigate the impact of Capital Form's report of the Company's stock price through further false statements. After the report was published, Defendant Dey spoke with analysts to falsely reassure them that allegations regarding billing and marketing practices were unfounded.  For example, a Deutsche Bank analyst report dated March 6, 2017 discussing a recent meeting with FleetCor management, including Defendant Dey, stated that during that meeting, "[m]anagement also highlighted that they are transparent on fee disclosures with fee information being provided to the customers in the initial packet after the customer signs up and details are also provided in the invoices."  For this reason, the Capitol Forum report was a partial disclosure and did not fully reveal the truth concerning FleetCor's misconduct, and accordingly, did not remove all of the artificial inflation in the price of FleetCor's common stock.

104.   Capitol Forum also released an additional report on March 20, 2017 after interviewing 31 current and former customers and 22 former employees. According to the March 20, 2017 report, these interviews "reaffirmed [Capitol Forum's] initial findings that fuel cards are marketed as having no fees" and further found that "the nature of FleetCor's sales & marketing practices, onboarding process, and initial grace period on fees work in concert to obscure certain important fees."

### 3.    The April 4, 2017 Citron Report that Disclosed Further Unsustainable Practices

105.   On April 4, 2017, Citron Research published a report entitled "Citron gives FleetCor the Sunlight it Deserves: For Investors, sure…but most importantly for customers," which raised further questions about FleetCor's marketing and billing practices.  Citron Research has been publishing investigative reports for over 14 years, and has a longstanding track record of identifying fraud in businesses. Citron based its analysis on "numerous customer, competitor, and former employee interviews, online review of customer and former employee complaints, gathering of customer invoices, lawsuits, FOIA requests, and financial modeling." Citron's report accused FleetCor of being a "predatory company by design, whose core strategy is to methodically rip off its customers, using business practices and fees

63

that are designed to deceive." Citron concluded that "[t]he point is that with fees generating 56% of total revenues, the company has become so dependent on abusive fee revenue that the stock will collapse when it proves unsustainable." Citron determined that even if FleetCor's fees revenues were reduced by one-third and it kept the same EBITDA multiple, the stock would trade at a 45% discount to current price.

106.   Citron also confirmed Capitol Forum's findings that FleetCor makes it extremely difficult for customers to pay their bills on time so as to ensure that FleetCor can generate late fees. Citron further confirmed that marketing material – even to government customers – misleadingly stated that there were "no fees" associated with FleetCor's products

107.   On this news, the price of the Company's stock declined from $150.15 per share on April 3, 2017 to $141.60 per share on April 4, 2017, or approximately 6%, a statistically significant amount on abnormally high daily trading volume of 8,892,000 shares (versus an average of 886,435 shares during the Class Period).

108.   Analysts echoed Citron's wariness of FleetCor's fee structure. For example, as discussed in an April 4, 2017 Benzinga article, Credit Suisse analyst Paul Condra discussed with Benzinga that:

> 56 percent of the revenue comes from customers, those are primarily fees. . . . The rest from the merchant represent interchange. I am Neutral

64

on the stock, and my view has been I have a tough time understanding the model with low visibility on fundamentals but that investors seem to like the stock for management's ability to raise prices. Management will say they don't raise prices, but they sell more higher cost products. We could probably benefit from more disclosure.

109.  After the Citron report was published, according to FE 2, Defendant Clarke sent an email around to FleetCor employees denying the Citron allegations. However, according to FE 2, at the same time, FleetCor hired a third party consultant, named Clearwater, to review the Company's practices.

110.  Further, by no later than May 24, 2017, the Company disclosed to analysts and investors that it had hired outside counsel to perform an internal review due to the allegations regarding its fee practices published by Capitol Forum and Citron.  Indeed, Defendants later admitted that this was a "Board-level legal review" – meaning that FleetCor's Board of Directors had required the Company to hire outside counsel to review FleetCor's fee practices.

### 4.    The April 27, 2017 Capitol Forum and Citron Reports Revealing The Results Of Additional Third Party Investigation Into FleetCor

111.  On April 27, 2017, Capitol Forum published another investigative report, entitled "FleetCor: Bill Payment System Imposes Numerous Obstacles that Limit Customers' Ability to Identify and Resolve Billing Issues and Make Timely Payments."  This report found that the complexity of the billing system was part of

the business and increased the odds that the customer would pay late or that an undisclosed fee would go undetected. Indeed, the report found that the system was set up so that customers would pay their bills late and so that FleetCor could generate late fees. Because of this, FleetCor would "always lose customers." As discussed above, the investigative report quoted one former Comdata Finance employee as saying that they heard Mr. Clarke state, "If you are not losing 10% of your customers you are not charging enough."

112. Capitol Forum interviewed 39 former employees and several customers in connection with this report. These former employees were quoted as saying the following about FleetCor's late fee and billing structure:

- "FleetCor's whole business is how do we take advantage of small business";

- "Everything is designed for customers to be late."

- FleetCor's billing structure is designed to "[c]reate chaos."

- "[T]here are barriers along the way that almost automatically cause a customer to be in a position where their bill might be late."

- "The whole system is set up so you can't pay your account early. Everything is designed for customers to be late."

- FleetCor was "always finding ways to stop customers from making payments on time."

113.   Indeed, of the 39 former FleetCor employees Capitol Forum interviewed, only one employee was more neutral than negative in his view on the intentionality of the complexity of the billing system.

114.   Also on April 27, 2017, Citron published a new report entitled "Citron Exposes the Dirty Illegal Secrets of FleetCor.  Also, Proof the Company is Already in Cover-Up Mode." This new report explained how as discussed above, FleetCor developed a "deep learning algorithm" to "intentionally cheat its customers."

115.   Citron's report also contained snapshots of FleetCor's website showing that since the publication of Citron's initial report, FleetCor had taken down certain marketing information aimed at government customers stating that there were no fees on the Fuelman credit cards.  According to Citron, the website change could be a result of either: an impending government probe, an investigation by the attorney general, or an investigation by the FTC.

116.   Additionally, Citron reported that through its interviews with former employees, it had learned of FleetCor: (1) "placing wrong dates on payments"; (2) "not checking mail on [a] timely schedule"; (3) "stealing rebates from customers"; (4) "double-billing for the same service"; (5) having "intentionally bad customer service"; (6) "blaming computer problems'" for poor customer service or late processed payments; and (7) generally having a "<u>corporate culture underpinned by</u>

67

deeceit." (emphasis added).  As Andrew Left, Citron's founder, stated in an interview

with Benzinga, an online financial media outlet, on April 27, 2017:

> In my opinion, through the interviews, through the analysis that this is
> something completely contrived by management.  This isn't by chance,
> this isn't just a few rogue employees jimmyjacking the system.  This is
> a company that said we found ways to do this to circumvent the system
> with fine print and in their mind still be legal and compliant.  They keep
> pushing the envelope to the point where it's not compliant anymore,
> and that's what I believe.

117.    Citron analyzed the amount of money that FleetCor would lose if forced

to decrease its fees.  According to the Citron report, in fiscal year 2016, FleetCor

generated $1 billion of net revenues from customer fees – excluding merchant fees.

The Citron report further concluded that "[i]f customer (junk fees) get reduced by a

mere 25% and FLT trades at a EV/EBITDA multiple of 14x like Wex, its nearest

competitor, FLT stock trades at $76 [or approximately 50% of its then trading

value]."

118.    These disclosures caused the price of the Company's stock to decline

from $151.38 per share on April 26, 2017 to $145.65 per share on April 27, 2017, or

4%, a statistically significant amount on abnormally high daily trading volume of

2,918,400 (versus an average of 886,435 during the Class Period).

119.    Analysts noted those reports caused of this price drop.  For example, an

April 25, 2017 Barclays analyst report stated that "Shares of FLT are down ~11%

since reporting 4Q (vs. S&P +3%) on 2/8/2017 on heels of cautious reports around its sales tactics, fuel-card related fees and customer complaints."  Additionally, a May 1, 2017 Morgan Stanley report noted that "FLT short sellers/writers have criticized some of FLT's fee/service practice to [small and midsize businesses], highlighting (and potentially creating) regulatory risk from FTC/State Attorneys General.  While we previously noted that we thought the risk was isolated, and that the theoretical FTC risk seemed modest (based on expert opinion), the volume of reports and substance of the complaints has rattled confidence in the marginal investor."

### 5.    The May 1, 2017 Filing Of The Chevron Action

120.   On May 1, 2017 (after the close of the market), Chevron filed the Chevron Petition against FleetCor in Texas state court for a temporary restraining order, temporary injunction and permanent injunction.  As discussed above, the lawsuit stated that "FleetCor's increasingly poor service threatens to harm Chevron's customer relationships and to decrease the value of the portfolio.  FleetCor's damaging actions include, but are not limited to: allowing the number of sales personnel to fall below contractual requirements; increasing customer card shipping-and-handling fees without approval; and attempting to cut call-center hours without

approval.  <u>FleetCor seeks to maximize its profits by harvesting the accounts for fees</u> <u>while failing to service the accounts at the contractually required levels.</u>"

121.   After Chevron filed its complaint and news of the complaint circulated within the market on May 2, 2017, the price of the Company's stock price continue to decline through May 3, 2017, due to a Citron tweet calling attention to the lawsuit and connecting the lawsuit to FleetCor's fee practices.  Analysts, including SunTrust, attributed the decline in FleetCor stock price to the filing of the lawsuit.

122.   In the end, the stock price decreased from the Chevron news from May 1, 2017 to May 3, 2017 dropping from $148.18 per share on May 1, 2017 to $131.26 per share on May 3, 2017, a statistically significant amount on abnormally high daily trading volume of <u>6,315,973</u> on May 2, 2017 and <u>13,812,600</u> on May 3, 2017 (versus an average of 886,435 during the Class Period).

*        *        *

123.   As statements from former employees confirm, after the truth of FleetCor's billing and sales practices began to leak into the market, FleetCor scrambled to mask its fraudulent behavior.

124.   Indeed, FleetCor executives continued to falsely reassure investors that there were no improper sales and billing practices at FleetCor even on the last day of the Class Period.  For example, on the May 1, 2017 second quarter 2016 earnings

70

call, the same day that Chevron sued FleetCor, Defendant Clarke claimed that "[w]e've got lots of satisfied clients and we retained 90% of the clients every year. So pretty positive."  Thus, FleetCor continued hide its reliance on "flipping."  In fact, to further hide its customer loss due to fees, FleetCor falsely touted its "retention-rate" to convince concerned analysts that its fee practices were not problematic enough to affect FleetCor's business. FleetCor claimed that if customers were truly being subjected to such horrible and unlawful business practices, the customer retention rate would be much lower.  Analysts took this statistic seriously. For example, in an article entitled "Strongly Refutes Fake News," Deutsche Bank analysts noted that FleetCor customers had over 700,000 customers and "has a +90% retention rate" with "33-40% of the [less than] 10% that leave [FleetCor being] due to involuntary reasons, such as bankruptcy."  However, as Clarke disclosed in a conference call on May 24, 2017, just a few short weeks later, he was actually referring to "revenue" retention – not customer retention.

125.   On the same call, the Executive Defendants also made several other easily verifiable misleading statements to investors in an attempt to dispute the veracity of allegations regarding its fee and marketing practices.  For example, Defendant Clarke falsely told investors that the Citron and Capitol Forum research reports were without merit and were just "fake news and exaggerations."  As

71

discussed above, this was false, as corroborated by Lead Counsel's investigation and numerous former employees.

126.   Next, Todd House told investors on the same call that even though there had been scrutiny on FleetCor's fee practices, "[w]e've really seen no impact on our day-to-day business. . . .   We've had a couple of our largest clients in the enterprise segment asked some questions, but it's been easily talked off.   And I'd say, our partners, the branded partners BP and Chevron have also asked some questions, but in general, it's been quite easy to work with them."   This was not the case with either BP or Chevron.   Indeed, this statement was made on May 1, 2017, the same day that Chevron filed a lawsuit against Chevron.   Further, the July 17, 2017 Capitol Forum report confirmed that BP was pressing FleetCor to address customer complaints related to its fees and billing.

127.   Finally, Defendant Clarke claimed that the customers pay only by "either a PNC or [R]egion's lockbox" – or P.O. Boxes controlled by third parties – and that "paper checks never come to FleetCor."   However, on May 3, 2017 Capitol Forum reported that invoices on several different fuel cards include a payment option where customers may send payments via overnight guaranteed mail to FleetCor's Covington, Louisiana location.   Capitol Forum also confirmed with a then-current

customer service representative that overnight check payments may be sent to FleetCor's Covington, Louisiana location.

### H.    Post Class Period Events

128.   While Clarke and Dey were making outward pronouncements of innocence, internally they was trying to quickly erase its own fraudulent practices and internal culture that promoted such practices.  Indeed, as noted above, according to FE 2, after the Citron and Capitol Forum articles were published, FleetCor brought in an outside consultant, Clearwater Consulting, to review FleetCor's practices. FleetCor also had initiated an internal legal investigation at the Board of Directors' behest.  Analysts asked Clarke and Dey on a May 24, 2017 conference call whether the Company had "done a board-level review as well, the board-level legal review?" Defendant Dey responded affirmatively "Yes . . . That was the [Terms and Conditions] review."

129.   The Board's investigation forced significant changes to the Company's sales practices and personnel.  According to FE 2, in spring or summer of 2017, after Citron filed a report revealing aspects of FleetCor's fraudulent billing scheme, FleetCor "out of the blue" held a meeting with employees to change the Company's disclosure practices.  The employees were instructed that, going forward, FleetCor would disclose information about fees on sales calls. At the meeting, FleetCor

employees were given a handout explaining FleetCor's fees.  FE 2, who was one of FleetCor's top three salespeople during FE 2's five years with the Company, confirmed that if this protocol were implemented, it would negatively affect sales and revenue going forward.  FE 2 confirmed that it would be harder for sales representatives to sell cards if they had to disclose the fees to customers.

130.   Further, both while the Board's internal investigation was ongoing and after it had reached its conclusions, FleetCor terminated the employment of two of its most senior employees in charge of U.S sales.  Specifically, two of the main players in FleetCor's sales and marketing structuring and the practices discussed herein resigned suddenly and suspiciously after the Board's investigation was well underway.  First, Todd House, President, North American Fuel Card, resigned in May 2017.  According to FE 8, House made a presentation to top sales employees on a Friday in May to discuss the recent allegations regarding FleetCor's fee practices.  According to FE 8, House did not mention anything about any intentions to leave FleetCor during the meeting, but on the Monday after the presentation, FleetCor employees received an email stating that House was resigning. The Company then announced House's resignation in a press release dated May 31, 2017.

131.   Second, Steven Casper, Vice President of Sales U.S. Operations, was recently fired from FleetCor.  FE 2 reported that Casper was fired in October 2017. According to FE 8, House was highly involved in the implementation of FleetCor's fee practices and according to FE 2 and FE 11, Steven Casper had the final say on decisions regarding the sales force.

## V.   DEFENDANTS' FALSE STATEMENTS

132.   FleetCor and the Executive Defendants made materially false and misleading statements and omissions of material fact to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Among other things, these Executive Defendants falsely and misleadingly represented to investors that: (i) that FleetCor's "sales and marketing" were responsible for FleetCor's growth, without disclosing the fact that FleetCor's sales tactics were predatory and misleading; (ii) that FleetCor's "bookings growth" was strong and a sign of future growth, even though a substantial portion of that purported growth was just recycling current customers; and (iii) that FleetCor was enabling Chevron's smooth transition to WEX rather than siphoning off Chevron's customers and "sabotaging" their transaction.

A.    **Defendants Misrepresented And Omitted Material Facts Concerning The Company's "Sales and Marketing"**

133.    Throughout the Class Period, analysts closely questioned Defendant Dey concerning the "secret sauce" of FleetCor's success.  Dey repeatedly claimed that FleetCor's success and growth was accomplished "the old fashioned way" – through "investments in sale and marketing."  However, FleetCor's success was not derived from "old fashioned" sales and marketing.  Instead, it was driven by FleetCor's deceptive marketing (including by withholding information about FleetCor's onerous fees), FleetCor's misleading billing practices, and FleetCor's widespread account flipping.  A selection of Defendant Dey's statements misrepresenting and omitting material facts concerning FleetCor's sales and marketing practices is set forth below.

134.    On February 10, 2016, Defendant Dey presented at the Goldman Sachs Technology Conference, where he touted FleetCor's enormous growth since its IPO in 2010.  Dey went on to state, "We build, we buy, and we partner. We invest a certain amount of money in sales and marketing. We kind of do it the old-fashioned way."

135.    Next, on March 8, 2016, Defendant Dey presented at the Raymond James Institutional Investors Conference.  At the conference, Defendant Dey again

represented that FleetCor achieves growth "by doing it the old-fashioned way. We invest in sales and marketing."

136.    On September 13, 2016 at the Deutsche Bank Technology Conference, an analyst from Deutsche Bank asked Defendant Dey: "I think one of the questions I always get is, how come FleetCor is so good at sales and marketing? What is your secret there?" Dey denied that there was any "secret sauce" to FleetCor's marketing, stating:

> Secret sauce? I don't know if there is any secret sauce to it, but, you know what, we tend to use every means imaginable to sell our products. We use – obviously, we have got a big investment in telemarketing, where we tend to sell more down market, obviously with these products and we know what that message that we have to deliver is in order to get a new account. We also partner with third parties. We use mail. We use the Web. We have direct sales forces. We use, again, other sorts of partners to help sell our products, so we use every means imaginable out there to sell our products, and we also have some cross-sell opportunities with some of our other products.

137.    Analysts paid close attention to Dey's statements attributing FleetCor's success to FleetCor's "old fashioned" sales and marketing investments. For example:

- In JP Morgan's February 22, 2016 report, it noted that its analysts met with Clarke and Dey and that "[t]he key to the 10 [FX/fuel-neutral growth revenue] is incremental sales and marketing dollars where it can get a 2x return on revenue and those investment dollars have been put to work. We're confident FLT can at least deliver on its stated guidance[.]"

- A JP Morgan report published on May 24, 2016 stated that "Sales investment driving double-digit revenue growth."

- SunTrust analysts also noted the connection between FleetCor's revenue growth and its sales investments, stating in an August 5, 2016 report "[o]ngoing above-average organic revenue growth will likely be driven primarily by increased sales investment."

138. Defendant Dey's statements in ¶¶134-36 were materially false and misleading by omission of material facts. The Company did not achieve growth "the old fashioned way" or "organically" through traditional and above-board sales and marketing, but instead achieved growth through fraudulent billing practices, dissemination of misleading marketing materials, and reliance on predatory sales tactics. As discussed above in Section IV(C)(2), FleetCor trained its salespeople to market FleetCor's cards as "no fee," when in reality FleetCor and its sales staff knew that enormous fees would eventually be imposed on the customer. In fact, FleetCor deliberately withheld information about its fees from its salespeople, so they were unable to provide accurate information even if they wanted to and had not been prohibited from doing so. Moreover, FleetCor's sales compensation structure was designed to maximize new account origination and usage by the customer. That compensation structure, in combination with FleetCor's standardized training for sales people not to disclose fees, meant that FleetCor's sales staff never told potential customers that they should expect significant late fees, and that FleetCor reserved

the right to impose a number of miscellaneous fees that could make up a significant increase to the customer's bill.  Instead, FleetCor's standard practice was to delay imposing those enormous miscellaneous fees on customers until they were comfortable with FleetCor's billing practices and (particularly in the case of the small businesses that FleetCor targeted) stopped checking the invoices so closely. Finally, these statements were misleading because, far from "old fashioned" sales and marketing, FleetCor took advantage of its management of multiple branded cards – and customers' ignorance of the fact that the same predatory company with excessive fees managed them all – to transfer unhappy customers to other cards and retain the cash flows from those accounts.

**B.      Defendants Made Numerous False Statements Regarding FleetCor's Bookings Growth**

139.   Beginning in May 2016, Defendants began to promote the Company's new "bookings," or as Clarke clarified on November 1, 2016, "the new accounts they acquired," as an important measure of the Company's functional health. Notably, Defendant Clarke claimed that FleetCor's "bookings" numbers were "the single best indicator of health" for investors to pay attention to.  These statements were also false and misleading as they omitted the material fact that much of FleetCor's purported new business growth was due to the widespread practice at FleetCor whereby its employees "flipped" customer accounts from one card to

another and counted each new card as a new sale. Certain of Defendants' false statements regarding bookings growth are set forth below.

140.   On a May 4, 2016 earnings conference call Defendant Clarke told analysts that "new sales booking dollars, the way we look at new business, was up 27% versus the prior-year."   JP Morgan analyst Tien-tsin later asked Defendant Clarke: "The sales, the booking dollars I think, Ron, you said up 27%.  Where are you seeing some of that good sales performance?  Is it more international, domestic? Is it in the same areas or maybe some new areas? Just trying to understand that better."  Defendant Clarke responded:

> Yes, Tien-tsin, it's literally across-the-board.  I've got the page here in front of me. The US numbers were up big, particularly because they didn't have as good a quarter a year ago.  The Comdata bookings are way, way up because we made investments both in the trucking line of business and in the corporate payments business. . . .. The people have stabilized.  The sales are way up. (emphasis added)

141.   On an August 4, 2016 Second Quarter 2016 conference call, Defendant Clarke announced that "[I]n terms of sales for the quarter, we had a very strong new bookings quarter, with bookings growing 18% over the prior year.  That's on top of the 27% sales growth rate that we had in Q1."

142.   On that same conference call, a JP Morgan analyst asked Defendant Clarke "how does the 18[%] and 27[%] in the first quarter in terms of bookings? How can we use that figure to translate that into revenue next year? Is there a rule of

80

thumb? Obviously it is a good number but just trying to contextualize that for?" After explaining the logic of modeling revenue with bookings growth figures, Defendant Clarke stated that:

> What I think what we're trying to do with the sales thing that we are disclosing here, is to give you a sense of sales investment that we are making.  Moreover, we told them $20 million to $25 million . . . [i]ncremental this year. So we are growing sales almost as fast if you take the first and second quarter, I think we are at 20% or something at the first half up.
>
> So we're, the first headline is <u>we're selling more, right</u>? Than we were the prior year.
>
> The second one, which I think it's good for investors, <u>is it's the single best indicator of health</u>.  If you can sell the card program in July of 2016 then your offers are relevant.
>
> We call out sales to let people know people still, that are making decisions like the product line, that we have in the market today. <u>We are not living off of the past</u>. Those are the couple of reasons for the disclosure.

(Emphasis added).

143.  On the November 1, 2016 earnings call, Defendant Clarke also announced that "[i]n terms of new sales for the quarter, bookings grew 7% versus the prior year, but we did have some really good sales performance inside of that, a number of our businesses grew new sales in excess of 50% in the quarter."

144.  In FleetCor's February 8, 2017 press release, Defendant Clarke was quoted as stating that "Q4 new sales bookings recovered quite nicely."  On the

earnings call that same day, Defendant Clarke repeated that "new sales bookings recovered quite nicely from Q3."

145.   Defendants' false and misleading statements concerning bookings growth impressed analysts, who noted them while recommending that investors purchase FleetCor stock. For example,

- JP Morgan announced in an August 5, 2016 report that it was maintaining its rating of Overweight and noted that "[n]ew sales (or bookings) increased 18%, which paired with 27% growth in 1Q bodes well for future growth."

- An August 5, 2016 JP Morgan report observed that "New sales (or bookings) increased 18%, which paired with 27% growth in 1Q bodes well for future growth."

- A November 1, 2016 Oppenheimer & Co. report highlighted as a "key point" in raising its revenue guidance for 2016 FleetCor's claim that "[b]ookings growth was up 7% Y/Y, highlighted by 50% Y/Y growth in Comdata new business sales."

146.   The statements and omissions set forth in ¶¶140-144 were materially false and misleading.  The Company overstated its "bookings growth" because it relied upon "flipping" accounts to meet its account growth goals.  As discussed above in Section IV(D), FleetCor's sales personnel routinely engaged in a practice of transferring existing customers to different FleetCor cards in order to maximize their personal compensation and to meet FleetCor's demands for new accounts.  This practice was widespread, well-known, specifically encouraged by FleetCor

82

management, and readily identifiable through FleetCor's central computer systems. According to FleetCor's salespeople, who were in a position to know how much account flipping took place, between 40-70% of the FleetCor's "new" bookings out of its main Norcross office, where the vast majority (if not all) of FleetCor's U.S. telesales were based were actually flipped accounts. Defendants' statements were misleading by virtue of the fact that they omitted that these were not all, in fact, new accounts and in fact included many recycled accounts.

### C. Defendants Made Numerous False Statements Regarding FleetCor's Revenue Growth

147. Throughout the Class Period, Defendants made repeated false statements about FleetCor's revenue growth, which allegedly occurred in the face of massive macroeconomic headwinds. However, Defendants omitted the material fact that FleetCor's organic growth was derived from usurious fees that destroyed customer relationships and were not sustainable in the long term. Set forth below is a number of Defendants' false and misleading statements about revenue growth:

148. On FleetCor's earnings conference call for the fourth quarter and fiscal year of 2015 held on February 4, 2016, CEO Clarke stated that the Company's "organic adjusted revenue growth was approximately 10% for the quarter." Clarke attributed this growth to several factors, including the Company's U.S. MasterCard business, its Pacific Pride business, part of FleetCor's cardlock fueling industry or

automated, open 24/7, unattended fueling sites for commercial fleet vehicles, and revenue from Comdata, which was acquired in November of 2014.

149.   On May 4, 2016, FleetCor announced its first quarter 2016 earnings in a press release and held an earnings conference call.  Defendant Clarke announced that "[o]n a macro neutral basis, that is adjusted for fuel price, fuel spreads, and FX, revenues actually grew 10%."  Defendant Clarke attributed this growth to five different "primary drivers": 1) the MasterCard business; 2) the Comdata business; 3) the Uber business; 4) the Pacific Price business; and 5) lower interest expense caused by FleetCor de-levering and a lower tax rate than 2015.

150.   On FleetCor's August 4, 2016 conference call announcing earnings for the second quarter of 2016, Defendant Clarke announced that a "Q2 revenue of $418 million" and stated that "organic revenue growth was 9%."

151.   On November 1, 2016, FleetCor held its earnings conference call for the third quarter of 2016.  Defendant Dey stated that for the Company's North American segment, "most of our lines of business performed well resulting in approximately 9% organic growth."

152.   On FleetCor's February 8, 2017 earnings call for the fourth quarter and year-end 2016, Defendant Clarke reported that "on a constant macro or like-for-like basis Q4 revenue growth would have been 24% . . . ."

153. Defendants' false and misleading statements concerning revenue growth impressed analysts, who relied on them in recommending that investors purchase FleetCor stock. For example:

- A Barclays analyst noted in a February 5, 2016 report that "FLT's businesses continued to grow well despite macro headwinds and some softness in same store-sales, with the overall company growing revenue 10% Y/Y on a constant macro basis excluding [Stored Value Solutions] (9% including SVS).

- A Deutsche Bank analyst report dated May 4, 2016 stated that "New sales growth of 27% Y/Y and solid momentum in key products including MA universal cards (vol. up 48% Y/Y on constant macro), Comdata (up 11%) and corporate payments (up 13% ex-healthcare) bode well."

- A May 5, 2016 Barclays analyst report stated that "[o]n a constant macro basis, organic growth was ~9% (10% growth excluding SVS), indicating fundamental stability across the FLT business."

- In an August 4, 2016 report entitled "Future Looks Bright," Jefferies analysts discussed how "FLT indicated that organic revenue (const. curr. /const. fuel) grew 9% in the quarter (same as Q1), and that core Comdata trucking grew 10% in Q2 (vs. 11% last quarter). Other revenue drivers included MasterCard, which grew revenues 27% y/y (vs. last quarter's dramatic 48% const. fuel growth; boosted by Uber and pricing, in our opinion), and corporate payments."

154. The statements and omissions set forth in ¶¶148-152 were materially misleading. Defendants' statements were rendered materially misleading through the omission of the material fact that FleetCor's revenue growth was a result of its rampant "flipping" practices as well as its predatory sales practices where sales

85

employees would falsely pitch prospective customers on a no fee card.  These practices, were not sustainable and will lead to an enormous cut to revenue when FleetCor is forced to change them.  Indeed, as FE 2 confirmed, it will be far more difficult for salespeople to sell the Company's products if the Company actually requires them to disclose fees when attempting to sell the product.  Moreover, if FleetCor is forced to cut its fees due to fears of regulatory or legal action, then it will be a significant cut to revenue growth – these fees alone account for at least 10% of the Company's revenue.

### D.   Defendants Falsely Stated That They Were Helping Chevron Transition To WEX

155.   As discussed above, on February 8, 2017, CEO Clarke reassured investors that, although the Company was "disappointed" with Chevron for terminating its contract, "we will help them transition to their new supplier."

156.   This statement was false and misleading.  As an initial matter, FleetCor did not disclose that Chevron terminated its relationship with the Company because of its enormous fees, which threatened to destroy Chevron's goodwill with its customer base.  Even more significantly, by this time, FleetCor and Defendant Clarke had already refused to assist Chevron transition to its new supplier in violation of its contract with Chevron.  In fact, according to the Chevron Petition discussed above, as of the date that Clarke made this statement, the clock had already

run out for FleetCor to provide the financial data to Chevron and WEX called for under FleetCor's contract with Chevron.   Then, days after Clarke made this statement, FleetCor took overt steps to obstruct Chevron's departure.

157.   Indeed, according to the Chevron Petition, between February 13 and March 22, 2017, FleetCor informed Chevron that it refused to permit WEX to do reasonable due diligence and refused to provide Chevron and WEX access to all of the books, records, and data regarding FleetCor's overseeing of the Chevron cards.

158.   Tellingly, during the time that FleetCor was delaying Chevron's departure and cultivating their portfolio for new accounts, Dey and Clarke made further massive sales of FleetCor stock.   Clarke received total proceeds of approximately <u>$16 million</u> from FleetCor stock sales on March 8 and 9 of 2017, and Dey receiving total proceeds of $162,000 from sales on March 8, 2017.

## VI.   <u>ADDITIONAL ALLEGATIONS OF FLEETCOR'S AND THE EXECUTIVE DEFENDANTS' SCIENTER</u>

159.   At all relevant times, the Executive Defendants acted with scienter in making material omissions of fact and materially false and misleading statements during the Class Period.   Each of the Executive Defendants had knowledge that the statements he or FleetCor made were false and misleading, or acted with reckless disregard for the truth or falsity of those statements, as demonstrated by the allegations above, and the additional substantial direct and circumstantial facts and

87

evidence below supporting a strong inference of scienter for the Executive Defendants. Numerous facts and circumstances support a strong inference of scienter on the part of the Executive Defendants, including the facts and circumstances below, among others detailed in this Complaint:

160. First, as discussed above in Section IV(F), the Executive Defendants made massive insider sales during the Class Period, which provided them with a strong motive and incentive to artificially inflate the price of FleetCor stock through materially false and misleading statements to investors. Indeed, Defendant Clarke made over $100 million in total proceeds during the Class Period and would have made substantially less (approximately $17 million less) had the stock price not been artificially inflated. ¶88.

161. Second, as discussed above in ¶61 according to former employees, Defendant Clarke was the "mastermind" behind the various fraudulent business practices. Capitol Forum reported that Clarke specifically directed that the terms and conditions for FleetCor's fuel cards be reduced from 6-point to 4-point font and from black to grey so that they would be much harder to read. ¶61. Additionally, as confirmed by former employees, starting in late 2015 or early 2016, top level executives began to hold semi-regular focus group meetings with top sales people at FleetCor and discussed customer outrage at the massive fees that FleetCor was

tacking onto customer bills.  (¶62)  Paul Citarella and Crystal Williams, FleetCor's

Vice President of Human Resources, attended these focus group meetings (and Todd

House attended at least one such group) and would have understood that FleetCor's

billing practices, which were conceived of and dictated by senior management, were

engendering massive customer dissatisfaction.  ¶62.  House, Citarella, and Williams

would have also understood – to the extent that they did not already know, which is

not believable – that FleetCor was making it impossible for its customers to pay on

time or avoid erroneous miscellaneous fees.  According to FleetCor's offer letter to

House in 2009 (filed with the SEC in conjunction with the Company's IPO), House

reported directly to Defendant Clarke and was viewed a potential CEO successor.

162.  Third, the reports from numerous former employees set forth above

confirm that the Company had a constant and widespread practice of marketing

FleetCor products to potential customers as "no-fee" cards.  See §III(C)(2).

FleetCor's former employees further consistently reported that the Company

systematically tacked on exorbitant fees to customer bills once the Company felt that

the customer would remain unaware of the fees or was too reliant on FleetCor to

cancel their account once the fees were discovered.  ¶¶40-41. Additionally, the

Company had a well-established policy of encouraging sales people to "flip"

accounts from one FleetCor card to another so as to create the false appearance of

FleetCor obtaining "new business." §IV(D).  Specifically, according to FleetCor's former employees and third-party investigative reports, the following practices were widespread and constant during the Class Period:

- FleetCor employees were instructed to tell potential new customers that FleetCor products had no attendant fees.  ¶48.

- FleetCor's payment system was constructed and maintained to make it impossible for customers to pay their bills on time so as to generate usurious late fees.  §IV(C)(1)(a).

- FleetCor waited weeks or months before it started tacking excessive and previously undisclosed fees onto customer bills, so that customers would potentially stop reviewing their bills as closely and would remain unaware of the large fees. ¶¶40-41.

- FleetCor management encouraged the practice of "flipping" accounts or moving a FleetCor account from one FleetCor card to another.  This practice made it seem that FleetCor was acquiring new business when, in reality, the revenue stream into FleetCor from that one customer remained constant. §IV(D).

Capitol Forum corroborated that these practices were widespread throughout the Company in its April 27, 2017 report, which noted that of the 39 former FleetCor employees Capitol Forum interviewed, only one employee was more neutral than negative in his view on the intentionality of the complexity of the billing system. ¶¶112-13. In addition, Citron did its own employee interviews and further corroborated Lead Counsel's findings. ¶¶105-106, 115-116.

163.  <u>Fourth</u>, the fact that FleetCor had to make significant personnel and policy changes after its marketing and billing scheme were exposed and the Board of Directors initiated an internal investigation strongly supports an inference of scienter.  Specifically, after the Board of Directors retained outside counsel to conduct an internal investigation in response to the Capitol Forum and Citron reports, Todd House, President, North American Direct Issuing, who had been with the Company since 2009, announced his "retirement" effective July 1, 2017. Similarly, former employees report that Steven Casper, Vice Present for U.S. Sales Operations, who had been with the Company since 2012, was fired in October 2017. ¶131.  Further, in July 2017, the Company implemented a significant change in policy when it brought all of its telesales personnel together and informed them that, going forward, the Company would actually disclose its fees to customers when selling its fuel cards.  ¶129.  The fact that FleetCor was forced to undertake such sweeping personnel and policy changes to attempt to correct the issues discussed herein indicates that these issues were deeply rooted in the Company and dictated from the very top of FleetCor's management.

164.  <u>Fifth</u>, FleetCor's training and compensation for its critical telesales group was specifically geared towards misleading customers and extracting the maximum amount of fees from each customer, whether justified or not.  Numerous

former employees and investigative reports corroborated that FleetCor only held a very brief training session for new employees and that, during that session, FleetCor trained its sales people to lie to potential customers and to pitch to potential new customers that there were no fees associated with their contracts.  ¶48. Indeed, numerous former employees stated that not only were they trained to sell customers on the fact that there were no fees associated with the cards, but they themselves were not told about the fees.  ¶¶49-50.  Thus, when customers called to complain about the fees, customer service representatives could not explain the fees to them. ¶49.  The compensation structure was also set up so that FleetCor employees were in no way incentivized to build client relationships or maintain a relationship long term.  FleetCor sales personnel were only compensated for the initial sale and for the gallons used by the client within the first ten weeks of their contract. ¶53. Thus, FleetCor employees were incentivized through their compensation to hook the customer into a contract with a false sales pitch.  It did not affect their compensation at all if the customer later learned of FleetCor's exorbitant fees and cancelled their contract – as long as the customer did so after ten weeks.

165.   Sixth, FleetCor created sophisticated Company algorithms to evaluate and maximize the fees charged to each customer.  According to Capitol Forum and Citron investigative reports, FleetCor used an internal Company algorithm to

maximize fees for each customer and tracked customer complaints to see how much in fees it could impose on a given customer. ¶¶62-64. As reported by Capitol Forum, the Company used a Journal Entry Spreadsheet, which contained a "TESTING" input which the Company used to see whether it could tack fees onto customer bills without customers pushing back. ¶62. The spreadsheet also contains language stating "% OF FEE CREDITS" tracking whether no credits were returned to customers who called to complain, in large part, about the fees. ¶62. Next to this language, FleetCor noted that this input "shows how well we are negotiating." ¶62. Similarly, as reported by Citron, FleetCor customers are all classified as "Red," "Yellow" or "Green," based on "how vulnerable the customers are to this type of gouging without detecting it or complaining." ¶64. These facts show a strong inference of scienter as the Company as a whole was focused on how much it could levy in fees on a customer before the customer would push back or close their account.

166. <u>Seventh</u>, Clarke and Dey had access to central company reporting systems that carefully tracked <u>all</u> customer complaints and evidence of account flipping. Lead Counsel's investigation and FleetCor's former employees confirm that FleetCor specifically recorded and tracked each complaint called into customer service as well as every FleetCor credit card that a customer had used in the past.

93

Indeed, FleetCor diligently tracked fee-related complaints in the Salesforce computer program (¶¶30, 66), which  is a tool that "lets you store customer and prospect contact information, identify sales opportunities, record service issues, and manage marketing campaigns, all in one central location – and make information about every customer interaction available to anyone at your company who might need it."  At all times, the Executive Defendants had access to the Salesforce system and various reports created from that system.  ¶66.  The Executive Defendants also had access to START reports, which would show weekly employee activity and all accounts lost or gained.  ¶¶53, 66.

167.  At all times, the Executives Defendants also had access to the ATS system, which contained lists of all FleetCor products that a customer had used and the dates they had obtained those products, as well as programs containing data for individual products, such as MCUI for the MasterCard products.  ¶¶68, 70, 71. These programs would provide the Executive Defendants with information as to whether an account had been "flipped."

168.  Eighth, FleetCor's undisclosed fees and predatory marketing practices were a significant component of FleetCor's revenue and growth (at least $200 million out of $1.8 billion in total revenue for 2016) and, as a result, they were issues of which the Executive Defendants were aware or recklessly disregarded. Indeed,

the Company's sales and marketing was one of its most critical functions, a subject of intense market scrutiny and concern, and a topic on which the Executive Defendants made numerous public statements during the Class Period.  Given the importance of this function, analysts repeatedly asked about it during conference calls and commented on it in their analyst reports.  §V(A).  Similarly, FleetCor's "bookings" growth was one of the Company's most important metrics, and the Executive Defendants were repeatedly asked about and made numerous statements about said "bookings" growth.  §V(B). In fact, Clarke claimed that bookings growth was "the single best indicator of health" that FleetCor could convey to investors. ¶ 142.  Defendants were, at a minimum, reckless in making such statements and failing to disclose the existence of the fraudulent billing and predatory marketing practices, as well as flipping.

169.  Ninth, as set forth above, the Executive Defendants repeatedly discussed FleetCor's organic growth, bookings growth, and sales and marketing investments on calls with investors and at investor conferences.  §V(A)-(C).  Thus, the Executive Defendants were acutely aware of the material aspects regarding FleetCor's sales and marketing (which were deceptive) and FleetCor's bookings "growth" (which was due to falsely pitching customers on a no-fee card and to "flipping" accounts from one FleetCor card to another).  These specific statements

reflect the fact that the Executive Defendants were in receipt of information regarding each of these subjects. The only other plausible inferences that can be drawn from these specific pronouncements is that the Executive Defendants did not investigate the information they provided to investors or that they deliberately ignored information they possessed regarding such matters. In either event, such deliberate recklessness would satisfy the scienter requirement.

170. <u>For example</u>, as discussed above (¶136), Defendant Dey told investors that FleetCor had no "secret sauce" but that the Company's success was due to "<u>big investment in telemarketing . . . we know what that message that we have to deliver is in order to get a new account</u>." The "message" and the "secret sauce," in fact, turned out to be falsely telling potential customers that FleetCor products had no attendant fees. With regard to fees, Clarke told investors on the February 4, 2016 earnings call that with regard to FleetCor's MasterCard business, "we did put some fees in because the clients are enjoying a much lower absolute bill from us." These statements show that the Executive Defendants were focused on sales and marketing and on FleetCor's fees, and were fully aware of or reckless in disregarding the falsity of their statements.

171. <u>Tenth</u>, at the beginning of the Class Period, the Executive Defendants constantly touted FleetCor's relationship with Chevron as a strong relationship and

a huge source of revenue. For example, at the Raymond James Institutional Investors Conference on March 7, 2016 and the JPMorgan Technology, Media and Telecom Conference on May 24, 2016, Defendant Dey stated that businesses like FleetCor "want to partner with big, major oil companies" and bragged that FleetCor had "relationships in the United States with companies like BP and Chevron."

172.   However, according to numerous former employees, Chevron was no exception to the rule and FleetCor imposed the same exorbitant fees on Chevron customers and also engaged in the same flipping of Chevron customers from Chevron to other cards.  ¶72.  Given the size and importance of the relationship with Chevron (as illustrated by the statements above), the Executive Defendants were or should have been aware of the fee and flipping practices with regard to Chevron.

173.   Eleventh, Clarke knew or recklessly disregarded that his February 8, 2017 statement to investors reassuring them that "we will help [Chevron] transition to their new supplier."  According to many former employees, once Chevron announced that it was leaving FleetCor and moving its business over to WEX, FleetCor amped up its flipping of Chevron accounts to other FleetCor cards, so as to try to retain the revenue from Chevron customers.  ¶83.  This was in complete contradiction to FleetCor's statements to investors.   Indeed, according to the Chevron Petition, February 8 – the day Clarke made this statement – was the last

day for FleetCor to comply with its contractual obligations to provide due diligence to WEX and Chevron, and they had refused to do so.  Then, according to the Chevron Petition, between February 13 and March 22, 2017, FleetCor expressly informed Chevron that it: (i) refused to permit WEX to conduct reasonable due diligence to confirm the fair market value of the portfolio WEX would be purchasing; and (ii) refused to provide Chevron and WEX access to all of the books, records, and data regarding Chevron's portfolio with FleetCor.  Additionally, as discussed in the Complaint, FleetCor senior executives explicitly rejected FleetCor and Chevron's requests for access to FleetCor's data in emails.  For example, in an email on March 7, 2017 email, FleetCor's Senior Vice President of Relations Management, Ron Leindenfirst, wrote to WEX that "[w]e have already said that we will not share revenue and expense data . . ." In another email on April 6, 2017, Leindenfirst wrote that "we will not provide WEX a detailed breakdown of revenue and expenses."  As former employees confirm, FleetCor purposefully hid its data from Chevron because it did not want Chevron realizing: (i) the excessive fees it was heaping on Chevron customers; and (ii) that many Chevron accounts were being flipped to other FleetCor cards.  *See, e.g.* ¶¶46, 68, 72, 81.  That the Executive Defendants were aware of these facts is supported by the fact that Chevron was such an important FleetCor relationship and that high level executives, such as Senior Vice Presidents, at

98

FleetCor repeatedly rejected WEX/Chevron's request for information.  It is not feasible that these Senior Vice Presidents could have been acting on their own without Clarke's knowledge.

174.  Twelfth, a strong inference of scienter of the Executive Defendants is supported by the fact that even on the last days of the Class Period, Clarke and Dey continued to issue statements (or stand by while others made statements) that were patently false and quickly exposed as such.  These brazen false statements demonstrate Clarke's and Dey's willingness and ability to deceive investors as a pattern and practice of deception.  For example, Todd House told investors on the May 1, 2017 earnings call that even though there had been scrutiny on FleetCor's fee practices, "[W]e've had a couple of our largest clients in the enterprise segment asked some questions, but it's been easily talked off.  And I'd say, our partners, the branded partners BP and Chevron have also asked some questions, but in general, it's been quite easy to work with them."  ¶126.  That same day, Chevron filed its Petition accusing FleetCor of sabotage and of destroying customer goodwill through its enormous fees. ¶81.  Similarly, Defendant Clarke touted that FleetCor had "lots of satisfied clients and we retained 90% of the clients every year," omitting that any retention relied on "flipping."  ¶124.  Further, Defendant Clarke claimed that FleetCor does not handle "paper checks" as an attempt to excuse allegations that

FleetCor delays check processing.  ¶127.  In fact, FleetCor documents themselves show, and FleetCor employees confirmed, that checks can be overnighted to a FleetCor office in Covington, Louisiana.  *Id.*   Defendant Clarke responded to questions about customer fees by calling the reports "fake news and exaggerations." ¶125.  The fact that two independent investigators (Capital Forum and Citron) and Lead Counsel's investigation all independently reached the same conclusion indicates that this was anything but "fake news."  Defendants' lies concerning those facts demonstrates a willingness and desire to mislead investors to avoid the truth being known.

## VII.   LOSS CAUSATION

175.   The market price of FleetCor's publicly traded common stock was artificially inflated by the material misstatements and omissions alleged herein, including misstatements and omissions regarding FleetCor's sales and marketing, new bookings, revenue growth, and relationship with Chevron.

176.   The artificial inflation in FleetCor's stock price was at least partially removed when third parties revealed certain aspects of the truth behind those material misrepresentations and omissions to the public on December 19, 2016, March 1, 2017, April 4, 2017, April 27, 2017, and May 1, 2017.  Statements made on these days revealed on a piecemeal basis the true nature and extent of Defendants'

scheme to conceal Defendants' fraudulent billing practices and predatory marketing practices. These disclosures, more particularly described above (§IV(G)), reduced the amount of inflation in the price of FleetCor's publicly traded common stock, causing economic injury to Lead Plaintiffs and other members of the Class.

177.   As illustrated by the chart below, each of these loss-causing disclosures occurred against a backdrop of little to no movements, or positive movements, in the wider stock market:

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|
| December 19, 2016 | Announcement that Chevron is leaving FleetCor and moving to WEX. | $148.04 on day before disclosure. Closed day of disclosure at $142.96.<br><br>Percentage Change: -3.43% | $2,258.07 on day before disclosure. Closed day of disclosure at $2,262.53.<br><br>Percentage change: +0.19% |
| March 1, 2017 | Capitol Forum investigative report raising questions on the legitimacy of FleetCor's sales and billing practices. | $170.00 on day before disclosure. Closed day of disclosure at $164.75.<br><br>Percentage Change: -3.08% | $2,363.64 on day before disclosure. Closed day of disclosure at $2,395.96.<br><br>Percentage change: +1.36% |

| Date of Corrective Disclosure | Corrective Disclosure | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|
| April 4, 2017 | Citron investigative report raising material questions about FleetCor's marketing and billing practices. | $150.15 on day before disclosure. Closed day of disclosure at $141.60.<br><br>Percentage Change: -5.69% | $2,358.84 on day before disclosure. Closed day of disclosure at $2,360.16.<br><br>Percentage change: +0.05% |
| April 27, 2017 | Capitol Forum investigative report discussing FleetCor's purposeful use of a confusing system to trick customers into paying late and other fees. Citron investigative report discussing FleetCor's use of an algorithm to cheat customers and reporting on FleetCor's "cover-up" of its business practices. | $151.38 on day before disclosure. Closed day of disclosure at $145.65<br><br>Percentage Change: -3.79% | $2,387.56 on day before disclosure. Closed day of disclosure at $2,388.77.<br><br>Percentage change: +0.05% |
| May 1, 2017 | Chevron files lawsuit against FleetCor after close of the market and news of lawsuit slowly leaks out. | $148.18 on day of disclosure.  Closed May 3, 2017 at $131.26.<br><br>Percentage Change: -11.41% | $2,388.33 on day of disclosure.  Closed May 3, 2017 at $2,388.13.<br><br>Percentage change: 0.00% |

178.   None of these disclosures was sufficient on its own to fully remove the inflation from FleetCor's stock price because each of them only partially revealed the conditions, risks, and trends that had been concealed from investors.   The corrective impact of the disclosures alleged herein was tempered by Defendants' continued misstatements and omissions about FleetCor's revenue growth and reassurances regarding the transparency of its billing practices.   These misrepresentations and omissions inflated and maintained the prices of FleetCor's publicly traded stock at levels that were artificially inflated, inducing members of the Class to continue purchasing FleetCor's common stock even after the truth began to partially enter the market.

## VIII.  CLASS ACTION ALLEGATIONS

179.   Lead Plaintiff brings this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired FleetCor securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors and officers of FleetCor, and their families and affiliates.

180.   The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 24, 2017, FleetCor had

over 92 million shares of stock outstanding, owned by hundreds or thousands of investors.

181.  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

- Whether the price of FleetCor stock was artificially inflated;

- Whether Defendants' conduct caused the members of the Class to sustain damages; and

- The extent of damage sustained by Class members and the appropriate measure of damages.

182.  Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

183.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

184.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

185.   FleetCor's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about FleetCor's sales practices and bookings, among others.

186.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding FleetCor's billing and marketing practices, bookings growth, revenue growth, and its assistance in transitioning Chevron to WEX. Given the then-existing facts contradicting

Defendants' statements, any generalized risk disclosures made by FleetCor were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

187.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the false forward-looking statement was authorized and/or approved by an executive officer of FleetCor who knew that the statement was false when made.

## X.   PRESUMPTION OF RELIANCE

188.   At all relevant times, the market for FleetCor stock was an efficient market for the following reasons, among others:

(a)   FleetCor stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, FleetCor filed periodic public reports with the SEC and the New York Stock Exchange;

(c)   FleetCor regularly and publicly communicated with investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    FleetCor was followed by at least fourteen (14) securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

189.   As a result of the foregoing, the market for FleetCor stock digested current information regarding FleetCor from all publicly available sources and reflected such information in the price of FleetCor stock.    Under these circumstances, all purchasers of FleetCor stock during the Class Period suffered similar injury through their purchase of FleetCor stock at artificially inflated prices and the presumption of reliance applies.

190.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding FleetCor's sales, marketing, and billing

practices—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of FleetCor's fuel card business and fee income derived therefrom, as set forth above, that requirement is satisfied here.

## COUNT I
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

191. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

192. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase FleetCor stock at artificially inflated prices.

193. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers

of the Company's stock in an effort to maintain artificially high market prices for FleetCor stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

195.   During the Class Period, Defendants made the statements specified above, which Defendants knew or recklessly disregarded the likelihood that the statements were false or misleading, in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

196.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal FleetCor's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

197.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FleetCor stock. Plaintiff and the Class would not have purchased the Company's stock at the prices they paid, or at all, had they been aware that the market prices for FleetCor stock had been artificially inflated by Defendants' fraudulent course of conduct.

198.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

199.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II
**For Violation of Section 20(a) of the Exchange Act
Against the Executive Defendants**

200.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

201.   The Executive Defendants acted as controlling persons of FleetCor within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public

statements about FleetCor, the Executive Defendants had the power and ability to control the actions of FleetCor and its employees.  By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: October 13, 2017

/s/ Katherine M. Sinderson

Katherine M. Sinderson (admitted *pro hac vice*)

Julia K. Tebor (admitted *pro hac vice*)

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

1251 Avenue of the Americas

New York, New York 10020

Tel: (212) 554 1400

Fax: (212) 554 1444

katiem@blbglaw.com

Julia.tebor@blbglaw.com

*Counsel for Plaintiff City of Sunrise General Employees' Retirement Plan*

H. Lamar Mixson

Georgia Bar No. 514012

Amanda Seals Bersinger

Georgia Bar No. 502720

**BONDURANT MIXSON & ELMORE, LLP**

1201 West Peachtree Street NW

Suite 3900

Atlanta, GA 30309

Tel: (404) 881-4100

Fax: (404) 881-4111

mixson@bmelaw.com

bersinger@bmelaw.com

*Liaison Counsel for Plaintiff City of Sunrise General Employees' Retirement Plan*

**APPENDIX A**

**Former Employee Key**

| FE No. | Tenure | Relevant Position(s) | Location |
|---|---|---|---|
| 1 | 8/2014 – 4/2016 | Customer Service Representative | Norcross, Georgia |
| 2 | 9/2012 – 8/2017 | Regional Sales Manager | Norcross, Georgia |
| 3 | 1/2016 – 3/2017 | Regional Territory Manager | Norcross, Georgia |
| 4 | 4/2013 – 6/2016 | Customer Service Representative | Norcross, Georgia |
| 5 | 8/2015 – 12/2016 | Inside Sales Account Manager | Norcross, Georgia |
| 6 | 10/2015 – 3/2016 | Inside Sales Representative | Norcross, Georgia |
| 7 | 12/2012 – 7/2017 | Senior Account Manager | Norcross, Georgia |
| 8 | 11/2014 – 6/2017 | BP Account Manager | Norcross, Georgia |
| 9 | Fall/Winter 2014 – Mid-2016 | Customer Service Representative | Norcross, Georgia |
| 10 | 11/2014 – 10/2016 | Senior Outside Sales Representative | Central North Carolina |
| 11 | 7/2015 – Fall 2016 | Regional Sales Manager | Norcross, Georgia |
| 12 | 7/2016 – 4/2017 | Account Manager | Norcross, Georgia |
| 13 | 10/2014 – 3/2017 | Account Executive | Norcross, Georgia |

## **CERTIFICATE OF SERVICE**

I certify that on this day, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

Filed October 13, 2017.

/s/ Katherine M. Sinderson_____
Katherine M. Sinderson