IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CITY OF SUNRISE GENERAL EMPLOYEES' RETIREMENT PLAN, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FLEETCOR TECHNOLOGIES, INC., *et al.*,<br><br>Defendants. | : | CIVIL ACTION NO. 1:17-CV-2207-LMM |

**ORDER**

This case comes before the Court on Defendants' Motion to Dismiss [30]. After a review of the record, a hearing on the motion, and due consideration, the Court enters the following Order.

## I. Factual Background[1]

Lead Plaintiff City of Sunrise General Employees' Retirement Plan ("Sunrise General") is a public pension fund that provides retirement benefits to public workers, other than police officers or firefighters, in the City of Sunrise, Florida. Plaintiff purchased shares of Defendant FleetCor Technologies, Inc.'s

[1] Consistent with the Court's task on a motion to dismiss, all facts are drawn from the Amended Complaint and taken in the light most favorable to Plaintiff unless otherwise indicated.

(“FleetCor”) stock during the Class Period (February 4, 2016 to May 3, 2017) and alleges it suffered financial damages from the fall of the stock price.

Defendant FleetCor is a global provider of workforce payment products, whose revenue is primarily derived through the sale and maintenance of “fuel card” programs to business owners with vehicle fleets. Fuel cards are generally distributed by those business owners to allow their employees to purchase fuel at gas stations. Defendant Ronald F. Clarke is Chief Executive Officer and Chairman of FleetCor’s Board of Directors, and Defendant Eric R. Dey is FleetCor’s Chief Financial Officer (collectively, “individual Defendants”).

Plaintiff alleges that FleetCor focused “down market” on small to medium fleet accounts because, as Dey stated, “those customers have very little pricing leverage.” FleetCor also developed branded fuel cards for company “partners,” such as Chevron/Texaco. Chevron/Texaco was formerly FleetCor’s largest U.S. partner.

Starting in late 2015, FleetCor began to suffer “macroeconomic headwinds,” including lower foreign currency interest rates and fuel prices, which prevented FleetCor from growing its revenue. To reassure investors, Clarke and Dey emphasized FleetCor was experiencing “‘organic growth’—or growth absent the fuel price and Forex (“FX”) headwinds—of over 10% year over year.” This growth was attributable to FleetCor’s “‘old-fashioned’ focus on ‘strong sales and marketing.’” In response to a question about FleetCor’s marketing “secret sauce,” Dey stated FleetCor’s success was based on its “big investment in telemarketing . .

. we know what that message that we have to deliver is in order to get a new account." FleetCor's U.S. marketing was housed in its telesales division, which was primarily located in Norcross, Georgia.

**a. FleetCor's Fees**

Plaintiff contends that what Defendants omitted from their telemarketing "message" was that FleetCor's cards were subject to many fees. According to unnamed former employees, FleetCor's telemarketers were trained to insist their products were fee free, that customers only paid for used fuel, and that FleetCor's service was essentially "free money." FleetCor's written marketing materials also emphasized this point by stating "Pay no fees- no set-up fees, transaction fees, card fees or annual fees."

Plaintiff alleges that FleetCor's employee compensation plan also encouraged the use of this false sales pitch because the employees were only paid based upon the first 10 weeks of a card's use; there was no incentive to build or maintain a customer relationship. Thus, FleetCor's telemarketers were incentivized to lie in order to just get the contract signed.

Contrary to FleetCor's fee-free claim, however, FleetCor received hundreds of millions of dollars from charging fees. Plaintiff alleges FleetCor charged two classes of fees: (1) late fees, which were charged because FleetCor made it impossible for its customers to timely pay their bills because (a) FleetCor's system would only allow online payments to be made on the due date, and by the time the payment processed, it would be late; and (b) FleetCor would not collect

mailed checks until after the due date; and (2) various hidden fees, which were disclosed in extremely fine print including a "'high risk' fee"—that was even imposed on customers with strong credit—and a "Minimum Program Administration Fee"—that was imposed when fuel costs fell below $3.25, where they have remained since 2014. Plaintiff also alleges that FleetCor had a policy of not charging fees until after the account was at least three months old because, by that point, customers would have stopped looking at their bills as closely. FleetCor would also only credit back improperly charged fees (as a credit applied to future bills) if the customer frequently called and complained, but FleetCor retaliated against its employees who reimbursed fees too frequently (by cutting the employee's compensation), so FleetCor employees were disincentivized from doing so.

Plaintiff also alleges that FleetCor was an anomaly in the industry in charging these fees. FleetCor had 12.5 times as many Consumer Financial Protection Bureau complaints related to billing than its competitor WEX, 14 times more Federal Trade Commission complaints, and 72 times more "Billing/Collection Issues" complaints with the Better Business Bureau.

Plaintiff also alleges that this fraudulent billing scheme was orchestrated by the individual Defendants—Dey and Clarke. A former FleetCor management-level employee stated that, "Ron [Clarke] is the mastermind—He's pulling all the levers." Clarke "specifically directed that the font on the terms and conditions be reduced from 6 to 4 point and switched from black to gray font." Clarke is also

credited in the Amended Complaint as saying, "Don't make it easy on folks to read" the terms and conditions, and that "if you are not losing 10% of your customers, you are not charging enough." FleetCor also had a white board at its headquarters that stated, "[i]t's all about the money."

In order to determine how much to charge in fees, Plaintiff alleges FleetCor implemented an algorithm, which would sort customers in three buckets—"Red, Yellow, or Green"—based on their perceived vulnerability to price gouging. This algorithm, Plaintiff alleges, was developed to "intentionally cheat its customers." Plaintiff alleges that FleetCor also carefully tracked its customer retention rate through a computer program called Salesforce.

FleetCor also employed a "Journal Entry Spreadsheet," "which is a 'document that various lower level FleetCor employees use[d] to request approval from upper level managers to provide FleetCor customers with a percentage credit back for various fees those customers incur.'" Plaintiff alleges the purpose of that Spreadsheet was to keep track of which fees the market would ultimately bear, in other words, to "'test' how far it could push its customers with fees and credit amounts when those customers pushed back.'"

FleetCor executives were also aware that these customers were upset about the "massive, previously undisclosed fees." In late 2015 or early 2016, FleetCor executives[2] conducted regular focus groups with its top sales employees, where

---

[2] Plaintiff alleges that the FleetCor executives present at these focus groups were: Paul Citarella, Senior Vice President of Sales and Marketing; Crystal Williams,

all of the fee issues were discussed, including the impossibility to pay online, the payment processing delay, and the illicit fees charging.

**b. Account Flipping**

Plaintiff also alleges that Defendants' "new business or 'bookings'" was rapidly growing—"at a rate as high as 27%." Clarke specifically stated that new bookings growth was "literally across-the-board" in all areas of FleetCor and that "[t]he US numbers were up big." He also stated that new bookings growth was the "single best indicator of health," and analysts noted these gains when attempting to sell FleetCor stock to potential investors.

However, Plaintiff claims this new bookings growth was "entirely illusory"; it was the product of "account flipping." In its business, FleetCor managed multiple branded fuel cards. If a customer was unhappy with its current fuel card, FleetCor would have a sales representative call and offer that customer a different fuel card, which unbeknownst to the customer was another FleetCor card. Account flipping occurred when FleetCor would shift existing customers from one FleetCor fuel card to another and then "book" the flipped existing customer as a new one. This new business, then, was not new at all. Plaintiff alleges that according to former employees, the flipping practice ranged from 40-70% of "new" sales out of the Norcross, Georgia office (where most, if not all, of the telesales were made).

---

Vice President of Human Resources; and, Todd House, President, North American Direct Issuing. House reported directly to Clarke.

Plaintiff alleges that FleetCor also encouraged this deception via its compensation system—sales employees were only paid on the first ten weeks of card use. Thus, when the initial ten weeks had passed, employees would attempt to "reset the clock" by selling the existing customer a new fuel card, thereby "flipping" the account. According to a FleetCor former employee, "if you don't flip there [at FleetCor], you don't make money."

Middle management's compensation structure similarly encouraged account flipping. Their compensation was also based in part on the first ten weeks of "new" accounts, and FleetCor kept a database—ATS—that allowed its executives to track account flipping.

**c. Clarke and Dey's Stock Sales**

Plaintiff alleges Clarke and Dey sold substantial stock holdings during the Class Period in order to take advantage of FleetCor's "soaring stock" that was artificially inflated due to Defendants' misrepresentations. During the Class Period, Defendant Clarke sold $100,486,436.99 in FleetCor stock, and Defendant Dey sold $4,169,155.61. Neither of the individual Defendants used a "Rule 10b5-1 plan"[3] to execute their trades.

---

[3] A Rule 10b5-1 plan is a binding, predetermined trading plan that provides the insider an affirmative defense to insider trading liability if the plan is entered into by an insider (1) prior to becoming aware of inside information, and (2) while acting in good faith. See 17 C.F.R. § 240.10b5–1(c).

**d. Public Disclosure of FleetCor's Practices**

Beginning in December 19, 2016, Chevron announced it was terminating its relationship with Fleetcor and moving to Fleetcor's largest competitior, WEX. When Chevron announced it was firing FleetCor, Plaintiff alleges that partial disclosures about Fleetcor's fraudulent practices began to emerge. Following Chevron's announcement, FleetCor's stock fell from $148.04 to $142.96 per share with an abnormally high trading volume of 3,220,700 shares traded (versus a daily average of 886,435 trades during the Class Period). On February 8, 2017, Clarke stated that FleetCor would "help [Chevron] transition to their new supplier." Plaintiff alleges that this was a lie; FleetCor had no intention of helping Chevron.

Soon after, outside third parties, including Capitol Forum and Citron,[4] published "explosive investigative report[s]" that, for the first time, exposed what Plaintiff alleges as FleetCor's improper business model. Specifically, on March 1, 2017, Capitol Forum published a report that explained FleetCor's model involved "overcharging customers and padding fee income through late fees even when customers pay on time." In response, the stock declined from $170.00 to $164.75 per share, with an abnormally high trading volume of 2,401,500 shares traded.

---

[4] Defendants argue that Citron is a short seller whose entire story should be discounted as it has an interest in decreasing stock prices. See Defs. Br., Dkt. No. [30-1] at 5 n.4. However, because this is a motion to dismiss, the Court will only consider the Amended Complaint's allegations—not outside evidence—and will not resolve any factual or credibility disputes in this procedural posture.

On April 4, 2017, Citron published another report on FleetCor's improper fee practices, which Plaintiff alleges exposed new facts to the market. The stock then declined from $150.15 to $141.60 per share, with an abnormally high trading volume of 8,892,000 shares. On April 27, 2017, both Capitol Forum and Citron published new reports on FleetCor's billing, including new information about FleetCor's algorithm Plaintiff alleges was used to cheat its customers and that it forced its customers to incur late fees. The stock again declined from $151.38 to $145.65 per share, with an abnormally high trading volume of 2,918,400 shares.

After the market closed on May 1, 2017, Chevron sued FleetCor in Texas for a temporary restraining order, temporary injunction, and permanent injunction. In Chevron's Verified Complaint, Chevron alleged:

> FleetCor's increasingly poor service threatens to harm Chevron's customer relationships and to decrease the value of the portfolio. FleetCor's damaging actions include, but are not limited to: allowing the number of sales personnel to fall below contractual requirements; **increasing customer card shipping and handling fees without approval**; and attempting to cut call-center hours without approval. **FleetCor seeks to maximize its profits by harvesting the accounts for fees while failing to service the accounts at the contractually required levels.**

(emphasis added). Plaintiff alleges that this news caused FleetCor's stock to continue to fall through May 3, 2017 from $148.18 to $131.26 per share, which analysts attributed to the lawsuit.

**e. Post Class Period Events**

In light of the third-party reports and lawsuits, FleetCor's Board of Directors required it to hire a third-party consultant and outside counsel to conduct internal investigations. This investigation led to the Board mandating significant changes to FleetCor's sales practices and personnel, including the termination of its two most senior U.S. sales employees and new disclosures of FleetCor's fees. FleetCor auditors also allegedly discovered the account flipping practice, but this was never publicly disclosed.

**f. This Lawsuit**

On June 14, 2017, Plaintiff filed this suit against Defendants, alleging that they violated Sections 10(b) and 20(a) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. On October 13, 2017, Plaintiff filed an Amended Complaint in which it alleges Defendants made four classes of misrepresentations and omissions:

- Defendants misrepresented and omitted material facts regarding their sales and marketing, to include that they publicly contended their success and growth was accomplished the "old fashioned way" through "investments in sales and marketing" when it was instead driven by deceptive marketing, misleading billing practices, and widespread account flipping (hereinafter, "Success Statements");
- Defendants misrepresented and omitted material facts regarding FleetCor's bookings growth, to include that they contended their new

bookings were the "single best indicator of health" while knowingly misrepresenting that its "new" bookings were in fact flipped accounts (hereinafter, "Booking Statements");

- Defendants misrepresented and omitted material facts regarding FleetCor's revenue growth, to include that they failed to admit their revenue growth was actually due to usurious, unsustainable fees (hereinafter, "Revenue Statements"); and,
- Defendants misrepresented and omitted material facts regarding the Chevron transition, in that FleetCor publicly claimed it "will" help Chevron transition to WEX but behind closed doors attempted to thwart the transition (hereinafter, "Chevron Statement").

On November 27, 2017, Defendants moved to dismiss Plaintiff's Amended Complaint, arguing Plaintiff's claims should be dismissed because Plaintiff failed (1) to particularly plead the relevant statements were false or misleading; (2) to raise a strong inference of scienter with respect to the individual Defendants; and (3) to adequately plead loss causation. See generally Defs. MTD, Dkt. No. [30-1].

On April 30, 2018, the Court held a hearing on this motion and, following the hearing, took the Motion under advisement until it could issue a written ruling.

## II. Legal Standard

Defendants' Motion implicates three different pleading standards: (1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2);

(2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b); and (3) the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA"). See In re Galectin Therapeutics, Inc. Secs. Litig., 843 F.3d 1257, 1269 (11th Cir. 2016) ("The PSLRA imposes additional heightened pleading requirements for Rule 10b–5(b) actions.").

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from

those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

Under Federal Rule of Civil Procedure 9(b), a complaint alleging fraud "must state with particularity the circumstances constituting fraud."

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

However, Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, it "does not require a plaintiff to allege specific facts related to the

defendant's state of mind when the allegedly fraudulent statements [or omissions] were made." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008). Instead, it is sufficient under Rule 9(b) to plead "the who, what, when, where, and how" of the allegedly fraudulent statements or omissions and then allege generally that those statements or omissions were made with the requisite intent. Id.

The PSLRA imposes the following additional heightened pleading requirements for Rule 10b-5(b) actions predicated on allegedly false or misleading statements or omissions:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Further, for all private Rule 10b-5(b) actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." Id., § 78u-4(b)(2). To qualify as a "strong inference" of scienter, the

inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Although factual allegations may be aggregated to create an inference of scienter, it must be alleged "with respect to each defendant and with respect to each alleged violation of the statute." Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004) (citing 15 U.S.C. §78u-4(b)(2)). If these heightened PSLRA pleading requirements are not satisfied, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

## III. ANALYSIS

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014). To state a claim under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (brackets in original).

As stated supra, Defendants argue that Plaintiff's claims should be dismissed because Plaintiff failed (1) to particularly plead the relevant statements or omissions were false or misleading; (2) to raise a strong inference of scienter with respect to the individual Defendants; and (3) to adequately plead loss causation. See generally Defs. MTD, Dkt. No. [30-1]. The Court will consider each argument in turn.

**a. Whether the Relevant Statements or Omissions are Particularly Pled as False or Misleading**

Defendants first argue that Plaintiff has not properly pled Defendants' challenged statements were false or misleading. Defendants attack all four categories of pled statements: (1) Revenue Statements; (2) Success Statements; (3) Chevron Statements; and (4) Booking Statements.[5]

**i. Revenue Statements**

Defendants first argue that Plaintiff has failed to explain why the Revenue Statements and the alleged fee practices upon which those statements were based were "fraudulent," to include "what statute, regulation, or standards the practices allegedly violated." Defs. Br., Dkt. No. [30-1] at 17. However, Defendants have not cited any authority for the proposition that the alleged fee practices must violate a statute, regulation, or standard in order to be actionable under the PSLRA. Rather, the question is whether Defendants publicly told investors one thing

---

[5] Because the Court finds *infra* that Plaintiff has not plausibly pled loss causation with respect to the Booking Statements, the Court declines to address whether those statements were also pled with particularity.

about their revenue sources and, thereby, their fees—i.e, that the cards were "fee free"—when in fact that statement was a material misrepresentation. See FindWhat, 658 F.3d at 1298-99 (collecting cases for the proposition that when a defendant voluntarily undertakes to say anything, a duty to tell the full truth arises). Because Plaintiff has plausibly pled that Defendants voluntarily misrepresented that FleetCor's cards were "fee free" when they were not (and created a scheme that would cause fraudulent fees to be charged), see Am. Compl., Dkt. No. [27] ¶¶ 28-54, the Court does not find that misrepresentation must separately violate some statutory or regulatory scheme to be actionable.

Second, Defendants argue that even if Plaintiff plausibly pled a fraudulent fee practice, Plaintiff has not sufficiently pled the scale of that practice. Defendants argue that Plaintiff has relied on thirteen, low-ranking confidential witnesses, and the Eleventh Circuit is skeptical of confidential witnesses in securities fraud complaints. Defendants also argue that the witnesses' "one-off anecdotes" are insufficient to prove the fraud's prevalence.

The Court first finds that, contrary to Defendants' assertions, the Eleventh Circuit does not take such a "hard line" on confidential witnesses. In Mizzaro, 544 F.3d at 1239–40, the case cited by Defendants for their assertion that the Eleventh Circuit is "skeptical of the reliability of unnamed sources cited in securities fraud complaints," Defs. Br., Dkt. No. [30-1] at 18, the Eleventh Circuit held that while a "whistleblower who demands confidentiality may be less credible than one who is willing to put his name behind his accusations, we do

not put as much weight on that inference as the defendants suggest.” Id. at 1239. Rather, the Eleventh Circuit welcomes confidential informants “so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge.” Id. at 1239-40. Because the Court finds that each of the confidential witnesses here is defined by their position and location, see Am. Cmpl. App. A, Dkt. No. [27] at 117, the Court is able to determine the basis of each witnesses’ knowledge. For instance, Plaintiff’s witnesses include seven, manager-level confidential witnesses who were employed at FleetCor’s Norcross, Georgia office where a vast majority (if not all) of their telemarketing was conducted, and the confidential witnesses’ allegations are not limited to “one-off anecdotes” as Defendants suggest.

Taking the facts most favorable to Plaintiff as the Court is required to do on a motion to dismiss, the Court finds Plaintiff has plausibly pled that the alleged fee-related fraud was widespread. Plaintiff has pled that the fee-related scheme was orchestrated by FleetCor Executives, fees amounted to 76% of FleetCor’s revenues, and that the majority of customer complaints related to fees. See, e.g., Am. Cmpl., Dkt. No. [27] ¶¶ 19, 53, 60-66, 111-13. This is sufficient to survive a motion to dismiss.

Finally, Defendants argue that even if the fraudulent fee practice was plausibly pled, they did not have a duty to accuse themselves of wrongdoing. See In re Citigroup, Inc. Securities Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (“[T]he federal securities laws do not require a company to accuse itself of

wrongdoing."). While the Court agrees with Defendants' general proposition, the Court disagrees with its application to this case. Here, Plaintiff has pled that FleetCor was actively touting its cards as "fee free," all the while knowing that the source of its revenue growth was actually due to fraudulently obtained fees. Once FleetCor chose to speak regarding the source of its revenue growth, it had a duty to disclose the full truth. See FindWhat, 658 F.3d at 1298. The Court therefore finds that Plaintiff has plausibly pled the Revenue Statements with particularity.

**ii. Success Statements**

Defendants next argue that the Success Statements should be dismissed because they are nonactionable corporate puffery. Defendants claim that Dey's comments that the "secret sauce" of Fleetcor's "organic" success was sales and marketing done the "old fashioned way" are not actionable because reasonable investors do not rely on them in making investment decisions. This Court agrees.

"A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available." In re Sci.-Atlanta, Inc. Sec. Litig., 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002). This is such a case. The Court finds that these statements are simply too vague to support a securities fraud violation as they "are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 671 (6th Cir. 2005); see also IBEW Loc. 595

Pension and Money Purchase Pension Plans v. ADT Corp., 660 F. App'x 850, 857 (11th Cir. 2016) (describing a stock repurchase plan as "thoughtful," "effective," and "optimal" constituted nonactionable corporate puffery); Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1029 (11th Cir. 2003) (characterizing the term "strong performance" as nonactionable mere puffery).

Defendant Dey's statements are simply not the type of statements that a reasonable investor would rely upon because, even taking the facts most favorable to Plaintiff, these statements are not subject to any sort of objective verification or even a clear definition. See Amalgamated Bank v. Coca-Cola Co., CIV.A. 1:05-CV-1226-RWS, 2006 WL 2818973, at *3 (N.D. Ga. Sept. 29, 2006) (stating that to survive the puffery analysis, "the alleged fraud must be based upon a statement capable of 'empirical verification' and not a statement of 'opinion or expectation.'" (quoting Next Century, 318 F.3d at 1028)). It is not clear what "the old fashioned way" would even mean, much less what "organic—as opposed to "inorganic"—sales and marketing would constitute. The Success Statements are simply too vague to support a securities violation and are accordingly **DISMISSED**.

**iii. Chevron Statement**

Defendants also argue that their Chevron Statement is barred by the PSLRA's safe harbor for forward-looking statements. Defendants argue that the statement that Defendants "*will* help [Chevron] transition to its new supplier" (emphasis added) is a "statement of the plans and objectives of management for

future operations," 15 U.S.C. § 78u-5(i)(1)(B), that is nonactionable as a matter of law.

The PSLRA provides that certain "forward-looking statements" are not actionable. See 15 U.S.C. § 78u-5(c). Under this safe harbor provision, a defendant "shall not be liable with respect to any forward-looking statement" if:

> the forward-looking statement is—
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> >
> > (ii) immaterial; . . .

Id. § 78u-5(c)(1)(A). A forward-looking statement includes, in pertinent part:

> a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer.

15 U.S.C. § 78u-5(i)(1)(B).

First, the Court finds that the forward looking statements prong of § 78u-5(c)(1)(A)(i) is inapplicable to the Chevron Statement as there are no allegations that the Statement was "accompanied by meaningful cautionary language." See id. However, the Court finds that the Chevron Statement is protected by the second prong of the safe harbor as it is immaterial as a matter of law. Much like the Success Statements, the Chevron Statement is also incapable of empirical verification and so vague that a reasonable investor would not rely upon it in making an investment decision. See Amalgamated Bank, 2006 WL 2818973, at

*3 (stating that to survive the puffery analysis, "the alleged fraud must be based upon a statement capable of 'empirical verification' and not a statement of 'opinion or expectation.'" (quoting Next Century, 318 F.3d at 1028)).

The Chevron Statement does not state *when* FleetCor "will" help Chevron or what it will do to constitute this "help." For instance, FleetCor did not state that it would comply with every contractual obligation in a timely fashion. Rather, even the Chevron Petition itself stated that FleetCor provided "limited high-level summary information," Dkt. No. [30-5] ¶ 22, which means FleetCor did not wholesale refuse to provide anything. The Chevron Statement, then, was not even literally false. This statement is too vague and immaterial to support securities law liability.

And the Court finds that FleetCor did not have a duty to disclose why Chevron fired it when it was discussing the Chevron transition. Under the securities laws, "[a] corporation has a duty to neutralize only the 'natural and normal implication' of its statements." FindWhat, 658 F.3d at 1305. Because whether FleetCor would assist Chevron in its transition does not implicate why FleetCor was fired, the Court does not find that FleetCor had a duty to disclose Chevron's motivation in firing it contemporaneously with its transition discussion. See id. (finding that because a statement "did not mention" the alleged omission subject, it could not be misleading). The Chevron Statement is thus **DISMISSED**.

b. **Scienter**

While Rule 9(b) permits scienter to be plead generally, the PSLRA imposes a higher standard: the plaintiff in a securities fraud case must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The plaintiff must allege facts that create a strong inference of scienter for each defendant. Mizzaro, 544 F.3d at 1238.[6]

"In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" Thompson v. RelationServe Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)). The Eleventh Circuit describes "severe recklessness" as follows:

> [s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Mizzaro, 544 F.3d at 1238 (quoting Bryant, 187 F.3d at 1282 n.18).

In other words, to adequately plead scienter and survive a motion to dismiss, Plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were

[6] Defendants have not challenged the scienter allegations with respect to Defendant FleetCor.

seriously reckless when they made the allegedly materially false or incomplete statements." Mizzaro, 544 F.3d at 1238 (internal quotations omitted). An inference of scienter is "strong" when the inference is

> more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, 551 U.S. at 324.

This inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. In making this inquiry, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." Id. at 322, 326. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326; see also Mizzaro, 544 F.3d at 1239 (contrasting this inquiry with the summary judgment inquiry of whether reasonable jurors could find that the plaintiff is entitled to a verdict); compare Tellabs, 551 U.S. at 324 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (emphasis added) with Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The judge's inquiry [at the summary judgment stage] . . . asks whether reasonable

jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]") (emphasis added).

Defendants argue that Plaintiff has not plausibly pled the individual Defendants acted with the requisite scienter because (1) it has not pled allegations directly linking any individual Defendant to the alleged fraud; and (2) the circumstantial evidence Plaintiff pleads is insufficient as a matter of law. However, the Court finds that Plaintiff has sufficiently pled scienter for Defendants Clarke and Dey.

Though the evidence at summary judgment may reveal otherwise, the Court finds Plaintiff has plausibly pled that the individual Defendants had direct knowledge of the fraudulent fee practices. First, Defendant Clarke is credited as being the "mastermind" of the fee scheme and ordering that the fee contract language be "greyed out" and made smaller to hide it from potential customers. Dey is also credited with stating "we know what that message that we have to deliver is in order to get a new account," demonstrating that he was personally aware of and condoned the "fee free" telemarketing pitch the Amended Complaint alleges all employees were taught. Taking these facts (and the reasonable inferences thereby) as the Court is required to on a motion to dismiss, Plaintiff has pled that the individual Defendants were aware of and encouraged the scheme.

The Court also finds that other circumstantial evidence supports that inference at this stage of the proceedings. First, Plaintiff has pled that FleetCor's

fees accounted for $200 million of FleetCor's $1.8 billion revenue stream such that the individual Defendants by virtue of their positions would have known of the fraud (in that, why would $200 million in fees have accrued if no fees were to be charged at all?). Defendants contend that this "must have known" theory is inappropriate. See Mizarro, 544 F.3d at 1250.

But this case is not like Mizarro, where only one confidential witness provided evidence that the alleged fraud occurred in one or two Home Depot stores to the tune of approximately $1 million, and from that, plaintiff sought to extrapolate by pure conjecture a $1 billion fraud across all Home Depot stores (which would have only amounted to 2% of Home Depot's annual sales). Id. at 1251-52. Here, Plaintiff has pled that at least 10 former employees who worked at FleetCor's telemarketing hub have substantiated that this "fee free" pitch was company-wide, and the company's subsequent termination of this pitch following the internal investigation confirms that it existed. That, coupled with the fact that the illicit fees generated $200 million provides evidence at this stage of the proceeding that the individual Defendants were at least extremely reckless with respect to the fee scheme. See In re Immucor Inc. Sec. Litig., 1:05-CV-2276-WSD, 2006 WL 3000133, at *18 (N.D. Ga. Oct. 4, 2006) ("Knowledge of facts relating to the core functions of a company can be imputed to a company's key officers.").

The Court also notes, while not independently dispositive, each of the individual Defendants made a significant amount of money due to stock sales during the Class Period, which only bolsters Plaintiff's scienter claims. "To

demonstrate the relevance of stock trades to the issue of scienter, a plaintiff 'bear[s] the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing.'" In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187, 1202 (N.D. Ga. 2007) (alteration in orginal). Here, Clarke sold over $100 million in stock[7] and Dey sold over $4 million during the Class Period, which constituted 67% and 78%[8] of Clarke and Dey's holdings, respectively. In the prior period of similar length—from November 9, 2014 to February 4, 2016—Clarke did not sell any shares and Dey sold $4.1 million in shares pursuant to a Rule 10b5-1 plan. See, e.g., In re Healthsouth Corp. Sec. Litig., No. CV-98-J-2634-S, 2000 WL 34211319, at *39 (N.D. Ala. Dec. 13, 2000) (comparing Class Period stock sales with sales that occurred during a prior period that was commiserate in length with the Class Period to determine an unusual trading pattern).

---

[7] Defendant Clarke sold shares on May 10, 2016, September 6, 2016, September 7, 2016, September 8, 2016, March 8, 2017, and March 9, 2017. Defendant Dey sold shares on May 26, 2016, September 6, 2016, and March 8, 2017.

[8] Defendants suggest that the Court should consider the individual Defendants' options in calculating the holdings percentage that each Defendant sold. But even if the Court does so, the Court still finds that selling 15.43% (Clarke) and 31.88% (Dey) of their holdings could still be probative of scienter, though certainly not dispositive. See, e.g., In re Sensormatic Elecs. Corp. Sec. Litig., No. 018346CIVHURLEY, 2002 WL 1352427, at *7 (S.D. Fla. June 10, 2002) (noting that insider sales in the range of 14.9% to 95.5% of the individual defendants' holdings were probative of scienter).

During the Class Period, neither of these Defendants acted subject to a Rule 10b5-1 plan, and Dey specifically abandoned a prior Rule 10b5-1 plan during the Class Period. As the Supreme Court has noted, "personal financial gain may weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 325. While their stock sales are not individually sufficient to support a scienter inference, the Court finds them probative at this stage nonetheless.

The Court is also not convinced by Defendants' argument that had individual Defendants waited six months after the Class Period to sell their shares, they would have made more money. That the stock price later went higher under a different set of facts does not affect whether the Individual Defendants acted with scienter during the Class Period with respect to what was known at the time of the sale. Rather, the time frame the Court is to consider is the "temporal distance between the sale and the release of information. . . ." In re Healthsouth Corp. Sec. Litig., 2000 WL 34211319, at *38. Here, both of the individual Defendants sold shares within seven days following a corrective disclosure, which the Court finds when taking all inferences in favor of Plaintiff, provides an inference of scienter. Accordingly, the Court **DENIES** Defendants' Motion as to scienter.

**c. Loss Causation**

"The loss causation element of a Rule 10b–5 claim requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." FindWhat, 658 F.3d at 1309. To demonstrate loss causation in a § 10(b)

claim, a plaintiff must plead "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." Robbins v. Kroger Props., Inc., 116 F.3d 1441, 1448 (1997); see 15 U.S.C. § 78u–4(b)(4) (requiring that the plaintiff prove that the misrepresentation "caused the loss for which the plaintiff seeks to recover").

"In other words, in a fraud-on-the-market case, the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'" Meyer v. Greene, 710 F.3d 1189, 1195 (11th Cir. 2013) (quoting Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 725 (11th Cir. 2012)). But, "loss causation does not require proof that the fraudulent misrepresentation was the *sole* cause of a security's loss in value, but the plaintiff must still demonstrate that the fraudulent statement was a 'substantial' or 'significant' cause of the decline in price." Meyer, 710 F.3d at 1196 (emphasis in original) (citing Hubbard, 688 F.3d at 726).

In order to demonstrate loss causation circumstantially, a plaintiff often

> (1) identif[ies] a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) show[s] that the stock price dropped soon after the corrective disclosure; and (3) eliminat[es] other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

FindWhat, 658 F.3d at 1311–12 (footnote omitted). “Thus, loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?” Id. at 1312.

> “To be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company.” In re Williams Sec. Litig.—WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009). Further, a plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace “through a series of partial disclosures.”

Meyer, 710 F.3d at 1197.

Plaintiff has alleged five potential corrective disclosures: (1) the December 19, 2016 announcement that Chevron was leaving; (2) the March 1, 2017 Capitol Forum investigative report; (3) the April 4, 2017 Citron Report; (4) the April 27, 2017 Capitol Forum and Citron Reports; and (5) the May 1, 2017 filing of the Chevron lawsuit. The Court will analyze these in relation to Plaintiff’s remaining claims.

**i. Bookings Statements**

As an initial matter, the Court notes that none of these purported disclosures in any way addressed or corrected the purported Booking Statements or addressed account flipping. In response to this issue, Plaintiff asserts that it is

asserting a "materialization of the risk" theory[9]—in that, it has pled Chevron's departure was in part caused by account flipping. See Pl. Resp., Dkt. No. [32] at 35 (citing Amended Complaint paragraphs 77-82 to support its materialization of the risk, account flipping claim); see also City of Pontiac Gen. Emps. Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc., 806 F. Supp. 2d 1267, 1297 (N.D. Ga. 2011) (explaining that loss causation can either be proved by pointing to a stock price decrease following the release of information *or* when the misrepresentations or omissions "concealed a foreseeable risk that ultimately materialized").

However, in reviewing Plaintiff's Amended Complaint, the Court does not find that Plaintiff pled that Chevron left because of account flipping. Rather, it pled FleetCor attempted to thwart the transition so Chevron *would not* find out about that practice. See Am. Cmpl., Dkt. No. [27] ¶ 77 ("In reality, *to disguise both its historic and ongoing account flipping and the extent to which it had exploited Chevron's customers with exorbitant fees*, FleetCor immediately began to obstruct the transition of Chevron's portfolio to WEX.") (emphasis added).

---

[9] "Materialization of the risk" occurs when a third party, as opposed to the defendant itself, providing the corrective information to the market. See Singer v. Reali, 883 F.3d 425, 445–46 (4th Cir. 2018) (explaining that there are two routes to prove loss causation: (1) the corrective disclosure theory, which involves the defendant itself publicly offering the corrective information; and (2) the materialization of the risk theory, in which "news from another source revealed the company's fraud"); see also id. ("That is, pursuant to each theory, the plaintiff must show "that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'" (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005))).

Accordingly, Plaintiff's Bookings Statements claims, and any other statements that are based on account flipping, are **DISMISSED** for failure to plead loss causation, as Plaintiff has not sufficiently alleged the market learned of this alleged practice during the Class Period.[10]

**ii. Revenue Statements**

With respect to the remaining disclosures, the Court finds that Plaintiff has plausibly pled that the March 1, 2017 Capitol Forum investigative report, the April 4, 2017 Citron Report, the April 27, 2017 Capitol Forum and Citron Reports, and the May 1, 2017 Chevron lawsuit filing all revealed corrective information to the market regarding Defendants' Revenue Statements. As pled, each of those reports released new information to the market regarding the fee practice. See Am. Cmpl., Dkt. No. [27] ¶ 177.

However, the Court does not find that Plaintiff has plausibly pled that the December 19, 2016 announcement that Chevron was leaving is causally related to the Revenue Statements. As pled in the Amended Complaint, that statement only revealed that Chevron was leaving, not its motivation in doing so. See Am. Cmpl., Dkt. No. [27] ¶ 76. Thus, there was nothing "corrective" about the disclosure with respect to the Revenue Statements.

In sum, the Booking Statements, and any related statements based on account flipping, are **DISMISSED** for a failure to plead loss causation. The

[10] At the hearing, Plaintiff for the first time stated it could amend its Amended Complaint to cure this deficiency. The Court **DENIES** that request.

Court also finds the loss caused by the December 19, 2016 Chevron announcement is unrelated to the Revenue Statements.

## III. CONCLUSION

Defendants' Motion to Dismiss [30] is **GRANTED, in part** as to the Success Statements, the Bookings Statements, and the Chevron Statement and **DENIED, in part** as to the Revenue Statements. The Court also finds that any loss caused by the December 19, 2016 Chevron announcement is unrelated to the Revenue Statements.

**IT IS SO ORDERED** this 15th day of May, 2018.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE