# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| CITY OF SUNRISE GENERAL EMPLOYEES' RETIREMENT PLAN, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FLEETCOR TECHNOLOGIES, INC., RONALD F. CLARKE, and ERIC R. DEY, <br><br> Defendants. | Civ. A. No. 1:17-cv-02207-LMM <br><br> CLASS ACTION |

# MEMORANDUM OF LAW IN SUPPORT
# OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
# <u>CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

ARGUMENT ..................................................................................... 5

I.    THE PROPOSED SETTLEMENT WARRANTS FINAL
APPROVAL ................................................................................ 5

    A.    Lead Plaintiff and Lead Counsel Have Adequately Represented
the Class ............................................................................ 7

    B.    The Settlement Was Reached Following Substantial Discovery
And Arm's-Length Negotiations with an Experienced Mediator ........ 8

    C.    The Relief that the Settlement Provides for the Class is
Adequate In Light of the Costs and Risks of Further Litigation .......... 9

    1.    The Risks of Establishing Liability and Damages Support
Approval of the Settlement ................................................. 10

        (a)    Risks To Proving Liability ............................................. 11

        (b)    Risks To Proving Damages and Loss Causation ............ 13

    2.    The Settlement Represents a Substantial Percentage of
Likely Recoverable Damages ................................................. 16

    3.    The Costs and Delays of Continued Litigation Support
Approval of the Settlement ..................................................... 17

    4.    All Other Factors Set Forth in Rule 23(e)(2)(C) Support
Approval of the Settlement ..................................................... 18

    D.    The Settlement Treats Class Members Equitably Relative to
Each Other .......................................................................... 20

E.    Other Factors Considered by the Eight Circuit Support
            Approval of the Settlement ..................................................21

II.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE ...............22

III.   NOTICE SATISFIED RULE 23 AND DUE PROCESS............................24

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ....................................................................6, 10, 21

*Canupp v. Sheldon*,
   2009 WL 4042928 (M.D. Fla. Nov. 23, 2009)...................................................8, 9

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
   2008 WL 11336122 (N.D. Ga. Oct. 20, 2008) ...........................................15, 16

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................13, 14

*Faught v. Am. Home Shield Corp.*,
   668 F.3d 1233 (11th Cir. 2012) ............................................................................6

*Francisco v. Numismatic Guar. Corp.*,
   2008 WL 649124 (S.D. Fla. Jan. 31, 2008)........................................................22

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018)....................................................20

*In re Biolase, Inc. Sec. Litig.*,
   2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ..................................................17

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ..............................................................................22

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Jan. 13, 2020)......................................................7, 9

*In re HealthSouth Corp. Sec. Litig.*,
   572 F.3d 854 (11th Cir. 2009) ...........................................................................5, 6

*Ingram v. The Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001) ..........................................................................9

*Kirkpatrick v. J.C. Bradford Co.*,
    827 F.2d 718 (11th Cir. 1987) ...............................................................7

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ............................16, 17

*Vinh Nguyen v. Radient Pharms. Corp.*,
    2014 WL 1802293 (C.D. Cal. May 6, 2014).....................................22

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005) ...............................................................24

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) .........................9, 22, 23

STATUTES

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
    15 U.S.C. § 78u-4(a)(7) .....................................................................24

OTHER AUTHORITIES

Federal Rule of Civil Procedure 23(e) ...........................................*passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff City of Sunrise General Employees' Retirement Plan ("Lead Plaintiff" or "Sunrise General"), on behalf of itself and the Class, respectfully submits this memorandum of law in support of its motion for final approval of: (1) the proposed settlement resolving all claims in the Action for the payment of $50 million in cash for the benefit of the Class (the "Settlement"), and (2) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in the Action in exchange for a cash payment of $50 million, which has been deposited into an escrow account. Lead Plaintiff respectfully submits that the proposed Settlement is an excellent result for the Class and satisfies the standards for final approval under Rule 23(e)(2) of the Federal Rules of Civil Procedure. As detailed in the accompanying Sinderson Declaration and summarized herein, the Settlement was reached after a mediation process overseen by an experienced class action

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated November 6, 2019 (ECF No. 96-2) (the "Stipulation") or in the Declaration of Katherine M. Sinderson in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Sinderson Declaration"), filed herewith. Citations to "¶ __" refer to paragraphs in the Sinderson Declaration and citations to "Ex. __" refer to exhibits to the Sinderson Declaration.

mediator and represents a substantial percentage of the maximum damages that could be established at trial.

The Settlement is particularly favorable in light of the substantial risks of continued litigation. This was not a case with clearly false or restated financial statements or a parallel government enforcement action to support Lead Plaintiff's claims. On the contrary, the Action presented a number of significant risks to establishing both liability and damages. Defendants argued that Lead Plaintiff's claims were premised solely on the decline in FleetCor's share price that followed the release of a report issued by a well-known short-seller, Citron Research, which published a report accusing FleetCor of questionable fee practices in its North America fuel card business segment. ¶ 59. Defendants vigorously contended that no securities fraud claims could be proven, because Defendants' statements about FleetCor's revenues were not inaccurate and they had not made any misstatements to investors about their fee practices. ¶¶ 60, 62. Defendants would contend that, even if Lead Plaintiff could establish that FleetCor had perpetrated a fraud on its customers through its fee practices, it would not be able to prove that the Company defrauded investors. ¶ 59. Defendants would argue that, on the contrary, investors were fully aware that FleetCor's business model was heavily dependent upon revenue from fees, and that investors benefitted from it. *Id.*

Finally, Defendants would argue that the alleged corrective disclosures, like the Citron Report and others, could not establish loss causation because those reports consisted only of opinions about FleetCor, based on information that was previously available to the public.  ¶ 73.  Defendants also contended that Lead Plaintiff would not be able to prove the portion (if any) of the price declines following the disclosures that was related to revelation of the alleged fraud, rather than other non-fraud-related information released on those dates.  ¶ 74.  In short, there were a number of significant risks that could have resulted in the Class obtaining no recovery or a lesser recovery as a result of continued litigation.

In light of these risks, Lead Plaintiff and Lead Counsel believe that the recovery of $50 million for the Class is an excellent result.  The Settlement represents a substantial percentage of the maximum damages that could be proved at trial.  The maximum damages that could be proven at trial in this Action – assuming that Lead Plaintiff succeeded on all liability issues – range from approximately $566 million (if a jury rejected every single one of Defendants' liability and loss causation arguments) to $114.8 million (if certain of Defendants' loss causation arguments were accepted).  Thus, the Settlement represents between 9% and 44% of maximum damages, which is well above the typical level of recovery in comparable securities actions.

In addition, at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Before the Settlement was agreed to, Lead Counsel had: (i) conducted an extensive investigation into the alleged fraud, which included a thorough review of public information and interviews with 76 potential witnesses, including numerous former FleetCor employees; (ii) drafted and filed an initial complaint and a detailed amended complaint based on this investigation; (iii) successfully opposed Defendants' motion to dismiss through briefing and argument; (iv) successfully obtained certification of the Class; (v) engaged in substantial fact discovery, which included obtaining and reviewing more than 315,000 pages of documents produced by Defendants and third parties; (vi) worked extensively with a financial economics expert; and (vii) engaged in extended arm's-length settlement negotiations, including a mediation session overseen by an experienced mediator, Jed D. Melnick of JAMS. ¶¶ 15-53.

Absent the Settlement, the Parties faced the prospect of protracted litigation through the remainder of fact discovery; costly expert discovery; additional contested motions; a trial; post-trial motion practice; individual class member loss causation and damages challenges; and likely ensuing appeals. ¶¶ 56-78. The

Settlement avoids these risks and delays while providing a substantial, certain and immediate benefit to the Class in the form of a $50 million cash payment.

In light of these considerations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.  Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Class Members.  The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered that were attributable to the alleged fraud.

## **ARGUMENT**

## I.  **THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims.  *See* Fed. R. Civ. P. 23(e).  A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Eleventh Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions.  *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public

5

policy strongly favors the pretrial settlement of class action lawsuits.").

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Eleventh Circuit has held that district courts should also consider following factors set forth in *Bennett v. Behring Corp.*:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

737 F.2d 982, 986 (11th Cir. 1984); *accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but

6

"rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments.

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett* factors. *See In re Equifax Inc. Customer Data Sec. Breach Litig*., 2020 WL 256132, at *10 (N.D. Ga. Jan. 13, 2020) (reviewing final approval of class action settlement in light of both the Rule 23(e)(2) factors and *Bennett* factors).

All of the applicable factors strongly support approval of the Settlement.

## A. Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

In determining whether to approve a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). Courts consider (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See, e.g.*, *Kirkpatrick v. J.C. Bradford Co*., 827 F.2d 718, 726 (11th Cir. 1987); *Equifax*, 2020 WL 256132, at *5.

Here, Lead Plaintiff and Lead Counsel have adequately represented the Class in both their vigorous prosecution of the Action for two years and in the arm's-length negotiation of the Settlement.   Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members, and has no interests antagonistic to the interests of other members of the Class.   In addition, Lead Counsel is highly qualified and experienced in securities litigation (*see* BLB&G Firm Resume, Ex. 3A-3) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.

Accordingly, as the Court previously found in certifying the Class, Lead Plaintiff and Lead Counsel have adequately represented the Class.  *See* ECF No. 93 at 12-14 (Court's order finding Lead Plaintiff adequate and certifying Class); *see also* ECF No. 68 at 11-13 (discussion of adequacy in Lead Plaintiff's memorandum of law in support of motion for class certification).

### B.    The Settlement Was Reached Following Substantial Discovery And Arm's-Length Negotiations with an Experienced Mediator

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length."   Fed. R. Civ. P. 23(e)(2)(B).   This inquiry is comparable to the Eleventh Circuit's traditional threshold examination of whether a proposed settlement is the product of fraud or collusion between the parties.  *See Canupp v. Sheldon*, 2009 WL 4042928, at *9

(M.D. Fla. Nov. 23, 2009) ("In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arms-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel.").

The Settlement here was reached only after extensive arm's-length negotiations between experienced counsel, which included a full-day mediation session with Jed D. Melnick of JAMS, an experienced mediator of securities class actions and other complex litigation.  ¶¶ 48, 51-52.  This backdrop clearly supports approval of the Settlement.  *See Equifax*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's length and there was no collusion, where case settled after mediation with an experienced mediator); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (presence of "highly experienced mediator" pointed to "absence of collusion").

### C.   The Relief that the Settlement Provides for the Class is Adequate In Light of the Costs and Risks of Further Litigation

In determining whether a settlement is "fair, reasonable, and adequate," the

Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" as well as other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  In most cases, this will be the most important factor for the Court to consider in analyzing the proposed settlement.[2]

As discussed in detail in the Sinderson Declaration and below, continued litigation of the Action presented a number of risks that Lead Plaintiff would be unable to establish liability and damages.  ¶¶ 56-78.   In addition, continuing the litigation through trial and appeals would impose substantial additional costs on the Class and would result in extended delays before any recovery could be achieved.  The Settlement, which provides a $50 million cash payment for the benefit of the Class, avoids those further costs and delays.  Moreover, the Settlement represents a substantial percentage of the maximum damages that could be established at trial, and thus represents a very favorable outcome in light of the litigation risks.  ¶¶ 75-76.  All of these factors strongly support approval of the Settlement.

### 1.     The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiff and Lead Counsel believe that the claims asserted

---

[2] Indeed, this factor under Rule 23(e)(2)(C) encompasses four of the six factors of the traditional *Bennett* analysis:  "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation."  737 F.2d at 986.

against Defendants in the Action are meritorious, they recognize that this Action presented a number of substantial risks to establishing both liability and damages.

### (a)     Risks To Proving Liability

Lead Plaintiff would have faced substantial challenges in proving that Defendants' statements were materially false and misleading when made and that the statements were made with intent to defraud investors.

**Falsity.**  Defendants would have continued to argue that their statements of FleetCor's historical revenue were accurate and did not give rise to any duty to disclose the Company's allegedly fraudulent fee practices.   Specifically, Defendants would have argued that their factual recitations of past revenues and earnings could not be misleading; that the statements concerning FleetCor's revenue did not even mention the manner in which FleetCor generated revenue from fees; and that the statements contained no projections of future performance that would arguably impose a duty on Defendants to disclose that its business model or fee practices were unsustainable.   ¶¶ 59-61.   Defendants would also continue to argue that Defendants' statements that FleetCor's fuel cards were "fee free" were not actionable because they were never included in any statement made to investors and that FleetCor's investors were told on multiple occasions that the Company did obtain revenue from fees.  ¶ 62.

**Materiality.**  Lead Plaintiff also faced challenges in proving that FleetCor's allegedly fraudulent fee practices materially impacted the Company's total revenue.  If it failed to do so, the alleged misstatements would be immaterial.  For example, Defendants would argue that Lead Plaintiff would not be able to show that the 10% growth of FleetCor's revenue in 2016 was derived from improper fee practices.  ¶¶ 63-64.

**Scienter.**  Even if Lead Plaintiff succeeded in proving that Defendants' statements were materially false, Lead Plaintiff would have faced hurdles in proving that Defendants made the statements with the intent to mislead investors or were severely reckless in making the statements.  ¶¶ 65-71.  For example, there was a risk that Lead Plaintiff would not be able to prove that Defendants knew that the fee initiatives instituted by the Company were illegal or fraudulent at the moment that the revenue statements were made. ¶ 67.  Indeed, Defendants claim that the Company's fee practices were proper and within the scope of the agreements governing its fuel cards.  *Id*.  Moreover, Defendants would argue that even if Lead Plaintiff could prove that Defendants knew that the Company's fee practices were wrongful, they could (at most) show intent by Defendants to defraud *consumers* by falsely marketing their fuel cards as "no fee," but could not

prove that there was an intent to deceive *investors*.  ¶ 68.[3]

While Defendants unsuccessfully asserted certain of these arguments in their motion to dismiss, when the Court was required to accept all allegations in the Complaint as true, there was a significant possibility that Defendants could have succeeded in these arguments at subsequent stages of the litigation when allegations in the Complaint would need to be supported by admissible evidence. ¶ 70.  On all these issues, Lead Plaintiff would have to prevail at several stages – on a motion for summary judgment and at trial, and if it prevailed on those, on the appeals that would likely to follow – which would likely have taken years.  ¶ 71.

(b)     **Risks To Proving Damages and Loss Causation**

Even assuming that Lead Plaintiff overcame the above risks and successfully established liability, Lead Plaintiff would have confronted considerable additional challenges in establishing loss causation and damages.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to

---

[3] Lead Plaintiff also faced challenges in proving scienter based on the Individual Defendants' sales of FleetCor stock during the Class Period.  Defendants would continue to argue that the Individual Defendants' sales were not unusual in amount when considering their holdings of FleetCor stock options, and their pattern of selling remained consistent during the Class Period as it did before.  ¶ 69. Moreover, Defendants would proffer evidence that the Individual Defendants had actually *increased* their holdings of FleetCor shares during the Class Period.  *Id.*

recover'"). While Defendants raised the issue of loss causation in their motion to dismiss and the Court rejected that argument, the threshold for alleging loss causation at the pleading stage is not onerous, and these arguments could have been presented with more force at summary judgment and trial where Defendants' position would have been supported by expert testimony opining that there was *no* loss causation, and limited or no damages. ¶ 72. Risks related to loss causation and damages were an important driver of the settlement value of this case. *Id*.

Defendants have argued and would continue to claim that the March 1, 2017 Capitol Forum article, the April 4, 2017 Citron article, and the April 27, 2017 release of follow-up articles were not corrective disclosures. ¶ 73. Defendants would argue that those reports did not reveal any new information and, instead, were full of opinions about FleetCor based on information already available to the public. Accordingly, Defendants will contend that any decline in stock price could not attributable to these developments. *Id*. Moreover, even if the Court accepted the initial March 1, 2017 report as a corrective disclosure, Defendants would argue that the subsequent reports of April 4, 2017 and April 27, 2017 were merely repetitions of its allegations, and thus could not serve as corrective disclosures. *Id*. If that argument were accepted, potential damages for the Class would be reduced by roughly 80%. ¶ 76.

Moreover, Defendants would contend that Lead Plaintiff bears the burden of proof in "disaggregating" the impact of confounding, non-fraud information from that of any actionable disclosures and that Lead Plaintiff would not be able to do so. ¶ 74. For example, Defendants would argue that Lead Plaintiff would not be able to disaggregate the stock price effects of alleged corrective disclosures contained in the May 1, 2017 Chevron Petition from the numerous confounding events surrounding that date—including two May 1, 2017 press releases disclosing FleetCor's financial results from the first quarter of 2017, its plans to acquire Cambridge Global Partners, several negative analyst reports, and the bulk of the disclosures in the Chevron Petition that were unrelated to the alleged fraud. *Id*.

The resolution of these disputed issues would have boiled down to a "battle of experts," and Defendants would undoubtedly have been able to present a well-qualified expert who would opine that the Class's damages were small or nonexistent. As Courts have long recognized, the uncertainty as to which side's expert's view might be credited by the jury presents another substantial litigation risk in securities actions. *See Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 11336122, at *8 (N.D. Ga. Oct. 20, 2008) ("The reaction of a jury to such expert testimony is highly unpredictable and '[i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for

Defendants,' and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs contended").

### 2. The Settlement Represents a Substantial Percentage of Likely Recoverable Damages

Lead Plaintiff submits that the $50 million Settlement is also a very favorable result when considered in relation to the maximum damages that could be established at trial. Assuming that Lead Plaintiff prevailed on all liability issues at trial (which was far from certain), the maximum damages that Lead Plaintiff would be able to prove was approximately $566 million. ¶ 76. If Defendants succeeded with respect to certain of their loss causation and damages arguments, damages would be reduced to approximately $114.8 million (and could be further reduced to zero if certain other arguments were accepted). *Id*. Accordingly, the Settlement represents approximately 9% to 44% of maximum damages. *Id*. And, even if Lead Plaintiff were successful at trial, Defendants could have challenged the damages of each large class member in post-trial proceedings, substantially reducing any aggregate recovery. ¶ 77.

The recovery provided by the Settlement, even at the 9% level when compared to absolute maximum damages, is well above the average level of recovery in comparable actions. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class

action settlement representing "5.5% of maximum damages and 10% of the most likely damages" and referring to this as an "excellent" recovery); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").  The outcome is particularly favorable here because this action was riskier than the norm (as it was lacking any financial restatement by the Company or parallel enforcement action) and because loss causation issues could have substantially reduced the maximum damages achievable at trial.

### 3.      The Costs and Delays of Continued Litigation Support Approval of the Settlement

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement.

While this case settled after certification of the Class and after substantial document discovery had occurred, achieving a litigated verdict in the Action would have required substantial additional time and expense.  In the absence of the Settlement, achieving a recovery for the Class would have required (i) the conclusion of fact discovery (including taking numerous depositions, of which 15 had already been noticed); (ii) conducting complex and expensive expert discovery; (iii) briefing an expected motion for summary judgment; (iv) a trial involving substantial fact and expert testimony; and (v) post-trial motions.  Finally,

whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict.  The foregoing would pose substantial expense for the Class and delay the Class's ability to recover – assuming, of course, that Lead Plaintiff and the Class were ultimately successful on their claims.

In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery of $50 million for members of the Class.

### 4. All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors also supports approval of the Settlement or is neutral.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation.  Here, the proceeds of the Settlement will be distributed to class members who submit

eligible Claim Forms with required documentation to the Court-appointed Claims Administrator, Epiq Systems ("Epiq"). Epiq, an independent company with extensive experience handling the administration of securities class actions, will review and process the claims under the supervision of Lead Counsel, will provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claim by the Court, and will then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.[4] This type of claims processing is standard in securities class actions and has long been found to be effective.

Second, the relief provided for the Class in the Settlement is also adequate when the terms of the proposed award of attorney's fees are taken into account. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation. Most importantly with respect to the Court's consideration the fairness of the Settlement, is the fact that approval of attorneys' fees are entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the

---

[4] The Settlement is not a claims-made settlement. If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted. *See* Stipulation ¶ 13.

Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶ 18.

Lastly, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  Here, the only such agreement is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which FleetCor would be able to terminate the Settlement if the number of Class Members who request exclusion from the Class reaches a certain threshold.  This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.  *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018).

### D.   The Settlement Treats Class Members Equitably Relative to Each Other

The proposed Settlement also treats members of the Class equitably relative to one another.  As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on the transactions in FleetCor stock.  Lead Plaintiff will receive the same level of *pro rata* recovery (based on the Recognized Claim as calculated under the Plan of Allocation) as all other Class Members.

**E.     Other Factors Considered by the
        Eight Circuit Support Approval of the Settlement**

Other factors considered by the Eleventh Circuit, including the reaction of

the Class to the Settlement and the stage of proceedings at which the Settlement

was achieved, *see Bennett*, 737 F.2d at 986, also support approval of the

Settlement.  With respect to the reaction of the Class, while the deadline set by the

Court for Class Members to exclude themselves or object to the Settlement has not

yet passed, to date no objections to the Settlement or the Plan of Allocation have

been received and no requests for exclusion have been received, despite the

mailing of nearly 60,000 Notices to potential Class Members. ¶ 81, 84.[5]

The stage of proceedings at which the Settlement was achieved also support

its approval.  As discussed above, the Settlement was only reached after a detailed

investigation undertaken by Lead Counsel prior to filing the Complaint; extensive

legal research in preparing the Complaint and the briefing in opposition to

Defendants' motion to dismiss; certification of the Class; substantial fact

discovery, including the review of 315,000 pages of documents produced by

Defendants and non-parties; extensive consultation with an expert in financial

---

[5] The deadline for submitting objections and requesting exclusion from the Class is
March 24, 2020.  As provided in the Preliminary Approval Order, Lead Plaintiff
will file reply papers no later than April 7, 2020 addressing any requests for
exclusion and objections that may be received.

economics; and extended settlement negotiations, which including exchanging detailed mediation statements and a full-day mediation. ¶ 99. As a result of these efforts, "Class Counsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation." *Francisco v. Numismatic Guar. Corp.*, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008). Accordingly, this consideration further supports approval of the Settlement.

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

## II.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

The standard for approval of a plan of allocation of the settlement funds is the same as that for approving a settlement: whether it is "fair, adequate and reasonable and is not the product of collusion between the parties." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). A plan of allocation need not be precise, but will be found fair and reasonable where there is a "rough correlation" between class members' injuries and the settlement distribution. *Id*. at 240; *see Vinh Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[a]n allocation formula need only have a reasonable, rational basis"). In determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel. *See*

*Yang*, 2014 WL 4401280, at *9.

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Class Members who submit valid Claim Forms.  In developing the Plan, Lead Plaintiff's damages expert calculated the amount of estimated artificial inflation in the price of FleetCor common stock which allegedly was proximately caused by Defendants' allegedly misleading statements by considering the price changes in FleetCor common stock in reaction to the alleged corrective disclosures, adjusting for price changes attributable to market and industry factors.  Notice ¶¶ 55-56.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of FleetCor common stock during the Class Period listed in the Claim Form and for which adequate documentation is provided.  Notice ¶ 59.  In general, the Recognized Loss Amount will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase and sale price of the stock, whichever is less.  *Id*. ¶¶ 58, 60.

Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class

Members who suffered losses as result of the alleged misconduct.  ¶¶ 86-93.  To date, no objections to the proposed Plan of Allocation have been received.  ¶ 94.

## III.   NOTICE SATISFIED RULE 23 AND DUE PROCESS

The Notice to the Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – i.e., it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005).

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards.  The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  In accordance with the Court's Preliminary Approval Order, Epiq began mailing copies of the Notice and Claim Form to potential Class Members on January 7, 2019.  *See* Villanova Decl. ¶¶ 3-5.  As of February 21, 2020, Epiq had disseminated 59,889  copies of the Notice Packet to potential Class Members and nominees.  *See id*. ¶ 8.  In addition,

Lead Counsel caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on January 17, 2020.  *See id*. ¶ 9. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).

On February 29, 2020, after nearly 60,000 Notice Packets had already been mailed, Epiq experienced a cyber incident that led it to take its computer systems down as part of its comprehensive response plan.  *See* Villanova Decl. ¶¶ 12-13. As a result, the toll-free number and website for the Settlement were temporarily disabled, but have since been restored.  *Id*.   The incident also resulted in the database that Epiq uses for mailing Notice Packets becoming unavailable and that database has yet to be restored.  A small number of requests for Notice Packets, which were all received after the Court-ordered deadline for such requests from brokers and nominees, were received by Epiq shortly before or after the incident and will be fulfilled as soon as its system becomes operational again.  *Id*.

## CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: March 10, 2020                Respectfully submitted,

/s/ *Katherine M. Sinderson*
Salvatore J. Graziano (admitted *pro hac vice*)
Katherine M. Sinderson (admitted *pro hac vice*)
Scott R. Foglietta (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554 1400
Fax: (212) 554 1444
Salvatore@blbglaw.com
Katiem@blbglaw.com
Scott.Foglietta@blbglaw.com

*Counsel for Lead Plaintiff City of Sunrise
General Employees' Retirement Plan and Lead
Counsel for the Class*

H. Lamar Mixson
Georgia Bar No. 514012
Amanda Kay Seals
Georgia Bar No. 502720
**BONDURANT MIXSON &
   ELMORE, LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Tel: (404) 881-4100
Fax: (404) 881-4111
mixson@bmelaw.com
seals@bmelaw.com

*Liaison Counsel for Lead Plaintiff City of
Sunrise General Employees' Retirement Plan*

Stuart Kaufman (admitted *pro hac vice*)
**KLAUSNER, KAUFMAN, JENSEN AND LEVINSON**
7080 NW 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff City of Sunrise General Employees' Retirement Plan*

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with 14 point Times New Roman, one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ Katherine M. Sinderson
Katherine M. Sinderson

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2020, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to all attorneys of record.

/s/ Katherine M. Sinderson
Katherine M. Sinderson